**MOGINRUBIN LLP**
Daniel J. Mogin (SBN No.  95624)
Timothy Z. LaComb (SBN 314244)
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone:     (619) 687-6611
Facsimile:     (619) 687-6610
dmogin@moginrubin.com
tlacomb@moginrubin.com

Don Bivens PLLC
Don Bivens
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone:     (602) 708-1450
don@donbivens.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED INDIVIDUALS,<br><br>        Plaintiff,<br><br>        vs.<br><br>EATING RECOVERY CENTER LLC,<br><br>        Defendant. | Case No: 3:23-cv-05561-VC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>(1) Violation California Invasion of Privacy Act, § 631;<br>(2) Violation of California's Confidentiality of Medical Information Act, § 56.10(a);<br>(3) Violation of California's Confidentiality of Medical Information Act, § 56.10(d);<br>(4) Violation of California's Confidentiality of Medical Information Act, § 56.101;<br>(5) Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; and<br>(6) Unjust Enrichment.<br><br>**<u>CLASS ACTION</u>**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Eating Recovery Center LLC ("ERC"). The allegations contained herein are based on Plaintiff's personal knowledge of facts pertaining to herself and upon information and belief, including further investigation conducted by Plaintiff's counsel:

## I.    SUMMARY OF THE CASE

1.    This is a class action lawsuit brought on behalf of all California citizens who had their personal communications and/or medical information unlawfully shared with, disclosed to, or intercepted by Meta Platforms Inc. ("Meta") due to ERC imbedding the Meta Pixel on its websites.

2.    There are few pieces of information more personal, sensitive, and valuable than a person's medical information. This is particularly true when medical information pertains to subjects like eating disorders or mental disorders. As a result, such information is vigorously protected by state and federal laws.

3.    ERC is a health care provider offering virtual and in-person treatment for eating disorders and mental disorders. Through its websites, eatingrecoverycenter.com and pathlightbh.com, users can access, schedule, or learn about these services and do things like take diagnostic quizzes or research symptoms, conditions, and treatment through the internal search bar.

4.    When conducting many of these actions, users communicate private and medical information to ERC and reasonably assume ERC protects this information. Not only is ERC legally obligated to protect this information, but it also assures users their information is "100% confidential" and states in its Privacy Policy that it will "NEVER share or sell" users' personal information with third parties.[1]

5.    Unfortunately, this is false. Unbeknownst to users, ERC has imbedded the Meta Pixel on its websites, which is a snippet of code that enables Meta to intercept, read, and learn

---

[1] https://www.eatingrecoverycenter.com/; https://www.eatingrecoverycenter.com/privacy-policy.

2

the contents or meaning of communications between users and ERC in real time. As a result, when users submit personal and/or medical information on ERC's websites, the Pixel transmits this information to Meta. For ERC users, this information includes: (i) the medical treatment users are receiving or considering; (ii) answers to diagnostic quizzes, which includes information about users' conditions and symptoms; (iii) locations where users are obtaining or considering receiving treatment, which indicates medical conditions and types of treatment; (iv) support groups for which users register, which indicates medical conditions and types and location of treatment; and (v) all information entered into the websites' internal search bar, which can indicate medical conditions and types of treatment. Meta can use information intercepted by the Pixel, provided by ERC, and/or already possessed by Meta to match the private and medical information to specific individuals.

6.     The transmission of information through the Pixel is instantaneous. Meta often receives the information even before ERC. The existence of the Pixel and transmission of information is intentionally invisible and occurs without obtaining consent by ERC users.

7.     ERC and Meta engage in this unlawful disclosure of data for pecuniary reasons. In exchange for sending information to Meta through the Pixel, ERC receives analytics and other information from Meta that enables it to more effectively advertise its services, increasing revenue as a result. In exchange for improving ERC's marketing efforts, Meta receives confidential and highly valuable data for tens of thousands of individuals, which it uses to improve advertising profiles for individuals and increase the value of its ad space and ad services.

8.     Through these unlawful actions, ERC has violated California's Invasion of Privacy Act, Cal. Penal Code § 631; has violated California's Confidentiality of Medical Information Act, Cal. Civil Code §§ 56.10(a) and (d), and 56.101; has violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., and has been unjustly enriched. These violations have harmed Plaintiff and Class Members, and Plaintiff seeks to remedy these harms through this action. Plaintiff seeks statutory damages, compensatory

damages, punitive damages, and injunctive relief to enjoin ongoing unlawful data disclosures and alert users' whose personal and/or medical information has been intercepted by Meta.

## II.    JURISDICTION AND VENUE

9.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 putative Class Members (defined below), and minimal diversity exists because a significant portion of putative Class Members are citizens of a state different than ERC.

10.    The Court has personal jurisdiction over ERC because ERC transacts substantial business in this District and has conducted systematic and continuous activities in California, including operating two clinics in California, conducting virtual services for thousands of California residents, and having an estimated 100,000+ unique California residents visit its websites annually.

11.    ERC has purposefully directed conduct at California and its residents and there is a substantial nexus between that conduct and the claims asserted herein that makes the exercise of jurisdiction over ERC reasonable.

12.    ERC directly and specifically markets to California residents through its websites, operating their websites in a manner that is expressly aimed at California and encourages California residents to visit and conduct commercial and other activity via its websites. Through these marketing efforts, ERC actively appealed to and profited from California residents.

13.    ERC's websites include several webpages specifically marketing to California residents, including the following:[2]

---

[2] https://www.eatingrecoverycenter.com/resource/california-eating-disorder-treatment.

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



5

Eating Recovery At Home is the leading virtual intensive outpatient program (IOP) for eating disorders. This comprehensive program is available to patients living in **California**. As effective as in-person treatment, the program fits seamlessly into your everyday life. Through ongoing connection and intensive support, you'll learn to navigate life's stressors and build resilience.

Our licensed multidisciplinary team members use a proven, evidence-based curriculum to treat eating disorders in children, teens and adults—and have had extensive training in telebehavioral health ethics and service delivery to provide effective, ethical treatment and group collaboration in a virtual setting.

This program is an ideal choice for anyone who needs additional outpatient support, a more flexible and convenient treatment option, is reluctant to receive treatment in-person or is ready to step down from partial hospitalization program (PHP) treatment.

## What You Can Expect

- Coverage by most major commercial insurers
- Same proven treatment offered on-site from the comfort of home
- Specialized experienced care team includes licensed therapist, registered dietitian, consulting physician and care coordinator
- Group therapy sessions with the same small peer group and clinical team provides sense of belonging
- Extensive family involvement, education and support
- Robust alumni network and resources available post-treatment
- HIPAA-secure technology in a safe, confidential environment

**Learn About Virtualcare**

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

6

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Eating Disorder Treatment Programs in <mark>California</mark>

Eating Recovery Center offers multiple levels of care for eating disorder treatment in <mark>California</mark>. With treatment centers located in Irvine and Sacramento, we provide in-person intensive outpatient and partial hospitalization programs. Virtual intensive outpatient treatment is available statewide.

In <mark>California</mark>, we provide evidence-based treatment and aftercare support for anorexia nervosa, avoidant/restrictive food intake disorder (ARFID), binge eating disorder, bulimia nervosa, compulsive overeating, diabulimia and other specific feeding and eating disorders (OSFED) for adults, adolescents and children of all genders, age 10 and up.

