**MOGIN LAW LLP**
Daniel J. Mogin (SBN No.  95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:      (619) 687-6611
Facsimile:      (619) 687-6610
dmogin@moginlawllp.com
tlacomb@moginlawllp.com

**Don Bivens PLLC**
Don Bivens
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone:      (602) 708-1450
don@donbivens.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED INDIVIDUALS, | Case No: 3:23-cv-05561-VC |
| Plaintiff, | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| EATING RECOVERY CENTER LLC, | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ii

I.      INTRODUCTION ............................................................................................. 1

II.     FACTUAL BACKGROUND.............................................................................. 3

   A.  The Meta Pixel ............................................................................................. 3

   B.  ERC Installs and Uses the Meta Pixel ......................................................... 4

   C.  Plaintiff Used ERC's Website and Services, Leading to Interception of Her Data by the Pixel ......................................................................................... 5

   D.  ERC and Meta Used Plaintiff's Data Intercepted by the Pixel ..................... 6

III.    LEGAL STANDARD......................................................................................... 7

IV.     ARGUMENT..................................................................................................... 8

   A.      ERC Violated CIPA, Cal. Penal Code § 631(a) ...................................... 8

      a.  Meta Violated the Second Prong of § 631(a) ..................................... 8

         i.   Meta Intercepted Plaintiff's Data Willfully ................................. 9

         ii.  Meta Intercepted Plaintiff's Data Without Her Consent............................. 9

         iii. Meta Intercepted the "Contents" of Plaintiffs' Communications ............ 10

         iv. Meta Intercepted Plaintiff's Communications While "In Transit" or "Being Sent From" California. ....................................................................... 14

      b.  Meta Violated the Third Prong of § 631(a) ..................................... 16

      c.  ERC Violated the Fourth Prong of § 631(a) ................................... 17

   B.      ERC Violated Multiple Sections of the CMIA ...................................... 18

      a.  ERC Violated Section § 56.10 ......................................................... 18

         i.   ERC is a Provider of Health Care ............................................. 18

         ii.  ERC Disclosed Plaintiff's Medical Information to Meta .......................... 19

         iii. Plaintiff is a Patient of ERC under the CMIA .......................................... 21

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

iv.  ERC Did not Obtain Plaintiff's Authorization to Disclose Her Medical
       Information to Meta ................................................................... 22

    b.  ERC Violated § 56.101(a) of the CMIA ........................................ 23

V.    CONCLUSION................................................................................ 24

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

# TABLE OF AUTHORITIES

**Page(s)**

**California Authorities**

*Frayo v. Martin,*
102 Cal. App. 5th 1025 (2024) ......................................................................22

*J.M. v. Illuminate Educ., Inc.,*
103 Cal. App. 5th 1125 (2024) .....................................................................18

*Pettus v. Cole,*
49 Cal. App. 4th 402 (1996) ...................................................................passim

*Ribas v. Clark,*
38 Cal. 3d 355 (1985) ....................................................................................8

*Vigil v. Muir Med. Grp. IPA, Inc.,*
84 Cal. App. 5th 197 (2022) .........................................................................23

**Federal Authorities**

*Brown v. Google LLC*
685 F. Supp. 3d 909 (N.D. Cal. 2023) ...........................................................11

*Calhoun v. Google, LLC,*
113 F.4th 1141 (9th Cir. 2024) .....................................................................10

*Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.),*
956 F.3d 589 (9th Cir. 2020) ........................................................................10

*Frasco v. Flo Health, Inc.,*
No. 21-cv-00757-JD, 2024 U.S. Dist. LEXIS 171360 (N.D. Cal. Sep. 23, 2024) ..............9

*Gaige v. Exer Holding Co., LLC,*
No. 2:24-cv-06099-AH-(AJRx), 2025 U.S. Dist. LEXIS 17146 (C.D. Cal. Jan. 30, 2025).20

*In re Google RTB Consumer Priv. Litig.,*
606 F. Supp. 3d 935 (N.D. Cal. 2022) ...........................................................11

*Javier v. Assurance IQ, LLC,*
No. 21-16351, 2022 U.S. App. LEXIS 14951 (9th Cir. May 31, 2022) .............................9

*Konop v. Hawaiian Airlines, Inc.,*
302 F.3d 868, 878 (9th Cir. 2002). ...............................................................14

*Lineberry v. Addshopper, Inc.,*
No. 23-cv-01996-VC, 2025 U.S. Dist. LEXIS 29903 (N.D. Cal. Feb. 19, 2025) ........10-11

*R.C. v. Sussex Publrs., LLC*
No. 24-cv-02609-JSC, 2025 U.S. Dist. LEXIS 59491 (N.D. Cal. Mar. 28, 2025)...........19

**Page(s)**

**Cases (cont.)**

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ............................................................................ 7

*Saleh v. Nike, Inc.,*
   562 F. Supp. 3d 503 (C.D. Cal. 2021) .............................................. 10

*Stasi v. Inmediata Health Grp. Corp.*
   501 F. Supp. 3d 898 (S.D. Cal 2020) ............................................... 23

*St. Aubin v. Carbon Health Techs., Inc.,*
   No. 24-cv-00667-JST, 2024 U.S. Dist. LEXIS 179067 (N.D. Cal. Oct. 1, 2024) .... 8,11, 19

*Tate v. VITAS Healthcare Corp.,*
   762 F. Supp. 3d 949 (E.D. Cal. 2025) .............................................. 16

*JP Morgan Chase Bank Account,*
   835 F.3d 1159 (9th Cir. 2016) ............................................................ 8

*Vishal Shah v. Fandom, Inc.*
   754 F. Supp. 3d 924 (N.D. Cal. 2024) ............................................... 8

*Zetwick v. Cty. of Yolo,*
   850 F.3d 436 (9th Cir. 2017) ............................................................. 7

**Statutes**

Cal. Penal Code § 630 ........................................................................ 1, 8

Cal. Penal Code § 631(a) ................................................................. passim

Cal. Civ. Code Div. 1, Pt. 2.6 ............................................................... 1

Cal. Civ. Code § 56.05(a) ..................................................................... 22

Cal. Civ. Code § 56.05(c) ..................................................................... 21

Cal. Civ. Code § 56.05(j) ..................................................................... 19

Cal. Civ. Code § 56.10 ...................................................................... 18,23

Cal. Civ. Code § 56.101 .................................................................. 18, 23,24

18 U.S.C. § 2510(8) ............................................................................ 10

1

## I.    INTRODUCTION

Plaintiff Jane Doe ("Plaintiff") alleges violations of the California Invasion of Privacy Act ("CIPA") Cal. Penal Code §§ 630, et seq., and the Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code §§ 56, et seq., based on the unauthorized interception of Plaintiff's data by Meta Platforms Inc. ("Meta") while she navigated ERC's website – eatingrecoverycenter.com.

