James F. Monagle, Esq. (SBN 236638)
MULLEN COUGHLIN LLC
500 Capital Mall, Suite 2350
Sacramento, CA 95814
T: 267-930-1529
jmonagle@mullen.law

*Attorneys for Defendant*
*Eating Recovery Center LLC*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

JANE DOE, individually and on behalf of a class of similarly situated individuals,

Plaintiff,

v.

EATING RECOVERY CENTER, LLC,

Defendant.

**No.: 3:23-cv-00561-VC**

Assigned to Hon. Vince Chhabria

**DEFENDANT EATING RECOVERY CENTER LLC'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

HEARING: July 24, 2025
TIME: 10:00 AM
PLACE: Courtroom 4

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................... i

II.   RELEVANT FACTUAL BACKGROUND ................................. 1

  A.   Meta's Data Related to Plaintiff's Visits To ERC's Website ............. 1

  B.   Plaintiff's Interactions With ERC And Its Website ......................... 2

  C.   ERC's Advertising Through Meta ............................................. 5

  D.   Meta's Alleged Use Of Data Related To Plaintiff ......................... 6

III.  OBJECTIONS TO PLAINTIFF'S FACTS ................................. 8

IV.   LEGAL STANDARD ............................................................ 9

V.    ARGUMENT ..................................................................... 10

  A.   Plaintiff Does Not Have Standing ........................................... 10

  B.   ERC Did Not Violate CIPA ................................................... 12

    a.   Meta Did Not Violate § 631(a)'s First Clause ......................... 13

    b.   Meta Did Not Violate § 631(a)'s Second Clause ...................... 13

      i.   The Contents of Plaintiff's Communications Were Not Disclosed to Meta ........ 13

      ii.  Meta Did Not Read, Attempt to Read, or Learn the Contents of Plaintiff's Communications While in Transit ........ 16

    c.   Meta Did Not Violate § 631(a)'s Third Clause ......................... 20

    d.   ERC Did Not Violate § 631(a)'s Fourth Clause ........................ 22

  C.   ERC Did Not Violate the CMIA .............................................. 23

    a.   Plaintiff Was Not a Patient of ERC ....................................... 23

    b.   Plaintiff's Medical Information Was Not Impacted ..................... 24

    c.   Meta Did Not "Actually View" Medical Information .................... 25

  D.   Plaintiff's Unjust Enrichment Claim Fails ................................. 25

VI.   CONCLUSION .................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*American Hospital Association v. Becerra,*
   738 F. Supp. 3d 780, 801- (N.D. Tex. 2024) ................................................................ 11, 12

*B.K. by next friend Tinsley v. Snyder,*
   922 F.3d 957, 966 (9th Cir. 2019) ............................................................................... 10

*Brown v. Google LLC,*
   685 F. Supp. 3d 909, 941 (N.D. Cal. 2023) ................................................................ 16

*Carolus v. Nexstar Media Inc.,*
   24-CV-07790-VC, 2025 WL 1338193, at *1 (N.D. Cal., Apr. 9, 2025) ...................... 10, 12

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 322 (1986) ............................................................................................... 9

*Cook v GameStop, Inc.,*
   689 F Supp 3d 58, 65-66 (W.D. Pa. 2023) ................................................................... 12

*Daghaly v. Bloomingdales.com, LLC,*
   23-4122, 2024 WL 5134350, at *1 (9th Cir., Dec. 17, 2024) ...................................... 14

Doe I v Google LLC,
   23-CV-02431-VC, 2025 WL 1616720, at *3 [ND Cal June 6, 2025] ........................... 22

*Eisenhower Med. Ctr. v. Superior Ct.,*
   226 Cal. App. 4th 430, 435 (2014) .............................................................................. 24

*Gray v. Luxottica of Am., Inc.,*
   8:24-CV-00160-MRA-DFM, 2024 WL 5689566, at *8 (C.D. Cal., Dec. 16, 2024)............ 24

*Gutierrez v. Converse Inc.,*
   2:23-CV-06547-RGK-MAR, 2023 WL 8939221, at *3 (C.D. Cal., Oct. 27, 2023)............ 14

*Gutierrez v. Converse Inc.,*
   2:23-CV-06547-RGK-MAR, 2024 WL 3511648, at *8 (C.D. Cal., July 12, 2024)............ 13

*Hammerling v. Google LLC,*
   615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) ............................................................. 14

*In re Facebook, Inc. Internet Tracking Litig.,*
   956 F.3d 589, 607 (9th Cir. 2020)................................................................... 13, 14, 16

*In re Zynga Privacy Litig.,*
   750 F.3d 1098, 1108-09 (9th Cir. 2014) ....................................................................... 14, 15

*Lien v. Talkdesk, Inc.,*
   24-CV-06467-VC, 2025 WL 551664, at *1 (N.D. Cal., Feb. 19, 2025)........................ 10

*Lightoller v. Jetblue Airways Corp.,*
   23-CV-00361-H-KSC, 2023 WL 3963823, at *4 (S.D. Cal., June 12, 2023) ............... 12

*Lineberry v AddShopper, Inc.,*
   23-CV-01996-VC, 2025 WL 551864, at *3 [ND Cal Feb. 19, 2025] ............................ 16

*Love v. Ladder Fin., Inc.,*
   23-CV-04234-VC, 2024 WL 2104497, at *1 (N.D. Cal., May 8, 2024) ....................... 15

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555, 560 (1992) .............................................................................................. 10

*Mikulsky v. Bloomingdale's, LLC,*
   713 F. Supp. 3d 833, 845 (S.D. Cal. 2024) .................................................................. 15

*NEI Contr. and Eng'g, Inc. v Hanson Aggregates Pac. Southwest, Inc.,*
   926 F.3d 528, 532 (9th Cir. 2019)................................................................................. 10

*Pettus v. Cole*,
    49 Cal. App. 4th 402, 429 (1996) ............................................................... 23

*Rodriguez v Ford Motor Co.*,
    3:23-CV-00598-RBM-JLB, 2024 WL 4957566, at *4 (S.D. Cal., Dec. 3, 2024) ........................... 13, 20

*Rodriguez v. Autotrader.com, Inc.*,
    762 F. Supp. 3d 921, 926-27 (C.D. Cal. 2025) .......................................... 10, 20

*Smith v. Facebook, Inc.*,
    745 Fed. Appx. 8, 9 (9th Cir. 2018) ........................................................... 16

*Spokeo, Inc. v. Robins*,
    578 U.S. 330, 338 (2016) ............................................................................ 10

*St. Aubin v. Carbon Health Tech., Inc.*,
    24-CV-00667-JST, 2024 WL 4369675, at *5 (N.D. Cal., Oct. 1, 2024) ................. 16

*Sutter Health v. Superior Ct.*,
    227 Cal. App. 4th 1546, 1550 (2014) ......................................................... 25

*Swarts v. Home Depot, Inc.*,
    689 F Supp 3d 732, 743 (N.D. Cal. 2023) ................................................... 13

*Tamraz v. Bakotic Pathology Assocs., LLC*,
    No. 22-0725-BAS-WVG, 2022 WL 16985001, at *4 (S.D. Cal. Nov. 16, 2022) ........ 24

*TransUnion LLC v. Ramirez*,
    594 U.S. 413, 425 (2021) ............................................................................ 10

*Wilson v. Rater8, LLC*,
    No. 20-cv-1515-DMS-LL, 2021 WL 4865930, at *4 (S.D. Cal. Oct. 18, 2021) ............ 24

