# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_________________________________

JANE DOE, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED INDIVIDUALS,

Plaintiff,

v. Case No.

EATING RECOVERY CENTER LLC, 3:23-cv-05561-VC

Defendant.

_________________________________

VIDEOTAPED DEPOSITION OF TOBIAS WOOLDRIDGE AS 30(B)(6) CORPORATE REPRESENTATIVE FOR META PLATFORMS, INC.

DATE: Tuesday, March 11, 2025

TIME: 9:37 a.m.

LOCATION: Remote Proceeding
Kirkland, WA 98033

OFFICIATED BY: Erik Thompson

JOB NO.: 7211953

[redacted]

MR. LACOMB: Objection. Vague.

A [redacted]

MR. LACOMB: Objection. Mischaracterizes [redacted]

MS. HARRIS: [redacted]

MS. HARRIS: Object to form, vague.

A I don't specifically know that.

Q [redacted] representation; is that correct?

MS. HARRIS: Object to form, misstates the testimony.

A I don't want to give an answer that would be speculative. And I am not completely confident of which identifier was hashed to --

Q Do you have any ideas of what it could be?

MS. HARRIS: Object to form, calls for speculation.

A The hashed identifier is possibly a hash of a separable ID.

Q A separable ID?

A Yes.

Q What is a separable ID?

A It is an ID designed such that it can be separated from an account.

Q Does Meta use separable IDs to connect events to Facebook users?

MS. HARRIS: Object to form, vague.

A A separable ID may connect information in this table to a user account.

Q You say may. In what circumstances would it not?

MR. LACOMB: Objection. Vague.

A [redacted]

Q I believe I understand that there are certain settings within Facebook, privacy settings for example, that if configured in a certain way, would, for example, prevent a separable ID from being connected to a Facebook user for more than one day; is that correct?

MR. LACOMB: Objection. Vague.

THE WITNESS: I believe -- oh, go ahead, Darcy.

MS. HARRIS: No, go ahead.

THE WITNESS: I believe this may be beyond the scope of topics for which I'm prepared but I do understand that Meta does have a control that would limit how long separable IDs are connected to an account.

BY MR. MONAGLE:

Q What's the shortest amount of time that you understand a separable ID might be connectable to an account?

MS. HARRIS: Object to form, vague.

A Again within my personal capacity, I do not specifically know the shortest time, but it will be I within the neighborhood of a day.

Q And do you know of any other settings that would be, for example, on a -- longer than a day versus, you know, by the next time they clear their cache or

Facebook ID of the currently logged-in Facebook user?
MS. HARRIS: Objection. Outside the scope, vague.
You can answer if you know.
THE WITNESS: Continuing my -- in my personal capacity, I am not.
BY MR. MONAGLE:
Q Okay. Anywhere on this document do you see either a Facebook ID or a C user value?
MR. LACOMB: Objection. Vague.
A [redacted]
Q Why not?
MR. LACOMB: Objection. Vague.
A [redacted]
[redacted] [redacted]
MS. HARRIS: Objection. Outside the scope, calls for speculation.
You can answer if you know -- vague.
[redacted]

MS. HARRIS: Object to form, vague.

A These appear to be events that were transmitted to Meta and logged.

Q What events do you believe these represent?

MS. HARRIS: Object to form, vague.

A [redacted]

Q Okay, what does that mean to you?

MR. LACOMB: Objection. Vague.

A [redacted]

MS. HARRIS: Object to form, vague, calls for speculation.

A [redacted]

Q Eight through 11. Yeah.

MS. HARRIS: Object to form, vague.

A These are very long cells in the table. I'm just looking at them with my eyes. I -- they appear to be similar. I -- if I was to make the conclusion that they were the same, I would prefer to just use some program to compare them, but they look largely the same to me.

Q Okay. Do you have any understanding of what [redacted]

MS. HARRIS: Objection. Vague, calls for speculation.

A [redacted]

MS. HARRIS: Object to form, vague, calls for speculation.

A Apologies. There's a lot to read. It may have been a button clicked in association to a form, but I couldn't tell you what the meaning of this form was.

Q Do you know -- do you believe that it was a button click? You said it may have been a button click.