**Struggling with an eating disorder?**

One conversation can make all the difference. Connect with us today.

| Get Help Now | 866-468-7925 |

100% Confidential

Condition
- Any -

Level of Care
- Any -

Who we treat
- Any -



### Eating Recovery Center <mark>California</mark> - Virtual Programs

Virtual Programming
866-438-8756

Who we treat:  Adult,  Child and Adolescent
Level of Care:  Virtual Intensive Outpatient
Conditions We Treat:  Eating Disorders,  Binge Eating Disorder

🖥 Virtual Programming



### Eating Recovery Center Irvine

114 Pacifica #450, Irvine, CA 92618
949-504-4673

Who we treat:  Adult,  Child and Adolescent
Level of Care:  On-site Intensive Outpatient,  Partial Hospitalization
Conditions We Treat:  Eating Disorders,  Orthorexia,  Anorexia Nervosa,  ARFID,  Atypical Anorexia,  Bulimia Nervosa,  Compulsive Overeating,  Diabulimia,  OSFED

Treatment & Services     Conditions     Programs by State     Insurance & Admissions     Treatment at Home     Education & Support Groups



### Eating Recovery Center Sacramento

3610 American River Dr, Suite 140, Sacramento, CA 95864
916-574-1000

Who we treat:  Adult,  Child and Adolescent
Level of Care:  On-site Intensive Outpatient,  Partial Hospitalization
Conditions We Treat:  Eating Disorders,  Orthorexia,  Anorexia Nervosa,  ARFID,  Atypical Anorexia,  Bulimia Nervosa,  Compulsive Overeating,  Diabulimia,  OSFED



FIRST AMENDED COMPLAINT

14.    In some instances, ERC advertises its California-based services while simultaneously requesting personal and medical information that will be sent to Meta via the Pixel. For example, the following screenshot is a webpage on ERC's website advertising virtual outpatient services for eating disorders to California residents and simultaneously requesting confidential private and medical information concerning users' conditions and symptoms:



FIRST AMENDED COMPLAINT

15.    While the above screenshots were taken from ERC's eating disorder website (eatingrecoverycenter.com), its mental health disorder website (pathlightbh.com), includes virtually identical marketing materials specifically targeting California residents.[3]

16.    ERC markets directly and continuously to individual California residents after learning they are California residents. For example, after Plaintiff provided information to ERC that demonstrated she was a California resident, ERC sent (and continues to send) Plaintiff targeted emails and Facebook ads directing her to ERC's websites, including through links to ERC's homepages, sign-ups for ERC support groups, blogs on ERC's websites, podcasts on ERC's website, and virtual events offered through ERC's websites. Plaintiff estimates that ERC sends targeted advertisements to her through Facebook or email five (5) times per week and has done so throughout the Class Period (defined below).

17.    ERC pays fees to market directly to California residents through third-party platforms like Google. For example, when Plaintiff enters the search phrase "eating disorder treatment in California" into a Google search bar, ERC is the *first* sponsored website listed in the search results. To achieve this position for this search phrase, ERC must pay a fee to Google and include material responsive to the search on its website. Google also allows advertisers to select the geographic regions in which they advertise, with fees increasing as more regions are included. Therefore, ERC affirmatively chose to and paid additional fees to market to California residents.

---

[3] *See*, *e.g.*, https://www.pathlightbh.com/treatment-centers/california (describing treatment programs and locations for California residents); https://www.pathlightbh.com/virtual-treatment/california (describing Pathlight's virtual treatment options "for patients living in California"); https://www.pathlightbh.com/sites/default/files/file/2024-02/PAL013.07A_CA_RegionalSheet_020924_Digital.pdf (regional sheet for California residents); https://www.pathlightbh.com/news/eating-recovery-center-expands-binge-eating-treatment-recovery-program-sacramento (article announcing new treatment center and programs in Sacramento, CA).

FIRST AMENDED COMPLAINT

18.     ERC's websites are highly interactive. Users are prompted to provide various types of information on ERC's websites when doing things like taking diagnostic quizzes, scheduling assessments, signing up for support groups, watching webinars, researching conditions and treatment, and using virtual services.

19.     ERC generates a substantial portion of its revenue from California. ERC has brick and mortar clinics in fourteen states but only has multiple clinics in eight states, including California. ERC also provides virtual treatment and services to thousands (potentially tens of thousands) of California residents annually. Based on web traffic analysis data, more than 100,000 unique California residents visit ERC's websites on an annual basis. And California also has more residents with eating disorders than any other state.

20.     Plaintiff's claims and injuries arose out of and relate to ERC's California-related activities. ERC entered into an agreement or conspiracy with a California-headquartered company (Meta) to engage in the unlawful activity alleged herein.

21.     Plaintiff engaged with ERC's websites because ERC offers in-person and virtual services in California. But-for ERC's California-specific locations and services, Plaintiff would not have engaged with ERC's website, would not have had her private and medical information intercepted by Meta, and would not have suffered the injuries alleged herein.

22.     Plaintiff suffered her injuries in California and had her data intercepted by a California company (Meta) while sending the communication from California. Given that Meta is headquartered in California, it is likely Plaintiff's communications were directed to a location in California.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because ERC transacts business in this District and a substantial portion of the events giving rise to the claims alleged herein occurred in this District.

### III.    PARTIES

24.     Plaintiff Jane Doe is a resident of California. Plaintiff provided private and medical information to ERC that was intercepted by Meta via the Pixel. On ERC's websites, Plaintiff has (i) taken multiple diagnostic quizzes, including those for anorexia and bulimia; (ii)

filled out forms with information concerning her diagnosis and condition; (iii) scheduled follow-up calls with ERC, which reveal her condition and treatment; (iv) scheduled clinical assessments, which reveal her condition and treatment, and (v) researched several topics pertaining to her specific condition, symptoms, and treatment using the internal search bar on ERC's websites, including: residential programs, locations, treatment levels, and insurance coverage. Plaintiff has, and at all relevant times had, a Facebook account.

25.    Defendant ERC is an international center for eating disorders and recovery, as well as for mood, anxiety, and trauma-related disorders. ERC's principal place of business is in Denver, Colorado. It has thirty-five centers in the US, including two in California. It also offers virtual services for thousands or tens of thousands of California residents. ERC employs roughly 1,400 individuals and generates roughly $280 million in annual revenue.

26.    The acts alleged to have been done by ERC were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of ERC's affairs.

27.    ERC, through its subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

## IV.    CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action on behalf of herself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All persons who reside in California and whose medical or private information or communications were obtained by, shared with, or disclosed to Meta during the Class Period as a result of using ERC's websites (the "Class").

> Specifically excluded from the Class are Defendant and its officers, directors or employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of Defendant. Also excluded from the Class are any attorneys appearing in this matter, any federal, state or local governmental entities, any judicial officer presiding over this

11

action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

29.     The Class Period is the full extent of the applicable limitations period, including any tolling or other equitable considerations that extend the limitations period.

30.     <u>Class Identity:</u> The Class is readily identifiable and is one for which records should exist.