When enacting CIPA in 1967, the California Legislature included the following "Declaration of policy":

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

> The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

Likewise, when enacting the *remedial* Confidentiality of Medical Information Act ("CMIA") 25 years later, the California Legislature declared that "persons receiving health care services have a right to expect that the confidentiality of individual identifiable medical information derived from health care providers be reasonably preserved." Cal. Civ. Code Div. 1, Pt. 2.6 (Stats. 1981, ch. 782, § 1, p. 3040). Couched in this understanding, the Legislature made clear the "intention" of the CMIA was "to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information." *Id*.

As demonstrated herein, ERC, in conjunction with Meta, engaged in the precise invasions of privacy with respect to Plaintiff that the California Legislature sought to protect against when enacting CIPA and the CMIA.

Plaintiff is a California resident REDACTED. Beginning in June of 2022, she evaluated treatment options for her eating disorder at ERC. In doing so, Plaintiff

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

interacted with ERC's website, which included filling out self-assessment forms, taking diagnostic quizzes, researching her condition, evaluating specific types of treatment and treatment locations, and providing insurance information to ERC. Plaintiff also repeatedly communicated with ERC employees concerning treatment, leading ERC to at least preliminarily conclude REDACTED

Plaintiff believed her communications with ERC were confidential. Not only was she communicating highly protected personal and medical information with a health care provider, but ERC stated on its website that her communications with ERC were "100% confidential" and that it "does NOT collect your personal information while you visit our website" and that it will "NEVER share or sell your personal information to a third party of any nature." Ex. 1.[1]

Unfortunately for Plaintiff, ERC was lying. Rather than keep communications confidential, ERC chose to install code (the "Pixel") on its website that enabled Meta to intercept Plaintiff's communications with ERC made while using ERC's website and connect that information directly to Plaintiff. This data included, among other things: (i) the specific documents that Plaintiff viewed on ERC's website, (ii) answers to self-assessment questions, (iii) the specific eating disorder Plaintiff researched, and (iv) the specific treatment options and locations that she was considering. It also revealed the precise path that Plaintiff took when navigating ERC's website, including the amount of time she spent on each page. As a result, Meta obtained detailed view of Plaintiff's communications and behavior. ERC enabled Meta's interception of Plaintiff's data because it wanted Meta's help REDACTED REDACTED

Meta immediately used Plaintiff's data to target her with advertisements. On the same day that Plaintiff first visited ERC's website, Plaintiff began receiving advertisements on Facebook from ERC and other mental health services. This continued throughout the period of time relevant to this case. Notably, Plaintiff had not previously received ads for eating or mental

---

[1] All references to "Ex." Refer to the Declaration of Timothy LaComb in Support of Plaintiff's Motion for Summary Judgment.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

health disorders on Facebook and did not consistently receive advertisements on Facebook for any medical condition aside from eating and mental health disorders thereafter.

Based on these uncontested facts, as well as those discussed below, ERC violated CIPA and multiple sections of the CMIA. Therefore, summary judgment should be granted in Plaintiff's favor on these claims.

## II.    FACTUAL BACKGROUND

### A.  The Meta Pixel

The Meta Pixel is code that website operators like ERC install on their websites that tracks how visitors interact with their websites. Ex. 2. Once installed, the Pixel tracks when website visitors take certain actions – called "events" – on a website. *Id*. Events include things like viewing a page or interacting with a webform. *See*, *e.g.*, Ex. 3 at Column T; Ex. 4 at Column A.

When an "event" occurs, the Pixel directs the visitors' browser to REDACTED transmit data concerning the event, including the uniform resource locator ("URL"), and the website visitor to Meta. Ex. 2; Ex. 3, *compare* Column P (Pixel initialization) *with* H (transmission of data to Meta).[2] Meta attempts to match this information to a specific Meta account, which it can do when a visitor is logged into a Facebook account while navigating the subject website. Ex. 5. If able to match the data to an individual, then Meta can build a history of activities for that individual and more effectively predict the individual's consumer preferences. *Id.*; Ex. 6 at 10-11.

Website operators can view the actions their customers take that were tracked by the Pixel on their Meta Pixel "Events Manager" page. Ex. 2. They can also retarget individuals with advertisements when those visitors had their data intercepted and matched by Meta. *Id.*

Website operators, like ERC, choose whether and how to incorporate and configure the Pixel on their website. Ex. 5 at 1-2. This includes choosing what data to send to Meta and whether to include "identifiers" in the data transmission, which enable Meta to match data to

---

[2] The spreadsheets produced by Meta (Exs. 4, 5, and 20) use Unix time, which tracks time in computing and represents the number of non-leap seconds that have elapsed since 00:00:00 UTC on January 1, 1970. Unix time can be converted to epoch time using an online tool like the converted located at https://www.epochconverter.com/.

specific individuals with Facebook or Instagram accounts. *Id.* at 2 ██████████
████████████████████████████████████████████████████████████████████
██████████████

**B.  ERC Installs and Uses the Meta Pixel**

      ERC is a specialized treatment center for eating and mood, anxiety and trauma-related disorders, providing treatment for anorexia, bulimia, binge eating disorder, depressive disorders, anxiety disorders and PTSD. Ex. 7. ERC provides several types of treatment, including inpatient, residential, partial hospitalization, intensive outpatient, and virtual/digital. Ex. 8.