*Yoon v. Lululemon USA, Inc.*,
    549 F Supp 3d 1073, 1086 (C.D. Cal. 2021) ............................................... 15

*Yoon v. Meta Platforms, Inc.*,
    24-CV-02612-NC, 2024 WL 5264041, at *5 (N.D. Cal., Dec. 30, 2024) ............... 15

*Zarif v. Hwareh.com, Inc.*,
    23-CV-0565-BAS-DEB, 2025 WL 486317, at *14 (S.D. Cal., Feb. 13, 2025) ................ 24, 25

**Statutes**

18 U.S.C. § 2510(8) ................................................................................... 16
Cal. Civ. Code § 56.10(a) .......................................................................... 26
Cal. Civ. Code § 56.10(d) .......................................................................... 26
Cal. Civ. Code § 56.101(a) ......................................................................... 26
Cal. Civ. Code § 56.05(j) ........................................................................... 28
Cal. Civ. Code § 56.05(m) ......................................................................... 27
Cal. Penal Code § 631(a) ...................................................... 14, 15, 21, 23, 25
Cal. Penal Code § 631 ......................................................................... 16, 19

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................. 10

I.        **INTRODUCTION**

This lawsuit is part of an opportunistic scourge of litigation attempting to force large settlements based on the threat of class-wide statutory damages ($5,000 per violation under CIPA, $1,000 under CMIA) from reputable businesses like Defendant who merely used commonplace website marketing tools to measure and increase the efficacy of their internet advertising, and in Eating Recovery Center LLC's ("ERC") case, try to help people who desperately need it. No private information of Plaintiff's was shared, let alone "medical information" protected by HIPAA or the CMIA.  As presented herein, Plaintiff lacks standing and has failed to prove a single element of any of her claims. ERC is entitled to summary judgment.

II.       **RELEVANT FACTUAL BACKGROUND**

A.        <u>**Meta's Data Related to Plaintiff's Visits To ERC's Website**</u>

Meta Platforms, Inc. ("Meta") has produced ███████████████████████████ ███████████████████████████████████████████████████████ (the "Plaintiff Data"). *See* Ex. 1[2] and Ex. 2. ████████████████████████████ the Plaintiff Data ████████████ ███████████████████████ (the "Visiting Period").  Id.

ERC had installed the Meta Pixel "out of the box" and did not specially configure it to transmit data other than the standard "events" the Meta Pixel transmits by default. Declaration of Sara Villegas ("Villegas Dec."), ¶ 6. In relation to the Plaintiff Data, those events were (1) data referencing URLs the browser visited, █████████████  and (2) limited data related to button clicks - which could include clicking on website buttons, hyperlinks, or similar interactive features on ERC's website (such as horizontal scroll arrows used to browse photos and content regarding different ERC treatment locations), ██████████████. *Id.*

───────────────────────────

[1] ██████████████████████ the Plaintiff Data produced by Meta ███████████████ (Ex 1, Column O; Ex 2, Column D) ███████████████████████████████████████████████████████████. Ex. 8 at p. 1; Ex. 12 at 33:5-35:22; 41:8-17.

[2] Unless otherwise noted, references to "Ex." Refer to the Declaration of James Monagle in Support of ERC's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment.

**B.    Plaintiff's Interactions With ERC And Its Website**

█████████████████████████████████████████████████

█████████████████████████████████. Ex. 11 at 18:12-20. Plaintiff testified she

█████████████████████████████████████████████████

█████████████████████████████████████████████." *Id.*, at

14:19-14; 16:4-17. Plaintiff's first interactions with ERC and its website apparently

███████████████████, when Plaintiff first

████████████████████████████████████████████████.

Villegas Dec., ¶¶ 19-21; 24.

        Plaintiff recalled █████████████████████████████

████████████████████ Ex. 11 at 19:19-23.  Plaintiff's ███████ was handled by a member

of ERC's call center staff, who are not permitted by ERC to provide any medical or diagnostic

information to prospective patients, but rather are only authorized to ask basic screening

questions. Villegas Dec, ¶ 24.  The screening questions Plaintiff was asked included whether

Plaintiff was seeking treatment for something ERC treats ████████████████, what type of

treatment Plaintiff was interested in ███████████████████████████

█████, whether Plaintiff had suicidal ideation or self-harm or substance abuse issues that

would disqualify her from being treated by ERC █████, and a benefits check inquiring what her

insurance was. *Id.* Plaintiff was informed ███████████████████████

██████████████ that a member of ERC's clinical assessment team would need to conduct

a 60-to-90-minute assessment of Plaintiff before a clinical recommendation could be made by

ERC and it could be determined whether Plaintiff could become an admitted patient of ERC's.

*Id.*, ¶ 25 & Ex. 7 thereto. An assessment ██████████████████, but Plaintiff ████████

███████████████████ never occurred. *Id.*, ¶ 26.

        Thus, Plaintiff was never provided any medical services by ERC, nor was she assessed by

ERC, nor was she provided any initial or preliminary diagnosis of any kind, and Plaintiff never

became a patient of ERC[3]. *Id.*, ¶¶ 26, 28. Plaintiff admitted ███████████████████████

███████████████████████████████████████. Ex. 11 at 23:24-24:2; 26:3-13; 37:10-13.

Instead, Plaintiff ████████████████████████████. *Id.*, at 37:14-25.

 Plaintiff did not complete the self-assessment form on ERC's website at any time, and

certainly ███████████████████████. Villegas Dec., ¶¶10, 20-21; Declaration of

James Vint ("Vint Dec."), ¶ 3. Plaintiff testified that she ████████████████████████████

████████████████████████████████. Ex. 11 at 27:24; 29:4-25; 187:19-188:11

(████████████████████████████████████████████████████████████████████

████████████). However, Plaintiff's contact information was given to ERC

████████████████, as Plaintiff was sent █████████████████████████. Ex. 6;

Ex. 7. Therefore, Plaintiff could be mistaken that she ████████████████. The only other

time Plaintiff █████████████████████████████████████████████, after

Plaintiff had been █████████████████████. Ex. 1, at Row 56; Ex. 11 at

100:11-15. Plaintiff did not interact with █████████████████████████████████████

████████████████████████████████████████████████████. Villegas

Dec., ¶ 22; Ex. 9, ¶¶ 31-34.

 Plaintiff also believes she ████████████████████ Ex. 11 at 27:21-22.

Plaintiff is mistaken. The quizzes on ERC's website do not provide any sort of diagnosis, either

that the quiz taker has an eating disorder (generally) or any particular type of eating disorder.

Villegas Dec., ¶ 22. Meta's Plaintiff Data shows ████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████. *Id.*; *see also* Ex.

1, at Row 49; Ex. 9, ¶¶ 38; 39(e); Ex. 10, ¶¶ 33-34. Instead, it appears that ████████████████

---

[3] Plaintiff refers to Salesforce contact records wherein she is labeled a patient. See Exhibits 35-36 to
Plaintiff's counsel's Declaration. This is a misnomer ERC used within Salesforce to distinguish prospective
patients like Plaintiff as well as patients from other categories of contacts like professionals and family
members. Thus, the term "patients" was used in this context to categorize both admitted patients and
prospective patients together. Villegas Dec., ¶ 27.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT   -3-

1 

2 ████████████████████████████████████████████. Villegas Dec., ¶ 22.

3 ████Plaintiff also noted ████████████████████████████████████

4 ████████████████████████████████████, no information regarding any actions

5 Plaintiff may have taken on ERC's website including a form submission would have been sent to

6 any third parties such as Meta. Vint Dec., ¶¶ 4-5.