[redacted]

button that was clicked?
A The custom data --
MS. HARRIS: Object to form, vague, calls for speculation, asked and answered.
[redacted]
BY MR. MONAGLE:
Q And what makes you conclude that?
A I see --
MS. HARRIS: Object to form, vague.
THE WITNESS: Sorry.
BY MR. MONAGLE:
Q Go ahead.
A Yeah, so I -- so I see the JSON parameter button text "For me" within the --
Q Do you see any other JSON parameter button texts in lines 8 through 11?
MS. HARRIS: Object to form, vague.
A I mean, I specifically see the parameter with

the record. The time is 11:27.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:36.

BY MR. MONAGLE:

Q Okay. Just a one more question about Pixel

[redacted]

MS. HARRIS: Object to form, vague, compound.

A [redacted]

[redacted] [redacted]

MS. HARRIS: Object to form, vague.

A [redacted]

Q [redacted]

MS. HARRIS: Object to form, vague.

A [redacted]

[redacted]

MS. HARRIS: Object to form, vague, compound.

BY MR. MONAGLE:

Q [redacted]

MS. HARRIS: [redacted]

[redacted]

Let me stop sharing my screen.

MR. LACOMB: Jim, just to go back, you were cutting out at least on my end. What cell were we [redacted]

MR. MONAGLE: I was talking about lines 43 and 44 of ERC Pixel 1, Column T.

MR. LACOMB: Yeah. Okay.

[redacted]

MS. HARRIS: Object to form, vague, assumes facts.

A [redacted]

Q Is hashed contact information only sent when advanced matching is turned on?

MS. HARRIS: Object to form, vague.

A Advanced matching is -- it refers to the product essentially of sending hashed contact information along with the Meta Pixel. And so I wouldn't necessarily use the term advanced matching is turned on so much as I would think of the terms the advertiser is using advanced matching, and the advertiser is sending hashed contact information with the Pixel as interchangeable.

Q Do you know whether or not ERC sent hashed contact information via the Meta Pixel at any time?

MS. HARRIS: Object to form, vague, calls for speculation.

A I do not know the answer to that.
Q Looking at ERC Pixel 1 and ERC Pixel 2 that we went over at length before the break, is there any indication in either of those documents that ERC sent hashed contact information relating to the plaintiff in this case?
MS. HARRIS: Object to form, vague, compound.
A In document 0001, the column Has User PII Data is false on every one of the log entries. And so that suggests that they did not send hashed contact information with those events.
Q And how about Pixel ERC 2, is there anything in that document that suggests otherwise or suggests that hashed contact information may or may not have been sent?
MS. HARRIS: Object to form, vague, compound.
A I do not think there is such information.
Q Meaning there's no information indicating that hashed contact information about the plaintiff was sent as reflected by Pixel ERC 002; correct?
MS. HARRIS: Object to form, vague.
A Neither of these tables includes an indication that hashed contact information was sent. ERC 1 has an

as you mentioned previously. I don't have a exhaustive list of every parameter that advertisers can toggle on or off.

Q Okay, let's go back to the last exhibit about answers to questions that were posed. Can you go back to that, please? And I'm interested at this point in the answer to question number three. And that is

[redacted]

MS. HARRIS: Object to form, vague, compound.

A [redacted]

[redacted]

MS. HARRIS: Object to form, vague, compound.

A [redacted]

[redacted]

A [redacted]

[redacted]

A Okay, yeah, I'll read it. I've completed reading the response.

Q [redacted]

MS. HARRIS: Object to form, vague.

A [redacted]

Q Do you know whether other limits might affect which data is made available for aggregation? For example, if someone is -- or if an entity is subject to core setup restrictions, is it possible that event data related to such entities may not be made available for aggregation?

MS. HARRIS: Object to form, vague, compound.

A [redacted]

Q Another thing you just mentioned about a potential restriction is people who opt out of being included in ad audiences. Is that a fair characterization of a limitation on what data can be subject to aggregation?

MS. HARRIS: Object to form, vague, misstates the testimony.

A Some data can be restricted based on people

using the control to opt out of receiving advertisements informed by the use of third-party apps and websites. And so that would apply restrictions to how that data can be aggregated.