31.     <u>Numerosity:</u> Class Members are so numerous and geographically dispersed that joinder is impracticable. Tens of thousands of California residents had their medical or private information or communications obtained by, shared with, or disclosed to Meta because of using an ERC website.

32.     <u>Typicality:</u> Plaintiff's claims are typical of the claims of Class Members because Plaintiff is a California resident who had her private and medical information and communications obtained by, shared with, and disclosed to Meta because of using ERC's website.

33.     Defendant has acted in a manner that applies generally to Plaintiff and all Class Members. Each Class Member has been similarly impacted by Defendant's failure to comply with California law concerning the dissemination and protection of communications and medical information.

34.     <u>Commonality:</u>   There are questions of law and fact common to the Class, including, but not limited to:

     (a)     whether Defendant violated § 631 of CIPA by aiding, agreeing with, and conspiring with Meta to disclose, share with, or permit Meta to collect Class Members' communications made while using ERC's website;

     (b)     whether Defendant violated § 56.10(a) or (d) of the CMIA by disclosing or sharing Class Members' medical information with Meta;

     (c)     whether Defendant was unjustly enriched by disclosing, sharing with, or permitting the collection of Class Members' communications and medical information with Meta to increase advertising effectiveness;

FIRST AMENDED COMPLAINT

(d)      whether Defendant constitutes a "provider of health care" as used in § 56.10 of the CMIA;

(e)      whether Class Members' communications with ERC were obtained by Meta while in transit;

(f)      whether ERC obtained consent from Class Members to share, disclose or permit the collection of communications and medical information made while using ERC's websites; and

(g)      whether the Pixel is a "machine, instrument, or contrivance" as the term is used by § 631 of CIPA.

35.     <u>Predominance</u>: The above-listed questions of law and fact common to all Class Members predominate over questions that may affect individual Class Members.

36.     <u>Adequacy</u>:  Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. Plaintiff has also retained counsel competent and experienced in the prosecution of class actions and complex data privacy cases to represent her and the Class.

37.     <u>Superiority and Manageability</u>: A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. The individual prosecution of separate actions by individuals would lead to repetitive adjudication of common questions of fact and law and create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant.  There will be no difficulty in the management of this action as a Class action.

## V.  FACTUAL ALLEGATIONS

### A.  Background

38.     Meta is one of the largest companies in the world and generates a vast majority of its revenue from selling advertising on its websites and providing advertising services to third parties. Meta's advertising superiority largely stems from the vast amount of personal data it collects. Meta collects this information when people use its apps, like Facebook, and when people use third-party apps and websites that include data collecting devices like the Pixel.

39.     One way in which Meta collects information when people use third-party websites is by offering the website operators "Business Tools" that "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[4]

40.     In exchange for the Business Tools, Meta requires website operators provide it with, or permit it to intercept data concerning their users. Website operators can either provide this information manually or allow Meta to collect it automatically through code placed on the websites.

41.     One such piece of code is the Pixel, which website operators can integrate into their websites. The Pixel "tracks the people and type of actions they take."[5] When a user accesses a website with the Pixel and takes certain actions on that website, the Pixel directs the user's browser to send a separate message to Meta's servers, i.e., re-direct the user's communication to Meta while the communication is in transit. When a California resident has its data intercepted by Meta (a California-headquartered company), then Meta intercepts a communication that was sent from a place within California and likely redirected to a place within California. Meta's code initiates this message simultaneously as the actions and communications on the website take place. The actions that trigger the Pixel include clicking on a page, inputting information, using a search bar, adding something to a cart, scrolling on the page, or providing answers to questions.

42.     The Pixel transmission to Meta includes, by default, data about the page that was being viewed when the event was triggered and the IP address of the browser. The transmission can also include far more detailed information about the user, including full names, email addresses, phone numbers, birthdays, mailing addresses, and other unique information provided to websites.

---

[4] https://www.facebook.com/help/adsmanagerbuiltin/331509497253087.

[5] https://www.facebook.com/business/goals/retargeting.

FIRST AMENDED COMPLAINT

43.     Meta views the information collected by the Pixel and connects it to the corresponding website visitor, which occurs regardless of whether the user has a Facebook account. For visitors with a Facebook account, the Pixel "relies on Facebook cookies, which enable [Facebook] to match . . . website visitors to their respective Facebook User accounts."[6] These cookies can connect website visitors to their Facebook profile regardless of whether they are logged into Facebook. If a Facebook user is not logged into Facebook or has blocked Facebook's cookies, then Meta can connect the intercepted data to the user's account through "Advanced Matching."[7]

44.     For website visitors without a Facebook account, Meta still collects, views, and uses the visitor's data.[8] For non-Facebook visitors, Meta creates what are commonly referred to as "shadow profiles." When Meta receives data concerning someone with a shadow profile, it connects that data to the profile, enabling it to target ads to the non-users.

45.     When health care providers place the Pixel on their websites, the information they permit Meta to collect often includes protected medical information, including information concerning the user's diagnosis, condition, or treatment.

46.     Typical internet users cannot detect whether the Pixel is present on a given website. The Pixel's existence is intentionally invisible to the naked eye and is not apparent from commonly visible website data. To detect the presence of the Pixel, users must use special tools or software typically reserved for web developers. And even if users can detect the presence of the Pixel, they cannot determine which information it is collecting and sending to Meta without understanding the coding terms, hashed values, and specialized abbreviations unique to the Pixel. Thus, the Pixel allows Meta to be a silent third party watching whatever users are doing on certain websites.

---

[6] Meta, Meta Pixel (2023), https://www.facebook.com/business/tools/meta-pixel.

[7] How We Built a Meta Pixel Inspector – The Markup.

[8] How We Built a Meta Pixel Inspector – The Markup.

FIRST AMENDED COMPLAINT

47.    Both Meta and website operators benefit financially from the Pixel. Meta offers the Pixel to website operators as an analytics and advertising tool that operators use to increase advertising effectiveness and revenue. According to Meta, the Pixel "can help you better understand the effectiveness of your advertising and the actions people take on your site" and "log[s] when someone takes an action on your website."[9] It also enables website operators to "have options to reach those customers again through future Facebook ads."[10]

48.    In exchange for helping website operators with the effectiveness of their advertising, Meta receives data regarding the website's users. Meta uses this information to improve the quality and detail of its ad profiles for each individual user, increase effectiveness of personalized content delivery, increase the value of its advertising network, and improve its machine-learning algorithms. All of this is geared toward improving Meta's ability to identify and target users through directed advertising and increase the value of its ad space and ad services.

**B.    ERC Violates CIPA, the CMIA, and other Laws through its use of the Pixel**

49.    ERC's websites are highly interactive and permit users to do several things. From links on just the home page, users can sign up for support groups, schedule assessments, and learn about various eating disorders and mood, anxiety, or trauma-related disorders. Users can also take self-assessment quizzes to determine condition and necessary treatment. And users can research symptoms, conditions, and treatments through the internal search bars on ERC's websites.