      ERC ██████████████████████████████████████████████ Ex. 9 at 9:11-12, 80:15-24; Ex. 10. In every instance in which the Pixel settings were changed, ERC either ████████████████████████████████████████████████████████████████. Ex. 11 at 43:7-13. ERC used data obtained via the Pixel to ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 11 at 13:21-14:11; Ex. 12 (list of Meta audiences created by ERC from October 27, 2022 to June 30, 2024); Ex. 38 (list of Meta audiences created by ERC from February 2, 2022 to October 26, 2022); Ex. 14 at 1. ERC did not disclose its use of the Pixel prior to this case being filed or seek or receive Plaintiff's authorization to transmit her data. Doe 201:17-24 (ERC used her data "without [her] consent or knowledge.").

      A custom audience is an audience that Meta creates based on criteria selected by ERC. Ex. 11 at 19:3-13. ERC's goal with custom audiences was ████████████████████ ████████████████████████████████████████). Ex. 9 at 51:23-56:12; 57:19-24. ████████████████████████████████████████ *See*, *e.g.*, Ex. 12, column E, rows 7, 16 (████████████████████████████████████ ██████ For example, Meta routinely created custom audiences for ERC that included individuals who ████████████████████████ *Id.* ████████████████████ ██████████████ Ex. 11 at 33:21-34:16; Ex. 9 at 12:9-14 (████████████████

1   REDACTED

2

3       A lookalike audience is REDACTED

4

5                                                    Ex. 16 at 97:18-23; Ex. 9 at 52:10-53:7.

6   Therefore, where the custom audience serving as the baseline was generated using Pixel data,

7   the lookalike audience is also derived from Pixel data, i.e., the lookalike audiences would not

8   exist but-for the Pixel data. Ex. 12 at Column E, Row 20 REDACTED

9              ); Ex. 9 at 52:10-53:7.

10      **C. Plaintiff Used ERC's Website and Services, Leading to Interception of Her Data by
           the Pixel.**

11

12      In June of 2022, Plaintiff considered using ERC to treat her eating disorder. Ex. 14 at

13  14:19-24. During this process, Plaintiff used ERC's website to, among other things: (i) take a

14  diagnostic quiz, REDACTED                                  (ii) fill out an intake form; (iii)

15  evaluate treatment options; (iv) assess treatment locations; and (v) research her specific

16  condition. *Id.* at 27:14-30:23; Ex. 3; Ex. 4. She also provided ERC with insurance information,

17  completed a "benefits check," and communicated with ERC concerning treatment via phone and

18  email. Ex. 14 at 20:6-15, 29:4-25; Exs. 17-18. Plaintiff continued to visit ERC's website through

19  September 15, 2023. Ex. 3; Ex. 4.

20      Many of Plaintiff's interactions with ERC's website were transmitted by the Pixel to

21  Meta. Ex. 3; Ex. 4. The transmissions by the Pixel to Meta included, among other things: (i)

22  REDACTED

23

24

25

26                                                   Ex. 3; Ex. 4. Meta was able to

27  match this data to Plaintiff because she was logged into her Facebook account at the time she

28

5

1    engaged in the "events" and REDACTED                                          .

2    Ex. 2 at 1-2.

3         Plaintiff did not know the Pixel was intercepting her communications with ERC and did

4    not consent to the interception. Ex. 14 at 201:17-24 (explaining that she joined the case because

5    her "personal health information . . . was disrespected and used without [her] consent or

6    knowledge."). ERC also stated repeatedly on its website that communications would be kept

7    "100% Confidential." *See*, *e.g.*, Ex. 19. For example, in June of 2022, the top of ERC's

8    homepage included the following, which clearly indicates that a visitor choosing to "explore

9    options" would have their information kept "100% Confidential":



18        Also in June of 2022, ERC made the following representation in its Privacy Policy:

19        ***Note to our website visitors:*** *ERC Pathlight does NOT collect your personal*
         *information while you visit our website.  We NEVER share or sell your personal*
20       *information to a third party of any nature.  We take your privacy rights very*
         *seriously, and we do not discriminate in any way against an individual who asks*
21       *about ERC Pathlight's compliance with data privacy rules, including CCPA.  The*
         *only time we collect your personal information is if you make the decision to*
22       *contact ERC Pathlight via phone, webform or email and inquire about our*
         *services.[3]*

24    **D.  ERC and Meta Used Plaintiff's Data Intercepted by the Pixel.**

25        ERC and Meta immediately began using Plaintiff's data after it was intercepted by the

26    Pixel. Ex. 20 at rows 114, 115. On June 14, 2022 – the same day that Plaintiff first interacted

---

[3] Ex. 1.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

with ERC's website, [REDACTED]

[REDACTED] *Id.* at row 114. Also on June 14, 2022, [REDACTED]

[REDACTED] *Id.* at row 115.

Plaintiff had not received advertisements from ERC or any other eating disorder treatment provider on Facebook before that day. *Id.* at rows 1-113. Meta continued to send Plaintiff advertisements on Facebook from ERC and other eating and mental health treatment providers throughout 2022 and 2023. Ex. 6 at 38-39.

Meta used Plaintiff's data intercepted by the Pixel to create aggregated reports, summaries, and analytics for ERC. These reports, summaries, and analytics included insights into the behavior of visitors on their website and the effectiveness of ERC's advertisements on Meta platforms. Ex. 5 at 1-2; Ex. 2 ([REDACTED]

[REDACTED] Ex. 11 at 22:22-23:5 ([REDACTED]

[REDACTED]

[REDACTED] Ex. 9 at 9:20-10:10 (explaining

ERC used the Pixel to [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Ex. 11 at 22:22-23:5.

[REDACTED]

[REDACTED]

[REDACTED] Ex. 5 at 1-3.

## III.    LEGAL STANDARD

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and summary judgment is appropriate." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). Stated differently, "[s]ummary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to

1    any material fact." See, e.g., *United States v. JP Morgan Chase Bank Account No. Ending 8215*,

2    835 F.3d 1159, 1162 (9th Cir. 2016).

3    **IV.    ARGUMENT**

4            As discussed in detail below, the record demonstrates that a rational juror could not find

5    for ERC and there are no genuine disputes as to any material facts underlying Plaintiff's CIPA

6    or CMIA claims. Therefore, summary judgment in Plaintiff's favor is appropriate.