7 The only other form of any kind (including quizzes) that ██████████████████

8 ██████████████████████████ was ERC's "PPC" webpage[4], with PPC standing for

9 pay-per-click, as this webpage could only be navigated to through search engine advertisements

10 ERC paid for, not natively through the website. Declaration of Kimberly Watson ("Watson

11 Dec."), ¶ 3. Notably, the URL for the "PPC" webpage does not contain the words "assessment"

12 "form" or "quiz" and ████████████████████████████████████████████████████

13 ████████████. However, ████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████. Ex. 9, ¶ 30. Although not

16 knowable to Meta except through a manual review of the PPC webpage as it is rendered to visitors

17 (and no evidence exists suggesting Meta did this), the ████████████████████████████

18 ████████████████████████████████████████████████████████████████████

19 ████████████. *Id.*, ¶ 32, fn. 24. To the extent ████████████████████████

20 ████████████████, the data in Ex. 2 ████████████████████████████████████

21 ████████████████████████████████. *Id.*, ¶ 32. Even based on a manual review of the

22 PPC webpage as it is rendered to a visitor (again, which Meta did not do), no determination

23 (including by Meta) is possible regarding ████████████████████████████████████

24 ████████████████████████████████████████████. *Id.* Regarding the

25 

26 

27 [4] *See* Ex. 9, ¶ 29 (noting that out of 24 unique page visits contained in Ex. 1, only three (3) webpages

28 visited contained a quiz or assessment form: (1) the self-assessment form URL, (2) the eating disorder quiz URL, and the PPC Webpage URL (referred to by Vint as the Eating Disorder Assessment).

1 ████████, ERC's expert Jim Vint testified that no data contained in Ex. 2 indicates to Meta

2 ████████████, and ████████████████████████████████████ Ex.

3 13 at 36:14-37:14.

### C.    ERC's Advertising Through Meta

Neither ERC or its competitors can target ads to persons who may be interested in eating

disorders. Villegas Dec., ¶ 13. At all relevant times, the Detailed Targeting Audiences available

to ERC through Meta were not significantly more detailed than what are currently available, *e.g.*,

Fitness and Wellness, Health & Wellness (Personal Care) and Healthy Diet (Personal Care). *Id.*

Similarly, a website owner that advertises with Meta like ERC cannot target the visitors of another

entity's website, meaning it is not and has not been possible (certainly not within the Visiting

Period) for ERC to direct advertisements to visitors of its competitor Alsana's website (and vice

versa – Alsana could not have targeted their Meta ads to ERC's website visitors). *Id.*, at ¶14; *see*

*also* Ex. 8 at p. 3.

A common use of the Meta Pixel for advertising purposes is for advertisers to rely on the

data it collects to target ads to "custom audiences." The custom audiences that ERC used to target

its ads through Facebook during the Visiting Period were based on standard events collected by

the Meta Pixel. Villegas Dec., ¶ 8.  For example, ERC ████████████████████████████

██████ as an inclusive custom audience; advertisements configured in this way would only be

shown by Meta to Facebook users ████████████████████████████████████████

████████████████████████████████████████████████.

ERC also used exclusive custom audiences, such as sending an advertisement to a general

audience of Facebook users Meta determined to be between the ages of 18 and 65 and from

California, but instructing Meta ████████████████████████████████████████

████████████████████████████████████████████████ (thereby

excluding them from the ad audience). *Id.* The principle behind an exclusive custom audience is

that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.*

ERC did not specially configure any nonstandard custom events during the Visiting Period. Custom events are events that the Meta Pixel can collect data about and ERC could specify – such as pressing a particular button – that would allow ERC to include that custom event in a custom audience targeting ads to any Facebook users who clicked on that button in a certain period such as the last 180 days. *Id.*, at ¶ 7.

A comparison of the Meta-produced data (Ex. 3) ███████████████████████ ███████, and the two spreadsheets of data that ERC exported from Meta Events Manager ████████████████████████████ (Ex. 4; Ex. 5) shows that the only ██████████████████████████████████████████████████████████████ ████████████████. Villegas Dec., at ¶ 15.

**D.**   **Meta's Alleged Use Of Data Related To Plaintiff**

Plaintiff apparently argues that █████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████. *See* Plaintiff's Motion, Pgs. 2 ("Meta immediately used Plaintiff's data to target her with advertisements."); and 6-7 ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. This is incorrect, as Meta's Data indicates ████████████████████████ █████████████████████████████. *See* Ex. 3, Row 1149, Columns B (██████████████████), H (██████████████████), and AB (██████████████); *see also* Ex. 12 at 169:1-170:2. Likewise, the advertising data ERC produced through the Meta Events Manager shows ██████████████ ████████████████████████████████████████. Ex. 4, Row 173, Column E.

Plaintiff also erroneously contends that Ex. 3 (Plaintiff's Exhibit 20) shows that ██████ ████████████████████████████████████████████████████████████ *See* Pl. Br. at 16. However, Column D of Ex. 3 references ████████████████████ ██████████████████████████████████████, and Meta's data demonstrates that █████████████████████████████████████████████████████████████ ██████████████████████████████████. Villegas Dec., at ¶ 18.

Moreover, in response to a written question from Plaintiff, asking Meta ███████████████

███████████████████████████████████████████████ Meta responded in part by

stating that ███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. Ex. 8 at p. 3. Meta

also stated: "Per Meta's practices, event data that Eating Recovery Center sent via the Meta Pixel

was not used to create a centralized profile for any individual ..." *Id.*, p. 4. Meta also testified that

insofar as "advertisers can choose to target their advertisements to people based on certain topics

… those topics are not based on Pixel data." Ex. 12 at 182:12-14; *see also* 152:2-9. Similarly,

Meta testified that ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████. *Id.* at 97:15-98:7; *see also*

Ex. 13 at 78:22-80:12, 83:10-84:16, 135:20-137:18; Ex. 10, ¶¶ 37-38. As ERC's expert noted,

Plaintiff may have ████████████████████████████████████, including clicking or

interacting with an ad on Facebook, or visiting these entities' Facebook pages ████████████

████████████████. Ex. 10, ¶ 40.

Meta written responses also stated that ██████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ which Meta explained is

██████████████████████████████████████████████████████████████████████████ Ex.

8 at p. 4; Ex. 12 at 100:8-16. Ultimately, Meta concluded ██████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 8 at p. 4; *see also* Ex.

12 at 101:20-102:18; and 103:7-12 (█████████████████████████████████████████████████

███████████████████████████████████████████████████████).

Importantly, Meta also testified

. Ex. 16 at 95:14-97:14; Ex. 4; Ex. 5; Villegas Dec., at ¶ 7. Instead, Meta testified that

Ex. 12 at 95:14-97:14.

Another category Meta identified regarding

. Ex. 8 at p. 4.

However, Meta testified that Meta

. Ex. 12 at 76:9-77:17.