Q Okay. So now I'm trying to see if I can draw another distinction. There's people who may not wish to be included within advertising audiences, but there's also potentially data that has nothing to do with any of Meta's advertising audiences. Is that a limitation?

MS. HARRIS: Object to form.

A You are using terms I'm unfamiliar with. Could you describe what you mean by the second?

Q So there is a -- hold on a second. I will try to further explain but there's different kinds of audiences that developers can utilize through Meta. One of those audiences is custom ad audiences, particularly potentially targeting Pixel related data such as, you know, send an ad to anyone who clicked on an ad and ended up landing on our homepage. That would be a custom ad audience. Do you generally agree that that's the nomenclature for that, custom ad audience?

MS. HARRIS: Object to form, vague, assumes facts.

A I would use the term website custom audience to describe an audience based on website interactions.

Q Okay. What are other audiences that could be utilized other than website custom audiences?

MS. HARRIS: Object to form, vague, outside the scope.

You can answer if you know.

THE WITNESS: So this is outside of the scope of the topics I'm prepared for, but one example could be an engagement custom audience, which would be an audience, for instance, people who liked my Facebook page.

BY MR. MONAGLE:

Q What about audiences based upon interests? Categorical interests?

MS. HARRIS: Object to form, vague, outside the scope.

You can answer if you know.

THE WITNESS: This is outside of the scope of the topics I'm prepared for, but interests -- I do not believe interest-based targeting is typically defined or described as custom audiences.

BY MR. MONAGLE:

Q Is there a such thing as general audiences or generalized audiences as opposed to custom audiences? For example, by location or any other categories?

MS. HARRIS: Objection. Outside the



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

scope, vague.

You can answer if you know.

THE WITNESS: I am not familiar with the term general or generalized audiences.

MR. MONAGLE: Just for the record, I mean, obviously we can fight about it later, but I do believe that there is a category in the matters for his examination directly relating to the use of data received through the Meta Pixel for advertising or marketing purposes. And so I do believe that this questioning is within the scope of the subpoena.

MS. HARRIS: Just to clarify, your questions were not specific to Pixel data. You were referring to audiences based on other types of data that had nothing to do with the Pixel and that was the basis for the objection.

MR. MONAGLE: I don't think so because -- you know, you might not see where I was going -- believe it's squarely within the categories deposed -- or noticed.

BY MR. MONAGLE:

Q So other than the restrictions that we've been discussing about making data available to potentially be aggregated, is it even technically possible for Meta to ingest all of the events that it receives and make it

subject to be aggregated? Is that even technically possible?

MS. HARRIS: Object to form, vague, compound.

BY MR. MONAGLE:

Q Is there a limitation in scope -- I'll strike the question and rephrase it.

Is there a limitation in scope to what Meta is capable of in terms of potentially digesting all of the events that are sent to it?

MS. HARRIS: Object to form, vague.

BY MR. MONAGLE:

Q Accounting for the limitations that we discussed earlier.

A I mean, that's a very broad question. I -- I don't know if I can answer that just on the basis that it's so broad. Maybe you could reword the question.

Q Okay. Do you know whether Meta has the capability to subject -- except for data that's excluded by limitations that we discussed earlier, all of the events that it receives to machine learning, for example?

MS. HARRIS: Object to form, vague.

A This is still a relatively open-ended question. To give an example, Meta has systems which

are constantly looking for attacks on it; right? Of say, if one computer is sending an egregious amount of data to it. My understanding is those systems use machine learning in order to protect Meta at scale against such attacks. And so, like, arguably, yes, you know, that data may be subject to machine learning, but again this is a very broad or open-ended question.

Q I'm trying to get at whether or not it's even possible for machine learning to assess all of the data that Meta receives. It just seems like such an overwhelming amount of data. You know, I wouldn't know how that would be accomplishable in scope.

Let me see if I can ask it a different way. Do you have any reason to believe, for example, the data in the ERC 2 or -- Pixel ERC 2, Column A was or was not subject to machine learning to improve the accuracy of content delivery?

MS. HARRIS: Object to form, vague.

A The systems which process this data have changed and evolved over the course of time. And so speaking for it today, the information listed in Column A, I do not believe feeds into ads personalization for users today. I cannot necessarily speak for every point in the past.