50.    Unbeknownst to users, and despite claiming near the top of the home page that information is "100% Confidential," ERC unlawfully shares much of this information with Meta without users' consent via the Pixel. The information ERC enables Meta to collect includes: (i) medical treatment users are seeking; (ii) answers to diagnostic quizzes, which reveals symptoms and conditions; (iii) locations where users are seeking treatment, which

---

[9] https://www.facebook.com/business/tools/meta-pixel;
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[10] https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

FIRST AMENDED COMPLAINT

indicates the type of treatment users are seeking; (iv) the support groups for which users register, which discloses medical conditions; (v) users' scheduling of appointments through the site, which discloses conditions and treatment; and (vi) content entered into the websites' internal search bar, which can disclose medical condition, symptoms, and/or treatment.

51.    ERC also shares information that ensures Meta can connect the medical information to specific individuals, including users' IP addresses associated with their browser and Facebook IDs ("FID"). An FID uniquely identifies an individual's Facebook user account. Anyone who possesses a person's FID can use this identifier to quickly and easily locate, access, and view the corresponding Facebook profile.

52.    The following diagram shows the information intercepted by the Pixel when a person with a Facebook account searches "eating disorder" on ERC's internal search bar, which includes the search terms and the user's FID:

:authority: www.facebook.com
:method: GET
:path: /tr/?id=878621809183024&ev=Microdata&dl=https%3A%2F%2Fwww.eatingrecoverycenter.com%2[Fsearch%3Fkeyword%3Deating%2520disorder]&rl=https%3A%2F%2Fwww.eatingrecoverycenter.com%2Finsurance&if=false&ts=1676824623114&cd[DataLayer]=%5B%5D&cd[Meta]=%7B%22title%22%3A%22Search%20%7Cb20Eating%20Recovery%20Center%22%2C%22meta%3Adescription%22%3A%22Browse%20our%20site%20for%20physician%20and%20leadership%20bios%2C%20resources%2C%20locations%2C%20care%20options%2C%20and%20more.%20Eating%20Recovery%20Center%20is%20here%20to%20assist%20in%20any%20way%20we%20can.%22%7D&cd[OpenGraph]=%7B%22og%3Asite_name%22%3A%22Eating%20Recovery%20Center%22%2C%22og%3Aurl%22%3A%22https%3A%2F%2Fwww.eatingrecoverycenter.com%2Fsearchk%22%2C%22og%3Atitle%22%3A%22Search%20%7Cb20Eating%20Recovery%20Center%22%2C%22og%3Adescription%22%3A%22Browse%20our%20site%20for%20physician%20and%20leadership%20bios%2C%20resources%2C%20locations%2C%20care%20options%2C%20and%20more.%20Eating%20Recovery%20Center%20is%20here%20to%20assist%20in%20any%20way%20we%20can.%22%7D&cd[Schema.org]=%5B%5D&cd[JSON-LD]=%5B%5D&sw=1920&sh=1080&v=2.9.96&r=stable&a=tmgoogletagmanager&ec=1&o=30&fbp=fb.1.1676646470419.132868203&it=1676824622517&coo=false&es=automatic&tm=3&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7
cookie: sb=hpKyY6Wa_S1cjXXq3BlpijHu; datr=P-S-Y0nVQQMNYyU5uouVeImI;[c_user=1000759430        ]xs=12%3AJaykUFgVCGi7YA%3A2%3A1673454670%3A-1%3A-1%3A0A%3AAcsWQF7D8aiCE1J3_apOAZrKANHNvCPJ7ipjToq6bFQ; fr=0mEbC9Ubieton8u9f.AWUPyy4bi9vRI04k8Pa_bdSZuCw.Bj65yO.2_.AAA.0.0.Bj65yO.AWUYgCpfDFE
referer: https://www.eatingrecoverycenter.com/
sec-ch-ua: "Chromium";v="110", "Not A(Brand)";v="24", "Google Chrome";v="110"
sec-ch-ua-mobile: ?0

53.    Even for non-Facebook users, the Pixel discloses information that enables Meta to connect the private and medical information to specific individuals. This information includes names, addresses, phone numbers, device identifiers, URLs, IP addresses, and other information. Meta connects this information to "shadow profiles" they keep for individuals without Facebook accounts.

FIRST AMENDED COMPLAINT

54.     The following are representative examples demonstrating how users interact with ERC's websites and how that information is sent to Meta via the Pixel.

55.     First, upon entering the homepage of eatingrecoverycenter.com, users can hover on the "Conditions" tab and select a particular condition in order to explore treatment options. After selecting a condition, users are given an option to take a self-assessment quiz. Once a user submits an answer, many of which contain private and/or medical information, the answer is automatically sent to Meta.

56.     For example, ERC's "Compulsive Overeating" quiz asks users how often they "experience distress around my eating, including guilt, shame, or regret." The question looks like this:



57.     Once the user answers the question, its answer is sent to Meta via the Pixel. For Facebook users, the information submitted includes their FID, meaning it is personally identifiable. The following diagram shows the information sent to Meta for someone who answers "Often" to the above question:

1

2      :authority: www.facebook.com
       :method: GET
3      :path: /tr/?id=878621089183024&ev=SubscribedButtonClick&d1=https%3A%2F%2Fwww.eatingrecoverycenter.com%2Fconditions%2Fcompulsive-overeating%2Fquiz%23start-quiz&r1=htt
       ps%3A%2F%2Fwww.eatingrecoverycenter.com%2Fconditions%2Fcompulsive-overeating&if=false&ts=1676886841083&cd[buttonFeatures]=%7B%22classList%23A%N22quiz-opt%20range%2
4      2%2C%22destination%22%3A%22%2C%22id%22%3A%22Often%220ften%22dd[buttonText]=Often&cd[formFeatures]=%58%50&cd[pageFeatures]=%78%22title%22%3A%22ihy%20D
       n%22%2C%22type%22%3A%22Anull%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%2N7D&cd[buttonText]=Often&cd[formFeatures]=%58%50&cd[pageFeatures]=%78%22title%23A%22ihy%20D
       o%20l%20Overeat%3F%20Compulsive%20Overeating%20Quiz%20%7C%20Eating%20Recovery%20Center%22%22&osn=1920&sh=1080&v=2.9.96&r=stable&a=tmgoogletagmanager&ec=2&o=30&cs_est
5      =true&fbp=fb.1.1676466470419.1328682039&it=1676886837882&coo=false&es=automatic&tm=3&rqm=GET
       :scheme: https
6      accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
       accept-encoding: gzip, deflate, br
7      accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7
       cookie: sb=hpKyY6Wa_S1cjRXq3Blpijhu; datr=P-S-Y0nVQQfMYyU5uouVeImI; c_user=100075943        xs=12%3AJaykUFgVCGi7YA%3A2%3A1673454670%3A-1%3A-1%3A%3AAcWQF7D8aiCElJ3_a
8      pOAZrKANhMvCP37ip)Toq6bFQ; fr=0mEbC9Ubieton8u9f.AWUPyy4bi9vRI04k8Pa_bdSZUCW.Bj65yO.2_.AAA.0.0.Bj65yO.AWUYgCpfDFE
       referer: https://www.eatingrecoverycenter.com/
9      sec-ch-ua: "Chromium";v="110", "Not A(Brand";v="24", "Google Chrome";v="110"
       sec-ch-ua-mobile: ?0
       sec-ch-ua-platform: "Windows"
       sec-fetch-dest: image

10

11      58.    Every answer that a user provides is submitted to Meta in this manner.