7    **A.  ERC Violated CIPA, Cal. Penal Code § 631(a)**

8            The California Legislature created CIPA "to protect the right of privacy of the people of

9    this state," which was under "serious threat" due to the invasion of privacy resulting from the

10   continual an increasing use of [new] devices and techniques." Cal. Penal Code § 630. In light of

11   this clear legislative intent, courts "give[e] effect to CIPA's broad statutory language" because

12   doing so "is consistent with the California Legislature's stated intent to protect privacy interests,

13   as well as the California courts' approach when applying statutes to new technologies." *Vishal

14   Shah v. Fandom, Inc*., 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024). *See also Ribas v. Clark*, 38

15   Cal. 3d 355, 359 (1985) (Supreme Court of California explaining "[i]n enacting this statute, the

16   Legislature declared in broad terms its intent "to protect the right of privacy of the people of this

17   state . . .").

18           Section 631(a) of CIPA creates four prongs of potential relief. *St. Aubin v. Carbon

19   Health Techs*., Inc., No. 24-cv-00667-JST, 2024 U.S. Dist. LEXIS 179067, at *10-14 (N.D. Cal.

20   Oct. 1, 2024). Plaintiff brings claims against ERC for violating the fourth prong, which makes it

21   unlawful for ERC to aid, agree with, employ, or conspire with Meta "to unlawfully do, permit,

22   or cause to be done any of the acts or things mentioned" in the first three avenues. Cal. Penal

23   Code § 631(a). Therefore, to prove her CIPA claim, Plaintiff need only show that Meta violated

24   one of the first three prongs of CIPA and that ERC aided, agreed with, employed, or conspired

25   with Meta in its CIPA violation. *Id.* This is precisely what the uncontested facts prove, as

26   demonstrated below.

27          **a.  Meta Violated the Second Prong of § 631(a).**

28

8

A party violates the second prong of § 631(a) where it "willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, of communication while the same is in transit or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a).

### i. Meta Intercepted Plaintiff's Data Willfully.

The explicit purpose of the Pixel is to intercept data from website visitors like Plaintiff and match that information to those individuals. Ex. 5 at 1; Ex. 2. Meta readily admits that companies REDACTED

and that REDACTED

Ex. 5 at 1. Meta then uses one of several tools to match the intercepted information with that user account. *Id.*; Ex. 6 at 17.

This is precisely what occurred here. Plaintiff visited ERC's website "multiple times" when "looking to get [herself] treatment" for her eating disorder. Ex. 14 at 14:19-24. While using ERC's website, the Pixel intercepted her data and transmitted it to Meta. Ex. 3; Ex. 4. Meta then matched that data to Plaintiff. Ex. 3; Ex. 4; Ex. 5 at 1-2. And Plaintiff began receiving ads because of the Pixel's data interception. *See* Ex. 20 (no ads for eating disorder or mental health treatment until June 14, 2022 – the precise date Plaintiff first visited ERC's website). Stated succinctly, the Pixel functioned precisely as intended.

### ii. Meta Intercepted Plaintiff's Data Without Her Consent

To be effective, consent under § 631(a) must be made before the interception and by all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 U.S. App. LEXIS 14951, at *5 (9th Cir. May 31, 2022). In addition, consent under § 631(a) is only effective "if the person alleging harm consented to the particular conduct, or to substantially the same conduct and if the alleged tortfeasor did not exceed the scope of that consent." *Frasco v. Flo Health, Inc.*, No. 21-cv-00757-JD, 2024 U.S. Dist. LEXIS 171360, at *11 (N.D. Cal. Sep.

9

23, 2024) (quoting *Calhoun v. Google, LLC*, 113 F.4th 1141, No. 22-16993, 2024 U.S. App. LEXIS 20978, 2024 WL 3869446, at *5 (9th Cir. Aug. 20, 2024) (quotations omitted)).

Plaintiff did not consent to Meta's interception of her information when interacting with ERC's website. Plaintiff specifically testified that she joined this case because her "personal health information . . . was disrespected and used without [her] consent or knowledge." Ex. 14 201:17-24. Moreover, ERC told website visitors that their communications with ERC were "100% Confidential" and that it would "*NOT collect your personal information while you visit our website*" and that it would *"NEVER share or sell your personal information to a third party of any nature."* Ex. 1. While ERC did install a "consent banner" and update its policy, this did not occur until December 2023 – roughly one month *after* Plaintiff filed her complaint in this action. Ex. 21 at 68:11-20.

### iii.   Meta Intercepted the "Contents" of Plaintiff's Communications

CIPA prohibits interception of "the contents or meaning of any message, report, or communication." Cal. Penal Code § 631(a). Because CIPA does not define "contents," the Ninth Circuit has looked to the Federal Wiretap Act for guidance. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (drawing analogies between CIPA and the Wiretap Act); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021) (applying the federal definition of "contents" to a CIPA claim). The Federal Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8).

This Court and several other courts in this Circuit have held that detailed URLs constitute "contents of a communication" for purposes of CIPA when including elements like the specific document a user is viewing, the specific product or service a user is viewing, the type of care a patient is seeking, and the location of treatment centers a user is considering. *Davis v. Facebook, Inc.* (*In re Facebook Inc. Internet Tracking Litig.*), 956 F.3d 589, 605 (9th Cir. 2020) (URLs that include "the particular document within a website that a person views" can be "content" under CIPA); *Lineberry v. Addshopper, Inc.*, No. 23-cv-01996-VC, 2025 U.S. Dist. LEXIS 29903, at *9 (N.D. Cal. Feb. 19, 2025) (browser history was content where it

10

included specific products viewed); *St. Aubin v. Carbon Health Techs.*, Inc., No. 24-cv-00667-JST, 2024 U.S. Dist. LEXIS 179067, at *10-14 (N.D. Cal. Oct. 1, 2024) (URL containing "description of the type of care patient is seeking" was sufficient "to allege a violation of CIPA."); *In re Google RTB Consumer Priv. Litig.*, 606 F.Supp.3d 935, 949 (N.D. Cal. 2022) (finding under the Electronic Communications Privacy Act (ECPA), that "referrer URL that caused navigation to the current page"; "details about the publisher object of the site or app"; and "details about the content within the site or app" all constituted "content"); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 936 (N.D. Cal. 2023) ("full-string detailed URL[s]" containing "users' actions on a website, and their search queries" can constitute content).