## III.        OBJECTIONS TO PLAINTIFF'S FACTS

ERC objects to the following references to Plaintiff's exhibits on grounds that they do not say or support what Plaintiff claims they do, i.e., they Assume Facts Not In Evidence and Mischaracterize the Evidence (FRE 401/403, 611(a)(1): **Ex. 2** (pgs. 3:9,15,22; 6:2, 9:8, 16:17)); **Ex. 3** (3:15, 5:16, 5:26, 9:17, 11:28, 12:23-28, 13:14, 13:18, 13:22, 17:8, 18:7, 20:12, 20:16, 21:2, 34:18); **Ex. 4** (5:16, 5:26, 9:17, 12:28, 13:18, 17:8, 20:12, 20:24, 21:2); **Ex. 5** (4:1, 7:11, 7:21, 9:8, 16:17, 16:26, 17:8, 17:10, 20:28, 23:20, 24:20); **Ex. 9** (4:22-23, 4:27, 5:5, 5:9, 7:14, 17:9, 17:10, 24:8); **Ex. 11** (4:12, 4:14, 4:20-21, 4:27 [sub-objection; calls for speculation], 7:12, 7:18, 16:19, 16:23, 17:9 [sub-objection; calls for speculation], 18:3, 18:4, 20:7, 24:8 [sub-objection; calls for speculation]); **Ex. 12** (4:14, 4:24, 5:8); **Ex. 13** (13:18); **Ex. 14** (4:16, 5:18, 6:4, 22:8); **Ex. 16** (5:5, 13:21-22); **Ex. 20** (6:27, 9:19, 13:28, 16:20, 16:25, 18:7, 24:16); **Ex. 22** (12:28); **Ex. 26** (17:28, 18:3-4).  ERC similarly objects to Plaintiff's references to **Exs. 17-18** (5:18), **Ex. 33** (22:15), **Ex. 34** (22:15), **Ex. 35** (22:17), **Ex. 36** (22:17), all of which purport to establish that ERC provided medical services to Plaintiff, for Assuming Facts Not In Evidence / Mischaracterizing the Evidence

---

[5] The "custom_json_data" field includes a "buttonText" parameter. Ex 9, ¶ 30, fn. 23; Ex. 12 at 55:6-12, 62:9-14, 63:5-7.

(FRE 401/403, 611(a)(1)).  ERC objects to the following screenshots that were neither sought, produced, nor explored with ERC witnesses during the discovery process, on the grounds of Hearsay (FRE 802), Lacks Foundation/Authentication (FRE 901) and Best Evidence (FRE 1002): **Ex. 1** (1:10, 6:28, 23:2); **Ex. 7** (4:7); **Ex. 8** (4:8, 19:3); **Ex. 19** (6:7, 23:2); **Ex. 27** (19:5); **Ex. 28** (19:10); **Ex. 29** (19:12); and **Ex. 30** (19:14).  ERC objects to **Ex. 6** (3:20, 7:7, 9:14, 17:11-12, 20:20) and **Ex. 23** (20:25) on grounds that they are comprised of Unqualified / Improper / Inadmissible Expert Testimony (FRE 702; see Dkt. 81 – ERC's Daubert Motion), and that they Assume Facts Not In Evidence and Mischaracterize Evidence (FRE 401/403, 611(a)(1)).  ERC objects to **Ex. 21** (10:11), which references a consent banner ERC allegedly erected after Plaintiff filed suit against ERC, on grounds of Relevance and Undue Prejudice (FRE 401/403) and Subsequent Remedial Measures (FRE 407).  ERC also objects to the following references on grounds they Assume Facts Not In Evidence and that reference to them Mischaracterizes the Evidence (FRE 401/403, 611(a)(1)), as well as on grounds of Relevance (FRE 401) as noted below, including additional objections where noted: **Ex. 24** (14:27) (forensic data unrelated to Plaintiff's website visits) (FRE 401/403; see Dkt. 80), Lacks Foundation/Authentication (FRE 901); **Ex. 25** (17:16) (date of contractual terms not matched to ERC's use of Meta Pixel), Lacks Foundation/Authentication (FRE 901); **Ex. 37** (24:11) (addresses an entity other than ERC). Lastly, although Plaintiff's brief at 20:16-9 contains argument without an evidentiary reference, it Assumes Facts Not In Evidence (FRE 401/403) and Lacks Foundation/Authentication (FRE 901).

## IV.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (emphasis added). Because the Plaintiff bears the burden of proof on her claims, ERC may prove the "absence of a genuine issue of material fact" by "pointing out to the district court ... that there is an absence of evidence to support the [Plaintiff's] case." *Id.* at 323, 325.

1    **V.       ARGUMENT**

2        **A.      Plaintiff Does Not Have Standing**

3        Putative class representatives must have Article III standing, as the irreducible

4    constitutional minimum of a case or controversy. *B.K. by next friend Tinsley v. Snyder*, 922 F.3d

5    957, 966 (9th Cir. 2019). Standing is a "threshold issue" and an "essential and unchanging part

6    of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

7    560 (1992). A plaintiff must demonstrate standing "with the manner and degree of evidence

8    required at the successive stages of the litigation." *Id.*,. at 561.

9        To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2)

10   that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

11   redressed by a favorable judicial decision." *NEI Contr. and Eng'g, Inc. v Hanson Aggregates Pac.

12   Southwest, Inc.*, 926 F.3d 528, 532 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330,

13   338 (2016)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion

14   of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

15   conjectural or hypothetical.'" *Id.*  While "traditional tangible harms, such as physical harms and

16   monetary harms" are "obvious[ly]" concrete, intangible harms are concrete only when they have

17   "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in

18   American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). "Article III standing

19   requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341.

20       In the context of purported CIPA and CMIA causes of action in which a privacy interest

21   is allegedly implicated, "whether that interest is infringed depends on whether the information at

22   issue is actually personal and private" and whether it bears a "'close relationship' to a 'harm

23   traditionally recognized as providing a basis for a lawsuit in American courts.'" *See Carolus v.

24   Nexstar Media Inc.*, 24-CV-07790-VC, 2025 WL 1338193, at *1 (N.D. Cal., Apr. 9, 2025)

25   (citations omitted); *see also Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 926-27 (C.D.

26   Cal. 2025); *Lien v. Talkdesk, Inc.*, 24-CV-06467-VC, 2025 WL 551664, at *1 (N.D. Cal., Feb.

27   19, 2025) ("[W]hether that interest [in controlling personal, private information] is infringed

28   depends on whether the information at issue is actually personal and private.") (citations omitted).

In the operative Complaint, Plaintiff alleged that her "private and medical information to ERC that was intercepted by Meta via the Pixel." Ex. 16, ¶ 24. This information supposedly included information related to multiple diagnostic quizzes she took, including those for anorexia and bulimia, forms with information she filled out concerning her diagnosis and condition, calls she scheduled with ERC which revealed her condition and treatment, clinical assessments she scheduled which revealed her condition and treatment, and searches she performed on the internal search bar on ERC's websites pertaining to her specific condition, symptoms, and treatment. *Id*. If such information had actually been disclosed to Meta, Plaintiff would very likely have had standing. It was not, and she does not.

Now that discovery has concluded, we know that nothing even remotely close to Plaintiff's allegations occurred. In the first place, Plaintiff was never clinically assessed by and never became a patient of ERC. Ex. 11 at 23:19-24:2, 26:12-13; Villegas Dec., ¶ 28. More importantly, ██████████████████████████████████████████████████, and specifically ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 1; Ex. 2; Ex. 12 at 41:15-17; 82:14-83:19 (████████████████████████████████████████████ ████████). In fact, the only information Meta received ████████████████████████████████████████████████████████████████. Ex. 1; Ex. 2; Ex. 9, ¶¶ 10, 28-39; Ex. 10, ¶¶ 5-8, 17-18, 25-27, 31-35; Villegas Dec., ¶¶ 19-22.