Q Do you have any reason to believe that things

were different as of June 14, 2022, to present that may have changed your answer with respect to those periods?

MS. HARRIS: Object to form, vague, compound.

A My understanding of the primary use of data such as in Column A has been interpreting the structure of a website as opposed to interpreting things about a user. Specifically, if an advertiser configures an event using a tool like Event Setup Tool, then that information may, based on the configuration in Event Setup Tool, potentially be used in content delivery optimization.

Q So generally speaking, historically the data in Column A of Pixel ERC 2 would be used in service of, for example, the custom audience data we spoke about earlier?

A If a developer chose to configure a event using Event Setup Tool, they would have the ability to use that configured event in Custom Audiences, but that would be predicated on them configuring that event.

Q But if they didn't configure that event, generally speaking, the data in Column A of ERC Pixel 2, Meta would not necessarily be processing that or analyzing it for other purposes; correct?

MS. HARRIS: Object to form, vague,

compound.

A I think -- I believe there's some use cases it could be used for at -- again, primarily understanding the structure for website. Like, I mentioned in the event configuration case, the data in Column A in itself would not be immediately accessible in the Custom Audiences product.

Q And other than understanding the structure of a website, is there any other uses that you can -- or that you believe such data may have been potentially subject to prior to today?

MS. HARRIS: Object to form, vague.

A Not that I'm aware of in the -- in the given time period.

Q Have you ever heard of the term of a lookalike audience?

A I am familiar with the term.

Q What does that mean to you?

A Lookalike audiences are a product feature where an advertiser who has a pre-existing custom audience can create another audience based on that pre-existing custom audience containing users who seem similar to people in that pre-existing custom audience.

Q How does Meta determine who "seems" similar to members of a custom audience?

A I -- I believe that happens based on machine learning, based on first-party data, that is Meta data.

Q And do you know specifically what kind of data that's subject to machine learning informs lookalike audiences?

A I don't know specifically which data besides it is my understanding that it is Meta data.

Q But you don't know what data of Meta's it is?

MS. HARRIS: Object to form, vague, asked and answered, outside the scope.

THE WITNESS: Correct. I don't know specifically which data it is.

MR. MONAGLE: I'm going to show you another exhibit.

And then, Tim, when did you say you wanted me to go until? Or stop by?

MR. LACOMB: Let's do quarter till because then I can start at 1:30 and -- I have two and a half hours at least.

BY MR. MONAGLE:

Q Okay. I just -- before I leave the answer that we were focused on, which was number three about the different types of data, et cetera, at the bottom of that particular paragraph that we were looking at, it

[redacted]

Audiences. And that is a different bullet point in the response.

Q [redacted]

MS. HARRIS: Object to form, vague, asked and answered.

A [redacted]

MR. LACOMB: Objection. Mischaracterizes what the document says.

A [redacted]

[redacted]

MS. HARRIS: Object to form -- apologies. Object to form, vague, asked and answered.

THE WITNESS: When you say subject to machine learning, you mean as part of the content delivery optimization systems?

BY MR. MONAGLE:

Q [redacted]

MS. HARRIS: Object to form, vague, compound.

A [redacted]

[redacted]

Q And by matched you mean matched generally as opposed to, you know, subject to advanced matching?

MS. HARRIS: Object to form, vague.

A Yes.

Q Okay. But again, it may have been not necessarily was because Meta can't determine whether any particular event data was or was not; correct?

MS. HARRIS: Object to form, vague, asked and answered.

A Yes, I think that is correct.

Q Okay. I'm going to go on to a new exhibit. Let me know when you see it.

A I see the file in exhibit share. I'm just opening it.

Q [redacted]

outside the scope of the subpoenaed subjects, but --

THE WITNESS: Ad topics are based on -- on platform interactions, not Pixel interactions.

BY MR. LACOMB:

Q And what do you mean by platform interactions? Are you talking about the Meta platforms only or third-party platforms as well?

MR. MONAGLE: Objection --

A Meta's family of apps.

MR. LACOMB: All right. I don't want to pull up another doc, Jim, with just a minute or two. So why don't we just --

MR. MONAGLE: If you want --

MR. LACOMB: And we can jump back on at 3:05. Does that work?