12      59.    Once a user completes the quiz, ERC provides users the option to schedule an

13   assessment if their quiz results suggest they may have a condition for which ERC provides

14   services.

15

16   

17

18

19

20

21

22

23

24

25

26

27

28

60.    If a user clicks to schedule an assessment with ERC (which Plaintiff did), then that information is also shared with Meta. For example, the following diagram involves a user that clicked to schedule an assessment after taking the compulsive overeating quiz:

```
id: 909314106089721
ev: SubscribedButtonClick
dl: https://www.eatingrecoverycenter.com/conditions/compulsive-overeating/quiz#start-quiz
rl: https://www.eatingrecoverycenter.com/conditions/compulsive-overeating
if: false
ts: 1676540452148
cd[buttonFeatures]: {"classList":"","destination":"https://www.eatingrecoverycenter.com/form/sel
f-assessment-form","id":"","imageUrl":"","innerText":"Schedule an Assessment","numChildButton
s":0,"tag":"a","type":null,"name":""}
cd[buttonText]: Schedule an Assessment
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Why Do I Overeat? Compulsive Overeating Quiz | Eating Recovery Cente
r"}
sw: 1920
sh: 1080
v: 2.9.95
r: stable
a: tmgoogletagmanager
ec: 17
o: 30
cs_est: true
fbp: fb.1.1676466470419.1328682039
it: 1676538614046
coo: false
es: automatic
tm: 3
exp: c1
rqm: GET



id: 909314106089721
ev: SubscribeButtonClick
dl: https://www.eatingrecoverycenter.com/conditions/compulsive-overeating/quiz#start-qui
z
rl: https://www.eatingrecoverycenter.com/conditions/compulsive-overeating
if: false
ts: 1676551415330
cd[buttonFeatures]: {"classList":"cta-btn","destination":"tel:877-825-8584","id":"","imageU
rl":"","innerText":"877-825-8584","numChildButtons":0,"tag":"a","type":null,"name":""}
cd[buttonText]: 0-0-0
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Why Do I Overeat? Compulsive Overeating Quiz | Eating Recovery
Center"}
sw: 1920
sh: 1080
v: 2.9.95
```

FIRST AMENDED COMPLAINT

61.     As the above demonstrates, anyone reviewing this information would know private details about the user's mental and physical condition and treatment, including: (i) the user took the compulsive eating quiz, (ii) several of the user's symptoms, (iii) the quiz results indicated the user could have a compulsive eating disorder and an additional assessment was recommended, and (iii) the user called to schedule an assessment concerning compulsive eating. The same process takes place for the condition-specific quizzes on ERC's websites, such as the anorexia and bulimia quizzes.

62.     ERC also shares information concerning users' searches for and calls to treatment centers with Meta. ERC allows users to search treatment centers by location. Once a user identifies the treatment center it will use, ERC provides the option to call and schedule an appointment with the center. The user's search for the treatment center and clicks to call and schedule an appointment are shared with Meta in the following manner, which involves a user that searched for centers in California and called a center in Irvine:

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

FIRST AMENDED COMPLAINT

id: 878621089183024
ev: Microdata
dl: https://www.eatingrecoverycenter.com/recovery-centers/irvine
rl: https://www.eatingrecoverycenter.com/recovery-centers/california
h: +000
ts: 1676539820470
cd[DataLayer]: []
cd[Meta]: {"title" "Eating Recovery Center Irvine | Eating Recovery Center","meta:description":"Located in Irvine, California – in Orange County – ERC Irvine serves medically-stable adolescents and adults with eating disorders.\n\nOur eating disorders program provides evidence-based treatment for all types of eating disorders, including ARFID and Binge Eating Disorder. This center is our second in the state and first in Southern California, with a PHP program that provides supportive meals and snacks 7 days a week, with daily opportunities to practice new recovery skills in a safe, healing e"}
cd[OpenGraph]: {"og:site_name":"Eating Recovery Center","og:url":"https://www.eatingrecoverycenter.com/recovery-centers/irvine","og:title":"Eating Recovery Center Irvine | Eating Recovery Center","og:description":"Located in Irvine, California – in Orange County – ERC Irvine serves medically-stable adolescents and adults with eating disorders.\n\nOur eating disorders program provides evidence-based treatment for all types of eating disorders, including ARFID and Binge Eating Disorder. This center is our second in the state and first in Southern California, with a PHP program that provides supportive meals and snacks 7 days a week, with daily opportunities to practice new recovery skills in a safe, healing e"}
cd[Schema.org]: []
cd[JSON-LD]: [{"@context":"https://schema.org","@graph":[{"@type":"MedicalBusiness","@id":"https://www.eatingrecoverycenter.com/recovery-centers/irvine","description":"<p>Located in Irvine, California – in Orange County – ERC Irvine serves medically-stable adolescents and adults with eating disorders.</p>\n\n<p>Our eating disorders program provides evidence-based treatment for all types of eating disorders, including ARFID and Binge Eating Disorder. This center is our second in the state and first in Southern California, with a PHP program that provides supportive meals and snacks 7 days a week, with daily opportunities to practice new recovery skills in a safe, healing environment.</p>","name":"Eating Recovery Center Irvine","url":"https://www.eatingrecoverycenter.com/recovery-centers/irvine","telephone":"949-504-4673","address":{"@type":"PostalAddress","streetAddress":"114 Pacifica #450,","addressLocality":"Irvine","addressRegion":"CA","postalCode":"92618","addressCountry":"US"}}]}]

:authority: www.facebook.com
:method: GET
:path: /tr/?id=909314106089721&ev=PageView&dl=https%3A%2F%2Fwww.eatingrecoverycenter.com%2Frecovery-centers%2Firvine&rl=https%3A%2F%2Fwww.eatingrecoverycenter.com%2Frecovery-centers%2Fcalifornia&if=false&ts=1676842363299&sw=1920&sh=1080&v=2.9.96&r=stable&a=tmgoogletagmanager&ec=0&o=30&cs_est=true&fbp=fb.1.1676466470419.1328682039&it=1676824362408&coo=false&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7
cookie: sb=hpKyY6Wa_S1cjRXq3B1pijHu; datr=P-S-Y0nVQQWMYyU5uouVeImI; c_user=100075943; xs=12%3AJaykUFgVCGi7YA%3A2%3A1673454670%3A-1%3A-1%3A4%3AAcwQF7D8aiCE1J3_apOAZrKANMMvCPJ7ipjToq6bFQ; fr=0mEbC9Ubieton8u9f.AWUPyy4bi9vRI04k8Pa_bdSZuCw.Bj65yO.2_.AAA.0.0.Bj65yO.AWUYgCpfDFE
referer: https://www.eatingrecoverycenter.com/
sec-ch-ua: "Chromium";v="110", "Not A(Brand";v="24", "Google Chrome";v="110"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/110.0.0.0 Safari/537.36

FIRST AMENDED COMPLAINT

63. Anyone reviewing the above information would obtain information concerning the user's condition, treatment, general age, and general location.