This Court's recent decision in *Lineberry* is instructive. In *Lineberry*, this Court analyzed whether "browsing history" constituted "contents of a communication" under CIPA. *Lineberry*, 2025 U.S. Dist. LEXIS 29903, at *9. It determined that "[i]t seems clear that the browsing activity intercepted—which included the specific products viewed as opposed to just the IP address and fact that the website was accessed on a particular date—should be considered the 'contents' of the communication" because "[b]rowsing a specific product online is akin to calling the store and asking for information about that product, and everyone agrees that the latter counts as the 'content' of the communication." *Id.*

As in *Lineberry*, the Pixel intercepted detailed URLs that constitute the "content" of Plaintiff's communications with ERC. Again, Plaintiff used ERC's website to research and evaluate treatment options for her eating disorder. Ex. 14 at 14:19-24. While doing so, the Pixel intercepted URLs that revealed the specific documents Plaintiff was viewing:

REDACTED

The Pixel also intercepted URLs demonstrating the specific eating disorder and related issues that she researched:

REDACTED

---

[4] Ex. 3 at Column T, Rows 51-52.
[5] Ex. 3 at Column T, Rows 47-48.

11

REDACTED

The Pixel intercepted URLs demonstrating the specific types of treatment and treatment locations that Plaintiff was considering:

REDACTED

In addition to detailed URLs, the Pixel intercepted Plaintiff's interactions with forms and webpages. REDACTED



---

[6] Ex. 3 at Column T, Rows 49-50.
[7] Ex. 3 at Column T, Rows 53-54.
[8] Ex. 3 at Column T, Rows 55-56.
[9] Ex. 3 at Column T, Rows 57-58.
[10] Ex. 3 at Column T, Rows 35-36.
[11] Ex. 3 at Column T, Row 6.

[12] VC-ED refers to "Virtual Care Eating Disorder" and link was shortened to remove content that indicated Meta removed additional information in the link. Ex. 3 at Column T, Rows 25-26.
[13] Ex. 3 at Column T, Rows 31-34.
[14] Ex. 3 at Column T, Rows 29-30.
[15] Ex. 4 at Column A, Row 9 (showing "button click" of "For Me"); Ex. 22.

12

1

2



3

4

5

6

7

8

9

10

11

12

13        Plaintiff's intercepted data also demonstrates the exact browsing path that Plaintiff took

14  when using ERC's website, including REDACTED

15  ████████████████████████████████████████ Ex. 3, Column L, Q, T. It likewise

16  reveals how she interacted with certain webpages, REDACTED

17  ████████████████████████████████████████████

18  ████████ *See, e.g.,* Ex. 3 at Column T; Ex. 4 at Column A; Ex. 13.

19        Meta read and understood Plaintiff's communications with ERC in real time. After Meta

20  intercepted the data but before it logged or stored the information on its system, Meta read and

21  analyzed the data to determine whether any portion of the data should be removed. Ex. 16 at

22  76:6-77:17 (REDACTED

23  ████████████████████ Ex. 3 at Column T, Rows 25-26 (demonstrating Meta removed

24  certain parameters from Plaintiff's data before it was logged). Based on Meta's post-interception

25  and pre-storage analysis, some of Plaintiff's data was removed and replaced with content like

26  "REDACTED" *See, e.g.,* Ex. 3 Column T, Rows 39-44. Further demonstrating its

27  immediate comprehension and use of the data, Meta began targeting ads to Plaintiff from ERC

28  and third-party mental health services the same day it intercepted the data. Ex. 20 at Rows 114-

115.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

In sum, notwithstanding the prohibitions of CIPA and CMIA, the detailed URLs, form interactions, and other data intercepted by the Pixel gave Meta a clear understanding of exactly what Plaintiff was doing on ERC's website – evaluating eating disorder treatment by ERC. Meta read and correctly understood this information to mean Plaintiff was in the market for eating recovery treatment, resulting in Meta immediately sending Plaintiff ads for ERC and other eating and mental health disorder treatment providers.

### iv.  Meta Intercepted Plaintiff's Communications While "In Transit" or "Being Sent From" California.

The second prong of § 631(a) requires that the communications at issue were intercepted while "in transit" or while being "sent from, or received at any place within [California]." Cal. Penal Code § 631(a). Communications are intercepted while "in transit" when intercepted "during transmission" opposed to "while it is in electronic storage." *Konop v. Hawaiian Airlines, Inc*., 302 F.3d 868, 878 (9th Cir. 2002).

Here, the undisputed facts demonstrate Plaintiff's communications were both intercepted in transit and while being sent from California. The screenshot below, taken from an HTTP Archive ("HAR") file of ERC's website, demonstrates how Pixel transmissions occur on ERC's website.[16] A HAR file is a JSON-formatted archive file format for logging of a web browser's interaction with a site. The highlighted record indicates that, after the HAR file began recording ERC's website, an event triggering a Pixel transmission occurred that went directly from the user's browser to Meta, as demonstrated by the "Domain" column. This transmission to Meta shows the user clicked a link on ERC's website to start a quiz, as shown in the "dl" field. The link was clicked at 2:33:34.360 AM on February 19, 2023, depicted in the "it" field.[17] The transmission to Meta occurred at 2:33:34.534 AM – 174 milliseconds (less than 0.2 seconds) after the link was clicked to start the quiz, as shown in the "ts" field. As this proves, the Pixel intercepted the event data and sent it to Meta in real-time.

---

[16] This screenshot is an image of a transmission from the Plaintiff's HAR file but produced by the Firefox Web Browser (Developer's Edition) network debugger view, which enables a readable and comprehensible format for the HAR file. The same data transmission with the same values, albeit in a less readable format, is produced as Ex. 24 (PLTF04012-15).
[17] The time in the HAR file is depicted in Unix time and was converted to epoch time using the converted at https://www.epochconverter.com/.