The information Meta received ███████████████████████████ was not private medical information, and was not personal or sensitive information such that its disclosure would be highly offensive to a reasonable person. ██████████████████████████████████████████████████████. Ex. 1; Ex. 2; Villegas Dec., ¶¶ 19-22. Without knowing a website visitor's subject motive for visiting a website, such a visit cannot be considered personally identifiable health information. *See American Hospital Association v. Becerra*, 738 F. Supp. 3d 780, 801- (N.D. Tex. 2024) (holding that a visit to a webpage about, e.g., the onset of Alzheimer's disease is not individually

identifiable health information without knowledge of why the user visited the webpage). Unlike cases which distinguish *Becerra* on the grounds that patients in a different posture, ████ ███████████████████████████████████████████. Any visitor to the https://www.eatingrecoverycenter.com/conditions/anorexia webpage could have simply been a researcher, an employee, or looking at information for a friend or for their own edification. In fact, Plaintiff herself testified that ██████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. Ex. 11 at 68:10-71:10. This testimony serves to highlight why website visits to public webpages are neither personal nor sensitive.

As opposed to Plaintiff's unsubstantiated allegations, the data actually transmitted to Meta is insufficient to confer standing. *See Carolus*, 2025 WL 1338193, at *1; *Lightoller v. Jetblue Airways Corp.*, 23-CV-00361-H-KSC, 2023 WL 3963823, at *4 (S.D. Cal., June 12, 2023) ("Although Plaintiff alleges that Defendant monitored and recorded her communications via software when she visited Defendant's website, Plaintiff does not allege that she disclosed any personal information when she visited the website. As such, no personal information was intercepted and recorded."); *Cook v GameStop, Inc.*, 689 F Supp 3d 58, 65-66 (W.D. Pa. 2023) (dismissing claim for lack of standing despite allegations that the defendant "intercepted data regarding [the plaintiff's] mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited" and product searches and selections because the information was not personal information); Because Plaintiff lacks Article III standing, Plaintiff's Complaint must be dismissed.

### B. ERC Did Not Violate CIPA

Section 631(a) of CIPA has four "clauses" or "prongs" which cover three independent patterns of conduct: (1) intentional wiretapping, (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, [i.e., eavesdropping,] and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities. *See Rodriguez v Ford Motor Co.*, 3:23-CV-00598-RBM-JLB, 2024 WL 4957566, at

1  \*4 (S.D. Cal., Dec. 3, 2024) (citations omitted). "Section 631(a) [also] ... contains a fourth basis

2  for liability, for anyone 'who aids, agrees with, employs, or conspires with any person or persons

3  to unlawfully do, or permit, or cause to be done any of the' other three bases for liability." *Id.*

4      As the website owner, ERC cannot be liable under CIPA's first three clauses because it is

5  a party to any communications with Plaintiff and cannot "eavesdrop" on its own communications.

6  *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020).  Plaintiff

7  instead contends that ERC violated CIPA's fourth clause by aiding Meta's violation of one of the

8  first three clauses of the statute. However, "[a] defendant cannot be liable for aiding and abetting

9  another party in violation [of CIPA] absent a predicate violation of Section 631(a)'s first three

10 clauses." *See Gutierrez v. Converse Inc*., 2:23-CV-06547-RGK-MAR, 2024 WL 3511648, at \*8

11 (C.D. Cal., July 12, 2024) (citation omitted). Because there is insufficient to establish a genuine

12 dispute of material fact as to whether Meta committed an underlying violation of CIPA, ERC

13 cannot be liable for aiding Meta to do so.

14     **a.**    **Meta Did Not Violate § 631(a)'s First Clause**

15     Section 631(a)'s first clause prohibits "any person who by means of any machine,

16 instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized

17 connection ... with any telegraph or telephone wire, line, cable, or instrument, including the wire,

18 line, cable, or instrument of any internal telephonic communication system." "Courts have

19 uniformly interpreted this clause as applying only to communications transmitted over telephones

20 and not those transmitted over the internet." *Swarts v. Home Depot, Inc*., 689 F Supp 3d 732, 743

21 (N.D. Cal. 2023) (collecting cases). Thus, this clause does not support Plaintiff's claims.

22     **b.**    **Meta Did Not Violate § 631(a)'s Second Clause**

23     A party violates the second clause of § 631(a) where it "willfully and without consent of

24 all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to

25 learn the contents or meaning of any message, report, of communication while the same is in

26 transit or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a).

27     ***i.***    ***The Contents of Plaintiff's Communications Were Not Disclosed***

28

1   The information related to Plaintiff disclosed to Meta was limited ████████████

2   ████████████. Such information does not amount to the contents of communication

3   protected by CIPA. Because CIPA does not define the term "contents," courts have looked the

4   federal Electronic Communications Privacy Act ("ECPA") for guidance. *See In re Facebook*, 956

5   F.3d at 607. The ECPA defines contents as "any information concerning the substance, purport,

6   or meaning of [a] communication." 18 U.S.C. § 2510(8). "'[C]ontents refers to the intended

7   message conveyed by the communication, and does not include record information regarding the

8   characteristics of the message,' such as a party's name or subscriber number, or other

9   miscellaneous information like IP addresses, keystrokes, and ***pages viewed***." *Gutierrez v.*

10  *Converse Inc.*, 2:23-CV-06547-RGK-MAR, 2023 WL 8939221, at *3 (C.D. Cal., Oct. 27, 2023)

11  (emphasis added) (quoting *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014)).

12       To determine whether information is contents, Courts employ a contextual "case-specific"

13  analysis hinging on "how much information would be revealed" by the information's tracking

14  and disclosure. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022). The

15  Ninth Circuit noted that "[u]nder some circumstances ... divulging a URL containing that search

16  term to a third party could amount to disclosure of the contents of a communication," and has

17  drawn a distinction between URLs that "include[] only basic identification and address

18  information" which do not constitute the contents of a communications and those that contain "a

19  search term or similar communication made by the user." *In re Zynga Privacy Litig.*, 750 F.3d

20  1098, 1108-09 (9th Cir. 2014); *see also In re Facebook*, 956 F.3d at 605 (URLs which "emanate

21  from search terms inputted into a third-party search engine" could amount to the contents of a

22  communication); *Daghaly v. Bloomingdales.com, LLC*, 23-4122, 2024 WL 5134350, at *1 (9th

23  Cir., Dec. 17, 2024) (plaintiffs pointed to "no authority suggesting that the fact that [the plaintiff]

24  visited [a website] (as opposed to information she might have entered while using the website)

25  constitutes 'contents' of a communication within the meaning of CIPA Section 631").

26       Although a split of authority exists, most courts hold that information regarding website

27  browsing data collected while users interact with the website of a defendant company (as opposed

28  to internet-wide browsing history) does not rise to the level of the contents of a communication.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT   -14-

*See Yoon v. Lululemon USA, Inc.*, 549 F. Supp 3d 1073, 1086 (C.D. Cal. 2021) (collecting cases); *see also In re Zynga Privacy Litig.*, 750 F.3d at 1106; *Love v. Ladder Fin., Inc.*, 23-CV-04234-VC, 2024 WL 2104497, at *1 (N.D. Cal., May 8, 2024) (although the defendants allegedly "capture[d] a user's entire site visit," only form entries related to personal identifying information and sensitive health information would qualify as the "contents or meaning" of a communication) (collecting cases); *Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 845 (S.D. Cal. 2024) (though the plaintiff alleged that all of her interactions on defendant's website were tracked, those interactions were "more akin to the 'record' information that the Ninth Circuit has held not to be contents of a communication"); *but see Yoon v. Meta Platforms, Inc.*, 24-CV-02612-NC, 2024 WL 5264041, at *5 (N.D. Cal., Dec. 30, 2024) ("video viewing history can 'shed light on people's interests, politics, artistic tastes'"). Similarly, button clicks are typically considered record information "since they are akin to user habits." Only button clicks which identify specific user-driven information, such as the names of videos that a user viewed, could arguably convey an intended message. *See Yoon*, 2024 WL 5264041, at *6.