MR. MONAGLE: Okay. That's okay for me. Does that work for you guys?

MS. HARRIS: Yeah, that's fine.

MR. MONAGLE: All right. See you at 3:05. Thanks everybody.

THE VIDEOGRAPHER: Going off the record, the time is 2:53.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:08.

A [redacted].

//

BY MR. LACOMB:

Q [redacted]

Q No, I would not expect you to have reviewed it

[redacted]

[redacted]

MR. LACOMB: All right, let's go to -- it is Pixel_ERC_4 to 9?

MR. MONAGLE: I'm looking for it.

MR. LACOMB: Did you introduce the business tool terms this morning, Jim?

MR. MONAGLE: I can check real quick.

advertise to as part of a custom audience, does Meta target individuals in that state exclusively or primarily? Or how does that work?

MR. MONAGLE: Objection. Vague and ambiguous, argumentative as to individuals.

MS. HARRIS: Objection. Outside the scope, calls for speculation.

You can answer if you know.

THE WITNESS: I don't believe the Custom Audiences product requires you to specify a state.

BY MR. LACOMB:

Q No, I agree it does not require it, but I believe it gives an option to do so. And when that option is exercised, say for example ERC creates a custom audience that includes California as a geographic parameter, what does Meta do at that point concerning the geographic parameter?

MR. MONAGLE: Objection. Assumes facts, vague and ambiguous, argumentative as to geographic parameters and limitations.

MS. HARRIS: Objection. Outside the scope.

You can answer if you know.

THE WITNESS: When creating an audience like a website custom audience, I'm not -- this is

outside of the scope of the topics which I've been prepared, but I do not believe there is a parameter when creating a custom audience such as a website custom audience to choose a state.

BY MR. LACOMB:

Q Okay. Let's just quickly pull back up Exhibit 9.

A I have that document open.

Q Do you see -- let's go to Column B. Look at row 3. You see where it says ex_FB_Illinois_1412?

A I see that.

Q Do you understand that Illinois is a limiting factor in this audience that ERC created?

MR. MONAGLE: Objection. Vague and ambiguous, argumentative as to limiting factor.

MS. HARRIS: Objection. Calls for speculation.

THE WITNESS: EX_FB_Illinois is -- is the campaign name. I'll observe that cell E3 on this row actually says that there are no included custom audiences for this particular ad.

BY MR. LACOMB:

Q Okay. Then let's go to row 7. You see how ad name, campaign name, ad set name all include Colorado?

A I see that.

Q Does that inform your previous answer concerning whether custom audiences can include a state as a limiting factor?

MR. MONAGLE: Objection. Misstates prior testimony, argumentative, assumes facts.

MS. HARRIS: Objection. Calls for speculation.

THE WITNESS: My answer remains consistent. I mentioned previously that there are other ways -- much earlier today, that there are other ways to target and add to people including based on, you know, interests. That is not part of the custom audience product.

BY MR. LACOMB:

Q Well, I think I understand. So you're saying that you can limit the audience in other ways and then build a custom audience after factoring in those limitations; is that correct?

MR. MONAGLE: Objection. Misstates the testimony, argumentative.

THE WITNESS: I would think of these as simply two separate targeting options. One is custom audience, one is location. The two things are separate, distinct things.

//

know.

A I have that opened up again.

Q Okay. I believe earlier you had testified that these ad topics were not based on Pixel data but rather on platform data. And I'm just wondering if advertisers can actually target ads to these ad topics?

MR. LACOMB: Objection, vague.

MS. HARRIS: Objection. Outside the scope, calls for speculation.

You can answer if you know.

THE WITNESS: My understanding is that advertisers can choose to target their advertisements to people based on certain topics. And yes, those topics are not based on Pixel data.

BY MR. MONAGLE:

Q And then my last question is just a clarification. You were talking earlier about the Events Manager and how far back data might be available. And I believe you said that you believe that statistics [redacted] transmitted to Meta. But I think you also had testified that the Events Manager may show recently sent events. To the extent, on that second part, I don't know if that was a misstatement. And the first part was, you know, accurate in terms of statistics rather than events. But