64. ERC also shares information concerning users' registration for support groups. ERC offers several support groups that users can join online. When a user joins a support group through ERC's websites, this information is sent to Meta via the Pixel in the following manner, which involves a user signing up for the "Monday Midday LGBTQ+ Eating Disorder and Body Image Support Group":

```
:authority: www.facebook.com
:method: GET
:path: /tr/?id=909314106089721&ev=PageView&dl=https%3A%2F%2Fwww.eatingrecoverycenter.co
m%2Fevent%2Fmonday-lgbtq-eating-disorder-body-image-support-group&rl=https%3A%2
F%2Fwww.eatingrecoverycenter.com%2Fsupport-groups&if=false&ts=1676545300&sw=1920&sh
=1080&v=2.9.95&r=stable&a=tmgoogletagmanager&ec=0&o=30&cs_est=true&fbp=fb.1.1676466470
419.1328682039&it=1676540554083&coo=false&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7
cookie: sb=hpKyY6Wa_S1cjRXq3B1pijHu; datr=P-S-Y0nVQQMMYyU5uouVeImI; c_user=10007594
1  ; xs=12%3AJaykUFgVCGi7YA%3A2%3A1673454670%3A-1%3A-1%3A%3AAcWQF7D8aiCE1J3_apOAZrKANh
MvCPJ7ipjToq6bFQ; fr=0mEbC9Ubieton8u9f.AWUPyy4bi9vRI04k8Pa_bdSZuCw.Bj65yO.2_.AAA.0.0.B
j65yO.AWUYgCpfDFE
referer: https://www.eatingrecoverycenter.com/
sec-ch-ua: "Chromium";v="110", "Not A(Brand";v="24", "Google Chrome";v="110"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
```

65. Anyone reviewing the above information would obtain information concerning the user's medical condition, treatment, and sexuality.

66. ERC also shares keyword searches by users when using ERC's internal search bar, which often includes information concerning the user's condition, symptoms, treatment,

etc. For example, when a user uses the search bar to search "eating disorder," ERC provides the following information to Meta:

:authority: www.facebook.com

:method: GET

:path: /tr/?id=878621089183024&ev=%icrodata&dl=https%3A%2F%2Fwww.eatingrecoverycenter.com%2search%3Fkeyword%3Deating%2520disorder&rl=https%3A%2F%2Fwww.eatingrecoverycenter.com%2Finsurance&if=false&ts=1676824623114&cd[DataLayer]=%5B%5D&cd[Meta]=%7B822?title%22%3A%22Search%20%7C%20Eating%20Recovery%20Center%22%2C%22meta%3Adescription%22%3A%22Browse%20our%20site%20for%20physician%20and%20leadership%20bios%2C%20resources%2C%20locations%2C%20care%20options%2C%20and%20more.%20Eating%20Recovery%20Center%20is%20here%20to%20assist%20in%20k20any%20way%20we%20can.%22%7D&cd[OpenGraph]=%7B%22og%3Asite_name%22%3A%22Eating%20Recovery%20Center%22%2C%22og%3Aur%1%22%3A%22https%3A%2F%2Fwww.eatingrecoverycenter.com%2Fsearch%22%2C%22og%3Atitle%22%3A%22Search%20%7C%20Eating%20Recovery%20Center%22%2C%22og%3Adescription%22%3A%22Browse%20our%20site%20for%20physician%20and%20leadership%20bios%2C%20resources%2C%20locations%2C%20care%20options%2C%20and%20more.%20Eating%20Recovery%20Center%20is%20here%20to%20assist%20in%20any%20way%20we%20can.%22%7D&cd[Schema.org]=%5B%5D&cd[JSON-LD]=%5B%5D&sw=1920&sh=1080&v=2.9.96&r=stable&a=tmgoogletagmanager&ec=1&o=30&fbp=fb.1.1676466470419.1328682039&it=1676824622517&coo=false&es=automatic&tm=3&rqm=GET

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7

cookie: sb=hpKyY6Wa_S1cjRXq3B1pijHu; datr=P-S-Y0mVQQYMYyU5uouVeImI; c_user=100075943xxxxxxx; xs=12%3AJayXUFgVCGi7YA%3A2%3A1673454670%3A-1%3A-1%3A%3AAAcWQF7D8aICE133_apOAIrkAWhNvCPJ7ipjToq6bFQ; fr=0mEbC9Ubieton0u9f.AWUPyy4bi9vRI04k8Pa_bdSZuCw.Bj65yO.2_.AAA.0.0.Bj65yO.AWUYgCpfDFE

referer: https://www.eatingrecoverycenter.com/

sec-ch-ua: "Chromium";v="110", "Not A(Brand";v="24", "Google Chrome";v="110"

sec-ch-ua-mobile: ?0

68. Plaintiff visited ERC's websites on several occasions while investigating her condition, symptoms, and treatment options for her eating disorder. While using ERC's website, Plaintiff at least engaged in the following: (i) taking several diagnostic quizzes, including the anorexia and bulimia quizzes, which required her to provide medical information about her condition and treatment; (ii) researching her specific eating disorder through ERC's internal search bar, which included inputting information about her specific condition, symptoms, and treatment; (iii) searching for treatment locations and treatment levels for her eating disorder, which included information about her condition and treatment; (iv) scheduling an assessment with ERC through its website, which included information concerning her condition, treatment, treatment location, and treatment providers; (v) filling out forms with her name, diagnosis, symptoms, contact information, and insurance information; and (vi) researching levels of care and treatment options for mental health disorders provided by California treatment centers on pathlightbh.com.

FIRST AMENDED COMPLAINT

69.    Meta intercepted and viewed Plaintiff's information and created tools and analytics for ERC to market directly to her. After visiting ERC's website and providing the confidential information discussed above, Plaintiff began receiving (and still receives) ads for ERC on Facebook that were tailored to her specific eating disorder and symptoms. At the same time, Plaintiff started receiving targeted email advertising from ERC to the email address associated with her Facebook account that were also directly related to the conditions, symptoms, and disorders she disclosed to ERC.

**C.    ERC and Meta Harmed Plaintiff and Class Members**

70.    There is a significant market for consumers' medical data, and the value of medical data far exceeds the value of other types of consumer data. According to a 2021 article from Forbes, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."[11]

71.    According to a 2021 report, personal medical information is one of the most valuable types of data a consumer possesses. According to the report, a person's social security number sells on the black market for an average of $0.53 while a person's health care records sell for $250 on average. The article included the following breakdown of prices paid for various pieces of data:

| Record Type | Average Price |
| --- | --- |
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

---

[11] Healthcare Data: The Perfect Storm (forbes.com).

FIRST AMENDED COMPLAINT

72. According to a 2017 article from Forbes, electronic medical records were worth "hundreds or even thousands of dollars," while social security numbers were worth $0.10 and credit card numbers were worth $0.25.[12]

73. Healthcare providers spend millions of dollars annually to purchase health data and medical data. In fact, the medical data industry was valued at over $2.6 billion as of 2014, and this value has only increased exponentially in the ten years since this estimate was generated.