14

1
2
3
4
5
6
7
8
9
10



11

12  This same real-time interception by the Pixel and transmission to Meta occurred with

13  Plaintiff's online communications with ERC. For Plaintiff's communications, REDACTED

14  ████████████████████████████████████████████████████████████

15  ████████████████████ Ex. 16 at 21:24-25:10; Ex. 3, Columns H and P. When

16  comparing these times for Plaintiff's, REDACTED ██████████████████████

17  ██████████████████████████████████

18      In addition to intercepting the data while "in transit," the Pixel intercepted Plaintiff's

19  data while it was being sent from California. As shown above, the interception occurs in real-

20  time as Plaintiff engages with ERC's website. As Plaintiff testified at her deposition, she

21  interacted with ERC's website while in California. Ex. 14 at 127:11-16. Plaintiff's

22  communications were, therefore, intercepted while being sent from California. *Id.*; Strebe

23  Expert Report, 46 (Conclusion, ¶ 5a).

24      As the above demonstrates, based on undisputed facts, Meta willfully intercepted

25  Plaintiff's data via the Pixel without Plaintiff's consent while the data was in transit and being

26  sent from California. The data that Meta intercepted was the "contents" of Plaintiff's

27  communications with ERC, which Meta read, understood, and immediately used to target

28  Plaintiff with advertisements from ERC and other eating disorder providers. Therefore, Meta

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

violated the second prong of § 631(a) and summary judgment should be granted on Plaintiff's CIPA claim.

### b. Meta Violated the Third Prong of § 631(a).

A party violates the third prong of § 631(a) when it "uses or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." Cal. Penal Code § 631(a). Relevant here, the third prong of CIPA makes it unlawful for a party to use or attempt to use information that it intercepted in a manner restricted by the second prong, i.e., willfully, without consent, and while in transit or being sent from California. *See Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949 (E.D. Cal. 2025) ("an entity can violate the statute by learning the contents of the message *or* by using information obtained from listening in on a conversation.").

As demonstrated above, Plaintiff's data was intercepted willfully, without consent, and while in transit or being sent from California. Therefore, to show Meta violated the third prong of § 631(a), Plaintiff need only demonstrate that Meta used or attempted to use Plaintiff's information.

Meta used Plaintiff's data collected by the Pixel in several ways. Meta used Plaintiff's data to create reports, analytics, and summaries for ERC based on Pixel data. Ex. 5 at 2-4; Ex. 2 (explaining website operators can view events transmitted by the Pixel on their Meta Pixel "Events" page); Ex. 11 at 22:22-23:5 (REDACTED ).

Meta also used Plaintiff's data to include her REDACTED Ex. 20; Ex. 11 at 18:16-19:1. Third, Meta used Plaintiff's data to REDACTED . Ex. 20. Finally, Meta used Plaintiff's data REDACTED Ex. 5 at 2-4.

The undisputed facts demonstrate that Meta used Plaintiff's data after it was intercepted willfully, without authorization, and while in transit or being sent from California. Meta,

16

therefore, violated the third prong of § 631 and summary judgment should be granted on Plaintiff's CIPA claim.

### c.   ERC Violated the Fourth Prong of § 631(a).

A party violates the fourth prong of CIPA when it "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, permit, or cause to be done any of the acts or things mentioned [in the first three prongs]." Cal. Penal Code § 631(a).

ERC aided Meta's interception and use of Plaintiff's data. Plaintiff's data was intercepted by the Pixel. Ex. 3, Ex. 4, Ex. 5. ERC installed the Pixel and **REDACTED** ██████████████████████████ Ex. 9 at 25:3-14, 41:19-42:1; Ex. 11 at 43:7-13. ERC controlled which information the Pixel transmitted to Meta. Ex. 5 at 1-2; Ex. 9 at 13:10-19. ERC also controlled the content in the substantive and problematic URLs transmitted to Meta. Ex. 6 at 19-22. Put simply, Meta could not have intercepted Plaintiff's data without ERC's substantial assistance.

ERC agreed with Meta to both intercept Plaintiff's data without consent and use Plaintiff's data. As Meta explained, to use the Pixel, ERC was "required" to agree to several sets of terms, including the Meta Business Tools Terms and the Data Processing Terms. Ex. 25. The Meta Business Tools Terms detail that Meta can use website visitor data it collects via the Pixel for several purposes, including providing analytics services and targeted ad campaigns for website operators like ERC and improving, providing, and securing Meta Products. *Id*. Likewise, the first line of the Data Processing Terms states that "You acknowledge that your use of certain Meta Products may involve sending Personal Information to Meta." https://www.facebook.com/legal/terms/dataprocessing. In exchange for allowing Meta to intercept website visitor data, ERC received analytics and reports from Meta based on the intercepted data, the ability to target people with ads who previously interacted with ERC's website, and the ability to generate custom and lookalike audiences based on data collected by the Pixel.

ERC employed Meta to unlawfully intercept and use Plaintiff's unlawfully intercepted data. **REDACTED** ████████████████████████████████. Ex. 26 at 2.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

1  <span style="color:red">REDACTED</span> ███████████████████████████████████████

2  ███████████████████████████████████████

3  Ex. 11 57:14-58:15, 108:12-109:16; Ex. 26 at 2. ERC, therefore, employed Meta to intercept

4  data from website visitors and use it to direct advertisements at them. Ex. 11, Ex. 26. This is

5  exactly what happened to Plaintiff, as she had her data intercepted by the Pixel beginning on

6  June 14, 2022, and received advertisements from ERC due to her inclusion in custom audiences

7  thereafter. Ex. 3; Ex. 20.

8          As the foregoing demonstrates, Meta violated the second and third prongs of § 631(a).

9  ERC, at minimum, aided, agreed with, and employed Meta to "do, permit, or cause to be done

10  any of the acts or things mentioned" in the second and third prongs of § 631(a).

11      **B. ERC Violated Multiple Sections of the CMIA**

12          The CMIA is a remedial statute, meaning it must be "liberally interpreted to advance

13  [its] clear purpose[]." *J.M. v. Illuminate Educ., Inc*., 103 Cal. App. 5th 1125, 1132 (2024). As

14  described in detail below, through its use of the Pixel, ERC disclosed Plaintiff's medical

15  information to Meta in violation of §§ 56.10 and 56.101 of the CMIA.

16          **a. ERC Violated Section § 56.10**

17      Section 56.10 prohibits "provider[s] of health care" from "disclos[ing] medical

18  information regarding a patient of the provider of health care or an enrollee or subscriber of a

19  health care service plan without first obtaining an authorization." Cal. Civ. Code § 56.10.