The URLs and button clicks in the Plaintiff Data include basic webpage address and website browsing information which do not constitute the contents of a communications, not search terms or other user-inputted communications. Ex. 1; Ex. 2; Ex. 9, ¶¶ 10, 28-39; Ex. 10, ¶¶ 5-8, 17-18, 25-27, 31-35; Villegas Dec., ¶¶ 19-22. While Plaintiff argues that "the Pixel intercepted URLs that revealed the specific documents Plaintiff was viewing" (Pl. Br. at 11), Plaintiff only references ███████████████████████████████████████████████ ████████████████████████████████████████████████.

Plaintiff's contention that other URLs "demonstrat[e] the ████████████████ and related issues that she researched" and "types of treatment and treatment locations she was considering" (Pl. Br. at 11-12) is empty argument; the cited URLs entail mere website browsing. They are akin to record address information, and do not reflect search terms or similar user communications. "Information available on publicly accessible websites stands in stark contrast to [] personally identifiable patient records and medical histories ... that unequivocally provide[] a window into an individual's personal medical history." *Smith v. Facebook, Inc.*, 745 Fed. Appx.

8, 9 (9th Cir. 2018) (citation omitted). "Put simply, the connection between a person's browsing history and his or her own state of health is ... tenuous ..." *Id*. Furthermore, Plaintiff disingenuously states that the Plaintiff Data reveals ███████████████████████████

██████████████████████████████████████████████████████████████████████████████

Pl. Br. at 12-13.

█████████████████████████████████████████████████████████████████████████. Ex. 9,

¶¶ 10, 18-23, 32; Ex. 15 at 230:2-235:2; 237:12-240:22.

The cases cited by Plaintiff  for the proposition that URLs constitute the contents of communications are inapplicable to the facts of this case because they involve search terms or similar communications. *See, e.g., In re Facebook*, 956 F.3d at 605 (the plaintiffs alleged that URLS "could emanate from search terms inputted into a third-party search engine," and that the search terms and resulting URLs "could divulge a user's personal interests and queries"); *Lineberry v AddShopper, Inc.*, 23-CV-01996-VC, 2025 WL 551864, at *3 [ND Cal Feb. 19, 2025] (J. Chhabria) (specific products selected by user on website sufficed as "contents"); *St. Aubin v. Carbon Health Tech., Inc*., 24-CV-00667-JST, 2024 WL 4369675, at *5 (N.D. Cal., Oct. 1, 2024) (the plaintiff "provide[d] examples of how her searches and appointment bookings create[d] descriptive URLs" which "include[d] a patient's symptoms or the reason for her medical appointment"); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 941 (N.D. Cal. 2023) (the plaintiffs proffered evidence that the data collected included searches on sensitive topics that may reveal their sexual orientation, political or religious views, or upcoming big purchases).

### ii.    *Meta Did Not Read, Attempt to Read, or Learn the Contents of Plaintiff's Communications While in Transit*

Even if Meta had intercepted the contents of Plaintiff's communications, it did not read, attempt to read, or learn those contents while the communications were in transit.  "To establish a violation of clauses two and three [of § 631(a)], a plaintiff must show that a party willfully read or attempted to read the contents of a private communication *while the message was in transit*." *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 928 (C.D. Cal. 2025) (emphasis added); *see also R.C. v. Sussex Publishers, LLC*, 24-CV-02609-JSC, 2025 WL 948060, at *7 (N.D. Cal.,

Mar. 28, 2025); *Jones v. Tonal Sys., Inc.*, 751 F. Supp. 3d 1025, 1036 (S.D. Cal. 2024). "Courts in the Ninth Circuit have interpreted the in transit requirement narrowly." *Licea v. Am. Eagle Outfitters, Inc.*, 659 F. Supp. 3d 1072, 1084 (C.D. Cal. 2023) (citing *Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1152 (C.D. Cal. 2007) ("Even if the storage phase is transitory and lasts only a few seconds, it is still considered electronic storage")).

"Though section 631 does not define 'read' or 'attempt to read,' courts generally conclude that liability under prong two of section 631 requires some effort at understanding the substantive meaning of the message, report or communication." *Torres v. Prudential Fin., Inc.*, 22-CV-07465 (CRB), 2025 WL 1135088, at *5 (N.D. Cal., Apr. 17, 2025) (citation omitted). Here, the record is devoid of evidence that Meta read or learned the contents of Plaintiff's communications while they were in transit. Plaintiff's only arguments that Meta read or learned the contents of communications at all are that ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████. Pl. Br. at 13. Neither argument establishes that Meta learned or read the contents of Plaintiff's communications while in transit, and the evidence on which Plaintiff relies does not support such an assertion.

For the proposition that Meta read Plaintiff's communications "in real time" ████████████

████████████████████████████████████████████████████████████████████.

Ex. 12 at 76:6-77:17. That testimony does nothing to demonstrate that Meta read or learned the contents of Plaintiff's communications while they were in transit or in the process or being sent or received. Meta's representative █████████████████████████████████████████

████████████████████████████████. *Id*. It does not necessarily follow that

entailed an effort at understanding the substantive meaning of the communication, or ██████████

████████████ occurred while in transit. Moreover, Meta's representative ████████████████████

███████████████████████████████████████████████████. *Id*. at 88:22-98:6. In fact,

Plaintiff herself ██████████████████████████████████████████████ (and

therefore no longer in transit) analysis. Pl. Br. at 13.

Plaintiff's assumption that ████████████████████████████████████
████████████████████████████████████████████████████████ is baseless.
In the first place, ████████████████████ does nothing to prove that Meta read or
learned the contents of communications while they were transit. Additionally, ██████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████. Ex. 3, Row 1149, Column H (
███████████████), B and D; Ex. 4, Row 173, Column E; Villegas Dec., ¶¶ 16-18.
████████████████████████████████████. Ex. 12 at 91:24-25.
███████████████████████████████████████████████. *Id*. at 182:3-14. Because
ERC ████████████████████████████, it follows that ERC did not target Plaintiff
based on Pixel data and that Meta did not read or learn the contents of any of Pixel data in order
to target Plaintiff.

Plaintiff also attempts to argue that demonstrative screenshots and HAR files prove that
Pixel data was sent to Meta in real time. Pl. Br. at 14-15. Not only are the HAR files and
screenshots unrelated to Plaintiff's interactions with ERC's website (See Dkt 80), but they do
nothing to show that Meta made an effort to understand the substantive meaning of the
transmissions while they were in transit. Furthermore, the HAR file and screenshot do not indicate
that a simultaneous transmission of the same information was sent to both ERC and Meta. Rather,
they illustrate a set of sequential transmissions between the website visitor and ERC on the one
hand and the website visitor and Meta on the other, involving different parameters sent to each.
*See* Vint Dec., ¶¶ 6-11. Perhaps more importantly, Plaintiff's use of the demonstrative screenshots
and HAR files represents a multi-step process. First, the website visitor's browser makes a request
of the web server. Second, the web server responds by sending packets of data back to the
browser. Third, once those packets are reassembled, allowing the page to operate, additional code
allows new requests to be sent to the respective third parties. The same process occurs between
the browser and a third party, meaning the packets being transmitted are not able to be analyzed
or interpreted while in transit. They must first be received and then reassembled prior to any
analysis or ingestion. *Id*. ¶ 12. Since network packets are sent in different packets and are

encrypted in transit when using Hypertext Transfer Protocol Secure, it is not possible to read or understand the context of the transmission while in transit. *Id.* ¶¶ 13-14.