74. Through their scheme discussed herein to intercept and use Plaintiff's and Class Members' private medical data for their financial benefit, ERC and Meta have deprived Plaintiff and Class Members of the economic value of their private medical information. Plaintiff and Class members have also been injured through their receipt of continuous advertisements through Facebook and email stemming from their use of ERC's website while the Pixel was present.

D.    Tolling

75. Any applicable statute of limitations has been tolled by ERC's knowledge and concealment of the unlawful conduct and misrepresentations alleged herein. Plaintiff and Class Members could not have discovered ERC's unlawful conduct through reasonable diligence.

76. ERC knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on ERC's concealment.

## VI.    CLAIMS ALLEGED ON BEHALF OF THE CLASS
### COUNT I
**Violation of the California Invasion of Privacy Act, Cal. Penal Code § 630, et seq.**
**(Plaintiff and Class Against Defendant)**

77. Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs as if set forth herein.

78. California Penal Code § 631(a) provides in pertinent part:

[12] Your Electronic Medical Records Could Be Worth $1000 To Hackers (forbes.com).

FIRST AMENDED COMPLAINT

Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communications, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

79.    As alleged herein, Meta violated CIPA by using the Pixel to intercept Plaintiff's and Class Members' medical or private information or communications when they interact with ERC's websites. Plaintiff's and Class Members' communications were intercepted by Meta while in transit, passing over a wire, line or cable, and were sent and/or received at a place within California. The communications were intercepted by Meta without the knowledge, authorization, or consent of Plaintiff or Class Members. Meta viewed and used this information to increase the value of its advertising tools and services.

80.    ERC aided, employed, agreed with, and/or conspired with Meta to violate CIPA. ERC willfully and intentionally inserted an electronic device (the Pixel) into its website that, without the knowledge or consent of Plaintiff and Class Members, recorded and transmitted the substance of their confidential communications with ERC to Meta.

81.    The Pixel constitutes a machine, instrument, and/or contrivance as these terms are used in Cal. Penal Code § 631.

82.    ERC does not disclose that it is using the Pixel to permit Meta to track and automatically and in real time collect users' information and send it to Meta. In fact, ERC represents that users' communications are "100% Confidential" and that it "does NOT collect your personal information while you visit our website" and will "NEVER share or sell your personal information to a third party of any nature."[13]

---

[13] https://www.eatingrecoverycenter.com/; https://www.eatingrecoverycenter.com/privacy-policy.

83.    The communications that ERC permits Meta to intercept include numerous categories of users' medical and private information: (i) the medical treatment users are receiving or considering; (ii) answers to diagnostic quizzes; (iii) locations where users are obtaining or considering receiving treatment; (iv) support groups for which users register; and (v) all information entered into the website's internal search bar. This information constitutes protected private and medical information.

84.    Meta and ERC use the information intercepted by the Pixel for pecuniary purposes. Meta uses the information to increase the value of its advertising tools and services. In exchange for providing its users' information to Meta, ERC receives information and analytics provided by Meta that ERC uses to refine and more effectively advertise to new and existing users.

85.    By violating Cal. Penal Code § 631, ERC is liable to Plaintiff and Class Members for the greater of (i) treble actual damages related to their loss of privacy or (ii) $5,000 per violation. Under Cal. Penal Code § 637.2(a), Plaintiff and Class Members need not suffer or be threatened with any additional damages.

86.    ERC is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury.

**COUNT II**

**Violation of the Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10(a)**
**(Plaintiff and Class Against Defendant)**

87.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs as if set forth herein.

88.    The CMIA prohibits health care providers from disclosing medical information relating to their users without authorization.

89.    "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a user's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i).

1      90.    "Provider of health care" means "a person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code; a person licensed pursuant to the Osteopathic Initiative Act or the Chiropractic Initiative Act; a person certified pursuant to Division 2.5 (commencing with Section 1797) of the Health and Safety Code; or a clinic, health dispensary, or health facility licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code." Cal. Civ. Code § 56.05(o). ERC is a provider of health care under this definition.

91.    By imbedding the Pixel on its websites, ERC discloses medical information without the user's authorization.

92.    The information ERC discloses and shares with Meta constitutes medical information as the term is defined by the CMIA, including: (i) the medical treatment users are receiving or considering; (ii) answers to diagnostic quizzes, which contains information concerning the user's medical history, mental or physical conditions, and treatment; (iii) locations where users are obtaining or considering receiving treatment, which includes information concerning the user's mental or physical condition and treatment; (iv) support groups for which users register, which contains information concerning the user's mental or physical condition and treatment; and (v) all information entered into the websites' internal search bar, which can include information concerning the user's medical history, mental or physical condition, and treatment.

93.    ERC also discloses certain identifiers that make the medical information personally identifiable. This information includes: FIDs, names, mailing addresses, phone numbers, device identifiers, URLs, IP addresses, and other information. Meta also employs other tools (e.g., cookies) to ensure the user data can be directly connected to individuals, regardless of whether they have a Facebook account.

94.    ERC does not obtain authorization to disclose Class Members' medical information. It also fails to disclose anywhere that it shares this information with any third parties and actually claims the opposite in its Privacy Policy and through other statements on its websites.

FIRST AMENDED COMPLAINT

95.     ERC was at least negligent in releasing Plaintiff's and Class Members' medical information to Meta. ERC owed Plaintiff and Class Members a statutory and common law duty to maintain the confidentiality of their medical information. ERC breached that duty by inputting the Pixel on its website and enabling Meta to intercept the medical information. ERC's breach of its duty directly and proximately caused harm to Plaintiff and Class Members.

96.     By violating the CMIA, ERC is liable to Plaintiff and Class Members for the greater of (i) actual damages or (ii) $1,000 per violation. *See* Cal. Civil Code § 56.36(b). Plaintiff and Class Members need not suffer or be threatened with any additional damages. *Id.*

97.     ERC is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury.

**COUNT III**

**Violation of the Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10(d)**
**(Plaintiff and Class Against Defendant)**

98.     Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs as if set forth herein.

99.     The CMIA prohibits a health care provider or corporation from intentionally sharing, selling, using for marketing, or otherwise using medical information for a purpose not necessary to provide health care services to the patient without a patient's authorization.

100.    ERC is both a health care provider and corporation.

101.    By imbedding the Pixel on its websites, ERC intentionally shares, uses for marketing, or otherwise uses medical information for a purpose not necessary to provide health care services to their users without their authorization. Rather, ERC shares Class Members' information with Meta to improve advertising efficacy.

102.    The information ERC discloses and shares with Meta constitutes medical information as the term is defined by the CMIA, including: (i) the medical treatment users are receiving or considering; (ii) answers to diagnostic quizzes, which contains information concerning the user's medical history, mental or physical conditions, and treatment; (iii) locations where users are obtaining or considering receiving treatment, which includes

information concerning the user's mental or physical condition and treatment; (iv) support groups for which users register, which contains information concerning the user's mental or physical condition and treatment; and (v) all information entered into the websites' internal search bar, which can include information concerning the user's medical history, mental or physical condition, and treatment.

103.    ERC also discloses certain identifiers that make the medical information personally identifiable. This information includes: FIDs, names, mailing addresses, phone numbers, device identifiers, URLs, IP addresses, and other information. Meta also employs other tools (e.g., cookies) to ensure the user data can be directly connected to individuals, regardless of whether they have a Facebook account.