20          **i. ERC is a Provider of Health Care**

21          Under the CMIA, a provider of health care includes "[a]ny business organized . . . for

22  the diagnosis and treatment of the individual" and "[a]ny business that offers a mental health

23  digital service to a consumer . . . for the diagnosis, treatment, or management of a medical

24  condition of the individual." Cal Civ Code § 56.06(a),(d). The inclusion of these "broad scope"

25  of entities that maintain medical information is to "(1) protect this information, and (2) require

26  those who have it to act 'in a manner that preserves the confidentiality of that information.'"

27  *J.M. v. Illuminate Educ., Inc*., 103 Cal. App. 5th 1125, 1130 (2024).

28

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

ERC is a business organized for the diagnosis and treatment of individuals. According to its website, ERC provides a "continuum of care" that includes inpatient, residential, partial hospitalization, intensive outpatient, and virtual/digital. Ex. 8. ERC also offers numerous avenues for diagnoses, including quizzes, self-assessment, and assessment with ERC medical professionals. *Id.*; Ex. 27.

ERC is a business that offers mental health services to consumers for the diagnosis, treatment, or management of a medical condition of those consumers. Eating disorders are themselves mental health disorders, which ERC makes clear when explaining it has "grown" from "eating disorder treatment" to "meet the needs for a full range of mental health conditions, allowing us to effectively treat individual diagnoses and co-occurring illnesses." Ex. 28. ERC also offers a range of mental health services through its Pathlight mood and anxiety treatment centers. Ex. 29. ERC offers a host of healthcare services through both ERC and Pathlight, including virtual intensive outpatient services, virtual caregiver groups, virtual education series, and virtual support groups. *See*, *e.g.*, Ex. 30.

### ii.    ERC Disclosed Plaintiff's Medical Information to Meta

The CMIA defines "medical information" as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j). "Individually identifiable" means the medical information "includes or contains any element of personal identifying information sufficient to allow identification of the individual." Cal. Civ. Code § 56.05(j).

Consistent with the remedial nature of the CMIA, courts have interpreted "medical information" broadly and found that the definition covers, among other things: (i) URLs with information about the purpose and location of medical treatment (*St. Aubin v. Carbon Health Techs., Inc*., No. 24-cv-00667-JST, 2024 U.S. Dist. LEXIS 179067, at *25 (N.D. Cal. Oct. 1, 2024)); (ii) "queries" concerning therapy sought and specific symptoms (*R.C. v. Sussex Publrs., LLC*, No. 24-cv-02609-JSC, 2025 U.S. Dist. LEXIS 59491, at *16 (N.D. Cal. Mar. 28, 2025)); and (iii) searches on a website for medical treatment, information, and diagnoses for specific

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

medical conditions. *Gaige v. Exer Holding Co., LLC*, No. 2:24-cv-06099-AH-(AJRx), 2025 U.S. Dist. LEXIS 17146, at *17 (C.D. Cal. Jan. 30, 2025).

 The information ERC disclosed to Meta through the Pixel constitutes Plaintiff's medical information because it concerns her medical treatment and specific condition. Unlike general hospitals, ERC provides specialized treatment for eating and other mental disorders only, meaning there is little reason for anyone to be on ERC's website unless they have or are concerned they may have an eating or mental health disorder. Ex. 11 at 8:1-5. As shown above, the descriptive URLs disclosed by ERC through the Pixel demonstrate the type of treatment Plaintiff was considering (REDACTED the location of recovery centers she was considering (REDACTED the specific conditions and topics she researched (REDACTED); and the specific diagnostic and intake forms with which she interacted (REDACTED Ex. 3; Ex. 4.

 Many other URLs ERC disclosed to Meta reveal that Plaintiff was reaching out to ERC personally. For example, on June 14, 2022, REDACTED Ex. 3 at Column T, Row 15. After answering, she is sent to a webpage with the following URL: self-assessment-form?page=take_the_first_step&request_**type=personal**. If she answered "For a Patient," then she would have been sent to a webpage with the following URL: quick-admit-form?**type=patient**. Importantly, ***ERC*** dictates how it will name its URLs. Ex. 6 at 19-22.

 ERC discloses other data to Meta via the Pixel that included Plaintiff's medical information. REDACTED Ex. 4, Column A, Row 8; Ex. 23 at 1-3.

 Plaintiff's data disclosed to Meta was individually identifiable. As explained by Meta and exemplified through its production, REDACTED Ex. 5 at 1-2 (REDACTED

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

1    REDACTED ); Ex.

2    3; Ex. 4.

3        Meta read and understood Plaintiff's information to mean she was in the market for

4    eating and mental health disorders. On the same day that Plaintiff interacted with ERC's

5    website, she began receiving ads from both ERC and third parties concerning eating and mental

6    health disorders. Ex. 20. She had not consistently received advertisements on Meta concerning

7    mental health or eating disorders before interacting with ERC's website. *Id.*. She also has not

8    received consistent advertisements on Meta concerning medical conditions other than for eating

9    and mental health disorders. *Id.*

10                    **iii.   Plaintiff is a Patient of ERC under the CMIA**

11        Under the CMIA, a patient is "any natural person, whether or not still living, who

12    received health care services from a provider of health care and to whom medical information

13    pertains." Cal. Civ. Code § 56.05(c). While the CMIA does not define "health care services,"

14    "logic dictates that in order for a health care provider to gather medical information about a

15    person, the provider must have dealt with the person at some level and performed professional

16    services of some type." *Pettus v. Cole*, 49 Cal. App. 4th 402, 429 (1996). A "patient" under the

17    CMIA must also be interpreted in light of its remedial nature and stated purpose – to protect

18    personally identifiable medical information. *Id.*

19        *Pettus* is instructive. In *Pettus*, a plaintiff-employee was required by his employer to see

20    a psychiatrist so the psychiatrist could advise the employer about the plaintiff's disability claim.