Given the nature of internet communications, it would be virtually impossible to understanding the substantive meaning of the contents of an internet communication while it is transit. At the summary judgment stage, courts have recently acknowledged this and dismissed CIPA claims. For instance, in *Gutierrez v. Converse Inc.*, 2024 WL 3511648, at *1 (C.D. Cal., July 12, 2024), the plaintiff alleged violations of CIPA arising from a customer service chat feature provided on the defendant's website. The defendant argued that messages sent through the chat feature were encrypted while in transit and, moreover, that it is "virtually impossible" to learn the contents of an internet communication while it is in transit because internet communications are transmitted "in different network packets[.]" *Id.* at *7; *see also Torres v. Prudential Fin., Inc.*, 22-CV-07465 (CRB), 2025 WL 1135088, at *6 (N.D. Cal., Apr. 17, 2025) (granting the defendant's motion for summary judgment despite the plaintiff's argument that "a strict interpretation of the while-in-transit requirement would mean that CIPA could never apply in the context of the internet, where communications are near instantaneous and cannot be meaningfully read or understood until later"). Thus, there was no evidence that the third-party read or attempted to read or learn the contents of such messages while in transit, and the court granted defendant summary judgment. *Id.* at *7-8.

Plaintiff attempts to circumvent the in transit requirement of the second clause of § 631(a) by arguing that Plaintiff and/or Meta was located in California when Plaintiff's data was transmitted to Meta. This does not save Plaintiff's claim. Courts have repeatedly held that the contents of a communication must be read or learned while the communication was in transit or in the process of being sent or received, regardless of whether the alleged interception occurs in California. *See Valenzuela v. Super Bright LEDs Inc.*, EDCV2301148JAKSPX, 2023 WL 8424472, at *10 (C.D. Cal., Nov. 27, 2023) (collecting cases); *Adler v. Community.com, Inc.*, No. 2:21-CV-02416-SB-JPR, 2021 WL 4805435, at *4 (C.D. Cal. Aug. 2, 2021) ("[U]understand[ing] section 631 to prohibit access to any communications received in California ... would be an interpretation of extraordinary breadth ... [and § 631] requires plausible allegations that the

defendant 'read or learned the contents of a communication while the communication was in transit, or in the process of being sent or received.") (citation omitted).

Because there is no evidence that Meta read, attempted to read, or learn the contents of Plaintiffs' communications while in transit, Plaintiff's CIPA claim fails.

### c.    Meta Did Not Violate § 631(a)'s Third Clause

As an initial matter, "a finding of a violation under clause three [of § 631(a)] is contingent upon a finding of a violation of either clause one or two." *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1122-23 (S.D. Cal. 2024) (citations omitted).  Thus, because Meta did not violate CIPA's first or second clauses, Plaintiff's contention that Meta violated the third clause necessarily fails. *See Id.*, at 1123.

Plaintiffs' reliance on clause three is also misplaced because there is no evidence that Meta "used," "attempted to use," or "communicated" any of Plaintiff's communications with ERC. *See* Cal. Penal Code § 631(a) (in order to establish a violation of the third clause, a plaintiff must establish that a party "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" by violating the first two clauses).

There is no evidence that Meta used Plaintiff's data collected by the Pixel to create reports, analytics, or summaries for ERC. Plaintiff cites to Meta's written responses to questions as support for this proposition, but Meta's responses actually state ███████████████████████ ███████████████████████████████████████████████████████. Ex. 8 at p. 2 (emphasis added). Thus, ███████████████████████████████████ ███. During Meta's 30(b)(6) deposition, Meta confirmed that event data ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Ex. 12 at 87:15-88:3, 102:9-103:12. Moreover, the data produced by Meta shows ███████████████████████████████████████████; therefore, she would not have even been included in any of Meta's aggregated statistics that tracked ad efficacy. Ex. 3, Columns M-V; *see also* Villegas Dec., ¶ 23. No evidence exists regarding any other Meta reports incorporating Plaintiff's data.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT  -20-

As for inclusion of Plaintiff's data in custom audiences, ███████████
████████████████████████████████████████████. Ex. 3, Column B; Ex. 4,
Column E; Ex. 5, Column E; *see also* Villegas Dec., ¶¶ 4, 7-12, 15. ██████████
████████████████████████████████████████. *Id*. As discussed in
detail above, data showing that a device browser visited a website is not the contents of
communication protected by CIPA; thus the use of that data is not a violation of the statute.

Likewise, there is no evidence that Plaintiff's data was used to include her in lookalike
audiences for other eating and mental health providers. Lookalike audiences are ████████
████████████████████████████████████████████████. Ex. 12 at 97:19-23,
163:18-164:7; Ex. 9, ¶¶ 37-38. ████████████████████████████████████
████████████████████. Ex. 12 at 97:24-98:12. In fact, none of the ads shown to Plaintiff by ERC or
its competitors Alsana or Acute were served using lookalike audiences. Ex. 3, Columns D, H, I;
Villegas Dec., ¶ 18. Thus, even if lookalike audiences could be generated through Pixel data,
there is no evidence ████████████████████████████████████████
████████████████████████████.

Finally, there is no evidence that Plaintiff's data was used to ██████████████
████████████████████. The one document cited by Plaintiff on this point
suggests that data collected by the Pixel ████████████████████████████
████████████████████. Ex. 8 at p. 4 (emphasis added). However, the
document goes on to state ████████████████████████████████████████
████████████

_____

[6] In order to determine which custom audiences were included for ads that Plaintiff received, one can cross
reference ████████████████████████████████ (Ex. 3),
████████████████████████████████████████████, against the custom
audiences ████████████████████████████████████████. Exs. 4 and 5, Columns A, E.
████████████████████████. *Id*.

1

███████████████████████████████████████

2 ███ " *Id*.; *see also* Ex. 12 at 95:13-97:14, 102:9-103:12.

3            **d.    ERC Did Not Violate § 631(a)'s Fourth Clause**

4        The fourth clause of Section 631(a) prohibits aiding, agreeing with, employing, or

5 conspiring with any person "to unlawfully do, or permit, or cause to be done any of the acts or

6 things" prohibited by the first three clauses of Section 631(a). Cal. Penal Code § 631(a). A

7 defendant cannot be liable for aiding and abetting another party in violation of this clause absent

8 a predicate violation of § 631(a)'s first three clauses. Since Meta did not violate CIPA, ERC

9 cannot have aided or abetted Meta's violation. *See Cody v. Ring LLC*, No. 23-CV-562-AMO,

10 2024 WL 735667, at *7 (N.D. Cal. Feb. 22, 2024) (dismissing claim under Section 631(a)'s fourth

11 clause where plaintiff failed to establish "underlying third-party violation" of preceding clauses).