104.    ERC does not obtain authorization to disclose Class Members' medical information. It also fails to disclose anywhere that it shares this information with any third parties and actually claims the opposite in its Privacy Policy and through other statements on its website.

105.    ERC was at least negligent in releasing Plaintiff's and Class Members' confidential information to Meta. ERC owed Plaintiff and Class Members a statutory and common law duty to maintain the confidentiality of their medical information. ERC breached that duty by inputting the Pixel on its website and enabling Meta to intercept the medical information. ERC's breach of its duty directly and proximately caused harm to Plaintiff and Class Members.

106.    By violating the CMIA, ERC is liable to Plaintiff and Class Members for the greater of (i) actual damages or (ii) $1,000 per violation. *See* Cal. Civil Code § 56.36(b). Plaintiff and Class Members need not suffer or be threatened with any additional damages. *Id.*

107.    ERC is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT IV**

**Violation of the Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101**
**(Plaintiff and Class Against Defendant)**

108.     Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs as if set forth herein.

109.     California Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

110.     Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of § 56.36."

111.     ERC is a provider of health care that creates, maintains, preserves, or stores medical information. It failed to maintain, preserve, or store Plaintiff's and Class Members' medical information in a manner that preserves its confidentiality by installing the Pixel on its websites.

112.     ERC was at least negligent in failing to maintain the confidentiality of Plaintiff's and Class Members' medical information. ERC owed Plaintiff and Class Members a statutory and common law duty to maintain the confidentiality of their medical information. ERC breached that duty by inputting the Pixel on its website and enabling Meta to intercept the medical information. ERC's breach of its duty directly and proximately caused harm to Plaintiff and Class Members.

113.     Meta viewed and used Plaintiff's and Class Members' medical information to generate analytics from Meta that allowed ERC to refine and more effectively advertise to new and existing users. It also viewed and used Plaintiff's and Class Members' medical information to improve ad profiles for each individual.

114.     By violating the CMIA, ERC is liable to Plaintiff and Class Members for the greater of (i) actual damages or (ii) $1,000 per violation. *See* Cal. Civil Code § 56.36(b).

Plaintiff and Class Members need not suffer or be threatened with any additional damages. *Id.*

115.    ERC is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury.

## COUNT V

### Violation of California's Unfair Competition Law (UCL)
### (Plaintiff and Class Against Defendant)

116.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs as if set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the Class.

118.    By placing the Pixel on its website and permitting it to intercept its users' personal and medical information as discussed above, ERC engaged in unlawful and unfair acts and practices prohibited by the UCL.

119.    ERC did not obtain consent from Plaintiff or the Class to have Meta intercept their personal and medical information. Instead, ERC repeatedly and unambiguously told Plaintiff and the Class that their information would remain "100% confidential."

120.    Neither Plaintiff nor Class Members received any compensation from any entity in exchange for their personal and medical information.

121.    ERC's conduct constitutes unfair and unlawful business practices under the UCL. These practices offended established public policy and caused Plaintiff and Class Members to lose money and/or property. The injury to Plaintiff and Class Members outweighs any benefit to consumers or competition.

122.    Plaintiff seeks injunctive relief ordering ERC to (i) remove the Pixel and any other tool used to collect users' personal or medical information without consent; and (ii) provide notice to Class Members explaining that ERC enabled Meta to intercept their private and/or medical information when using ERC's websites.

FIRST AMENDED COMPLAINT

1

## COUNT VI

### Unjust Enrichment
### (Plaintiff and Class Against Defendant)

123.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs as if set forth herein.

124.    Through the unlawful disclosure of the private and medical information of Class Members discussed herein, ERC has been unjustly enriched. ERC represented to users that it does not share personal or medical information with third parties and that users' information is "100% Confidential." Yet, ERC imbedded the Pixel on its websites, allowing Meta to obtain private and medical information from users. In exchange, ERC received information and analytics from Meta that allowed it to refine and more effectively advertise to new and existing users, increasing revenue as a result.

125.    Class Members were impoverished through ERC's unlawful disclosure of their personal information and medical information. The information disclosed by ERC is some of the most valuable information consumers possess, particularly information concerning the users' medical conditions, history, and treatment. ERC denied Plaintiff and Class Members the value of their private and medical information without any compensation.

126.    There is a direct and significant connection between ERC's enrichment and Plaintiff's and Class Members' impoverishment. ERC's unlawful disclosure of Plaintiff's and Class Members' private and medical information to Meta through the Pixel both led to ERC's enrichment and caused Plaintiff's and Class Members' impoverishment.

127.    There is no justification for ERC's enrichment. ERC simply placed profit above lawful conduct and representations made to Plaintiff and Class Members. If ERC behaved as promised to users and required by law, then their unjust enrichment would not have occurred.

128.    Plaintiff and Class Members have no adequate remedy at law.

### VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests the following relief:

FIRST AMENDED COMPLAINT

A.      A determination that this action is a proper class action under Federal Rule of Procedure Rule 23, certifying Plaintiff as Class representative, and appointing the undersigned counsel as Class counsel;

B.      Declaring that ERC violated CIPA by disclosing and/or permitting Meta to intercept and record Plaintiff's and Class Members' communications, which included private and medical information;

C.      Declaring that ERC violated the CMIA by disclosing Plaintiff's and Class Members' medical information to Meta;

D.      Declaring that ERC violated the CMIA by intentionally sharing, selling, using for marketing, or otherwise using Plaintiff's and Class Members' medical information for a purpose not necessary to provide health care services to them;

E.      Declaring that ERC violated the CMIA by failing to maintain Plaintiff's and Class Members' medical information in a manner that preserves its confidentiality by installing the Pixel on its websites;

F.      Declaring that ERC violated the UCL through its unlawful and unfair business practices alleged herein;

G.      Declaring that ERC was unjustly enriched by disclosing and/or permitting Meta to intercept and record Plaintiff's and Class Members' private and medical information;

H.      Awarding damages to Plaintiff and Class Members, including statutory damages, compensatory damages, punitive damages, and pre- and post-judgment interest to the extent permitted by law;

I.      Permanently enjoining ERC from disclosing Class Members' private and medical information to third parties without consent;

J.      Permanently enjoining ERC from using information and analytics provided by Meta based on ERC's unlawful disclosure of Class Members' private and medical information;

K.      Requiring ERC to take reasonable steps to alert all users whose private or medical information was unlawfully disclosed to Meta or any other third party;

FIRST AMENDED COMPLAINT

L.    Requiring ERC to alert the California Attorney General's office that it unlawfully disclosed or permitted Meta to intercept and record the private and medical information of tens of thousands of California residents;

M.    Awarding attorney's fees, expenses, and taxable costs to the extent permitted by law; and

N.    Granting Plaintiff and Class Members such other further relief as the Court deems just and proper to protect their private and medical information.

## VIII.    JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

DATED: February 16, 2024

**MOGINRUBIN LLP**

_/s/Timothy Z. LaComb_
Timothy Z. LaComb
Daniel J. Mogin
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:    (619) 687-6611
Facsimile:    (619) 687-6610

Don Bivens PLLC
Don Bivens
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone:    (602) 708-1450
*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*