21    *Pettus*, 49 Cal. App. 4th at 429. The plaintiff only saw the psychiatrist once, no care or treatment

22    was contemplated at any time, and no traditional doctor/patient relationship was established,

23    i.e., the plaintiff could not bring a medical malpractice claim. *Id.* Even so, the court determined

24    the plaintiff was a patient under the CMIA because some level of health care services were

25    provided, which is all that is required. *Id.* 429-430. The court determined this broad

26    interpretation of "patient" was not only consistent with the language of the statute, but also with

27    the remedial purpose of CMIA, which is to protect medical information. *Id.*

28

21

Here, Plaintiff was a patient of ERC under the CMIA because she received a quantum of health care services from ERC. Again, Plaintiff used ERC's website to investigate treatment options for her eating disorder. Ex. 14 at 14:19-24. In doing so, she used ERC's website to, among other things: (i) take a diagnostic quiz; (ii) fill out a self-assessment form; (iii) evaluate treatment options; (iv) assess treatment locations; (v) research her specific condition; and (vi) provide personal and insurance information to ERC. ERCRes015978 (REDACTED ████████████████████████████████████████████████████) Plaintiff also communicated with ERC concerning treatment on several occasions by email, text, and phone. Ex. 14 at 27:14-30:23, 202:23-203:12; Ex. 31 (REDACTED ████████████████████████████████████████████████████) Plaintiff completed a "Ben/Check," meaning she provided her insurance information to ERC. Ex. 14 20:6-15; Ex. 32. ERC conducted some level of evaluation of Plaintiff, REDACTED ████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 33; Ex. 34. Perhaps most telling, ERC's own classifications demonstrate they considered Plaintiff to be a patient, as REDACTED ███████████████████████████████████████████████████████████████████████." Ex. 35; Ex. 36.

### iv. ERC Did not Obtain Plaintiff's Authorization to Disclose Her Medical Information to Meta.

An "authorization" under the CMIA must, among other things, be in writing, signed, and dated by the patient or an authorized representative. *Frayo v. Martin,* 102 Cal. App. 5th 1025, 1034, 322 Cal. Rptr. 3d 188, 194 (2024); Cal. Civ. Code § 56.05(a).

Again, ERC did not obtain Plaintiff's consent or anything resembling written authorization to disclose her medical information to Meta. *See supra.* Moreover, ERC represented it would *not* disclose her data to Meta, as it repeatedly stated on its website that communications would be "100% Confidential" and included the following language in its Privacy Policy: "ERC Pathlight does NOT collect your personal information while you visit our

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

website" and that "We NEVER share or sell your personal information to a third party of any nature." Ex. 1, Ex. 19.

As detailed herein, ERC is a provider of health care and Plaintiff is a patient of ERC, as those terms are used in the CMIA. ERC disclosed Plaintiff's medical information to Meta without obtaining Plaintiff's consent. Therefore, ERC violated § 56.10 of the CMIA.

### b. ERC Violated § 56.101(a) of the CMIA

Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal Civ Code § 56.101. Section 56.101(a) of the CMIA creates a duty for health care providers to take reasonable steps to maintain the confidentiality of medical information. *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 921 (S.D. Cal. 2020). To violate that duty, a plaintiff must demonstrate that its information was viewed by an unauthorized third party. *Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 211, 300 Cal. Rptr. 3d 32, 40 (2022).[18]

ERC created, maintained, preserved, and stored medical information for Plaintiff. ERC created the medical information at issue by installing the Pixel, configuring the Pixel, naming its URLs, and designing its website to prompt Plaintiff to provide the information. Ex. 5 at 1-2. But-for these actions, the medical information intercepted by Meta would not exist. REDACTED ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████ Exs. 33-36.

---

[18] In the preceding section, Plaintiff established that ERC is a provider of health care and that her information that Meta intercepted via the Pixel constitutes medical information and, therefore, will not repeat those arguments here.

23

1    ERC was, at minimum, negligent in creating, maintaining, and storing Plaintiff's

2    medical information through its use of the Pixel. ERC is likely to argue in its opposition to this

3    motion that it did not intend to create Plaintiff's medical information intercepted by Meta. Even

4    if accepted as true (it is not), ERC was still negligent in creating and maintaining Plaintiff's

5    medical information. As a large health care company with a sophisticated digital marketing

6    team, ERC should have known how the Pixel functioned on its website, particularly given the

7    sensitivity of the information at issue and fact that REDACTED

8    ████████ Ex. 9 at 25:3-14, 41:19-42:1; Ex. 11 at 43:7-13. Likewise, REDACTED

9    ███████████████████████████████████████████████████

10   ███████████████████████████████████████████████████

11   ███████████ *See*, *e.g*, Ex. 37 REDACTED

12   ██████████████████████████████ Even so, REDACTED

13   ████████████████████

14   Meta unquestionably viewed Plaintiff's medical information. Meta necessarily read

15   Plaintiff's medical information REDACTED

16   ███    *See*, *e.g.*, Ex. 20, Rows 114-115. Meta also necessarily read Plaintiff's medical

17   information when REDACTED ,

18   *e.g.*, Ex. 3 Column T, Rows 39-44 (containing REDACTED Finally, Meta

19   also read Plaintiff's medical information when using it REDACTED

20   █████████████████████████████████ Ex. 5 at 1-2.

21   As the above demonstrates, even accepting the absurd proposition that ERC did not

22   know it was disclosing medical information to Meta via the Pixel, ERC was still negligent in

23   creating and preserving Plaintiff's medical information through its use of the Pixel. This enabled

24   Meta to intercept Plaintiff's medical information, which it viewed. Therefore, ERC violated §

25   56.101 of the CMIA.

26   **V.    CONCLUSION**

27   For the reasons stated above, Plaintiff has demonstrated that indisputable facts

28   demonstrate ERC has violated both CIPA and multiple provisions of the CMIA. Therefore, the

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC

Court should grant summary judgment in favor of Plaintiff and permit these claims to proceed to class certification and trial.

DATED: May 28, 2025

**MOGIN LAW LLP**

/s/ Timothy Z. LaComb
Daniel J. Mogin
Timothy Z. LaComb
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:    (619) 687-6611
Facsimile:    (619) 687-6610

**Don Bivens PLLC**
Don Bivens
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone:    (602) 708-1450
*Pro Hac Vice Application Forthcoming

*Attorneys for Plaintiff*

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:23-cv-05561-VC