12        Plaintiff's CIPA claim separately fails because ERC did not have an intent to aid and abet

13 any violation of the statute by Meta. Under clause four, "a person may be held liable as an aider

14 and abettor if they: (a) know the other's conduct constitutes a breach of duty and give substantial

15 assistance or encouragement to the other to so act or (b) give substantial assistance to the other in

16 accomplishing a tortious result and the person's own conduct, separately considered, constitutes

17 a breach of duty to the third person." *Esparza v. UAG Escondido A1 Inc*., 23CV0102 DMS(KSC),

18 2024 WL 559241, at *6 (S.D. Cal., Feb. 12, 2024); *see also Smith v. YETI Coolers, LLC*, 754 F.

19 Supp. 3d 933, 942 (N.D. Cal. 2024) (The language of the fourth clause "indicates that the

20 defendant must be acting with the third party in order to have the third party perform acts that

21 violate the statute ... At the very least, that requires both knowledge of the conduct that will violate

22 the statute and a purpose of aiding, agreeing with, or employing the third party to commit those

23 acts.") (holding that the plaintiff failed to allege facts sufficient to show the requisite knowledge

24 and intent).

25        Plaintiff does not allege that ERC knew that Meta's conduct constituted a breach of duty

26 or that ERC acted with the purpose of furthering such a breach. Ex. 16, ¶¶ 77-86. Because ERC

27 did not willfully or knowingly aid and abet Meta, Plaintiff's CIPA cause of action against ERC

28 must be dismissed.

## C.    ERC Did Not Violate the CMIA

Plaintiff asserts three causes of action premised on alleged violations of sections 56.10(a), 56.10(d), and 56.101(a) of the CMIA. Ex. 16, ¶¶ 87-115. A patient's "medical information" must be impacted for those sections to apply. *See* § 56.10, § 56.101(a).  The protections of the CMIA do not apply here because Plaintiff was not a patient of ERC and the confidentiality of her medical information was not impacted.

### a.    Plaintiff Was Not a Patient of ERC

Plaintiff ███████████████████████████████████████████. Ex. 11 at 23:19-24:2, 26:12-13. Plaintiff ████████████████████████████. Villegas Dec., ¶ 24. ERC does not permit its response team to provide any medical or diagnostic information to prospective patients, who are only authorized to ask basic screening questions. *Id.*, ¶¶ 24-25. The response team ██████████████████████████████████████████████████████████████████████████████████████████. *Id.*, ¶ 25. Plaintiff █████████████████████████████████████████████████████████. *Id.*, ¶¶ 26-28.

Under the CMIA, a patient is "any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains." Cal. Civ. Code § 56.05(m). While the term "health care services" is not defined in the statute, "logic dictates that in order for a health care provider to gather medical information about a person, the provider must have dealt with the person at some level and performed professional services of some type." *Pettus v. Cole*, 49 Cal. App. 4th 402, 429 (1996). ERC did not perform professional medical services for Plaintiff.

At no point did Plaintiff ███████████████████████████ who could not and did not provide professional medical services. *See* Villegas Dec., ¶¶ 24-26. ██████████████████████████████████████████████████████████████████████████████████████, but these do not rise to the level of patient interactions.

Visiting a public website does not make one a patient of the website's provider. *See Zarif v. Hwareh.com, Inc*., 23-CV-0565-BAS-DEB, 2025 WL 486317, at *14 (S.D. Cal., Feb. 13, 2025) (dismissing CMIA cause of action where plaintiff alleged that she "browsed for medications for herself and others on Defendant's website" in part because such browsing did not amount to receipt of health care services). There is no evidence that ███████████████████ ████████████████████ (*see* Ex. 9, ¶ 39; Ex. 10, ¶¶ 32-34; Villegas Dec., ¶¶ 20-22), but even if she had the website does not provide any sort of diagnosis to a visitor, and cannot be considered professional services performed by medical professionals so as to consider the website visitor a patient. Villegas Dec., ¶ 22.

### b.    Plaintiff's Medical Information Was Not Impacted

"Medical information" is defined in the CMIA as "individually identifiable information ... regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j). "It is clear from the plain meaning of the statute that medical information cannot mean just any patient-related information held by a health care provider, but must ... include 'a patient's medical history, mental or physical condition, or treatment." *Eisenhower Med. Ctr. v. Superior Ct.*, 226 Cal. App. 4th 430, 435 (2014); *see also Tamraz v. Bakotic Pathology Assocs., LLC*, No. 22-cv-0725-BAS-WVG, 2022 WL 16985001, at *4 (S.D. Cal. Nov. 16, 2022) ("Information that merely indicates appointment information is not 'medical information' under the CMIA."); *Wilson v. Rater8, LLC*, No. 20-cv-1515-DMS-LL, 2021 WL 4865930, at *4 (S.D. Cal. Oct. 18, 2021) (distinguishing between "information about [a medical] appointment" and "information regarding treatment"). In other words, in order to qualify as medical information "the information must be substantive, rather than merely administrative." *Gray v. Luxottica of Am., Inc*., 8:24-CV-00160-MRA-DFM, 2024 WL 5689566, at *8 (C.D. Cal., Dec. 16, 2024).

Plaintiff's attempts to argue that the Plaintiff Data constitutes medical information is not well founded. Plaintiff first argues that "ERC provides specialized treatment," so website visitors have little reason to be there unless they have a particular disorder. Pl. Br., p. 20. Plaintiff's only citation for this proposition is to deposition testimony that describes the general deposition

process. *Id.* Plaintiff also argues that ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████. Again,

however, browsing a public website does not make one a patient or convey medical information.

*See Zarif*, 2025 WL 486317, at *14. Plaintiff further contends that ████████████████████████

███████████████████████████████████████████████████████████████ However,

this is irrelevant as the record is clear ████████████████████████████████. Ex. 9,

¶¶ 10, 19-20; Ex.15 at 230:2-235:2; 237:12-240:22. Finally, Plaintiff states that a website visitor

would be directed to certain webpages based on certain website interactions, but offers no

evidence in support. Pl. Br., p. 20.

       **c.**    **Meta Did Not "Actually View" Medical Information**

To state a cause of action under the CMIA, a plaintiff must establish that medical

information was "actually viewed by an unauthorized person." *Sutter Health v. Superior Ct.*, 227

Cal. App. 4th 1546, 1550 (2014). To the extent that Plaintiff alleges that she ██████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Ex. 1; Ex. 2; Ex. 9, ¶¶ 10, 28-39. By definition,

then, Meta could not "actually view" such information, even if it could be considered medical

information.

       **D.**    <u>**Plaintiff's Unjust Enrichment Claim Fails**</u>

"Unjust enrichment is not a cause of action, however, or even a remedy, but rather a

general principle, underlying various legal doctrines and remedies." *Rutherford Holdings, LLC v.*

*Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014). In any event, Plaintiff alleges that ERC was

unjustly enriched by "placing profit above lawful conduct" and not acting as required by law. Ex.

16, ¶¶ 126-127. As set forth above, however, ERC did not act unlawfully and therefore was not

unlawfully enriched.

**VI.**    **CONCLUSION**

For the foregoing reasons, ERC respectfully requests that the Court grant Defendants'

motion for summary judgment and dismiss Plaintiff's Complaint with prejudice.

Dated: June 13, 2025

Respectfully submitted,

**MULLEN COUGHLIN LLC**

By:  <u>*/s/ James F. Monagle*</u>
James F. Monagle

*Attorneys for Defendant*

*Eating Recovery Center LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 13, 2025, I electronically filed the foregoing DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT with the United States District Court for the Northern District of California by using the CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.


DATED: June 13, 2025                              Respectfully submitted,

                                        By:      */s/ James F. Monagle*
                                                 James F. Monagle