James F. Monagle, Esq. (SBN 236638) MULLEN COUGHLIN LLC
500 Capital Mall, Suite 2350
Sacramento, CA 95814
T: 267-930-1529

*Attorneys for Defendant*
*Eating Recovery Center LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>EATING RECOVERY CENTER, LLC,<br><br>Defendant. | **No.: 3:23-cv-00561-VC**<br><br>Assigned to Hon. Vince Chhabria<br><br>**DECLARATION OF SARA VILLEGAS IN SUPPORT OF EATING RECOVERY CENTER, LLC'S MOTION FOR SUMMARY JUDGMENT** |

**DECLARATION OF SARA VILLEGAS**

I, Sara Villegas, declare as follows:

1. I was the Senior Director of Digital Marketing at Eating Recovery Center LLC, which is a role I held for approximately two years and is the last role I held at ERC, where I worked from April 2019 through June 2025. If called as a witness, I could and would competently testify to the following facts on the basis of my own personal knowledge and my review of documents created and maintained in the regular course of ERC's business.

2. ERC is an entity that operates two different businesses: Eating Recovery Center ("ERC"), which provides eating disorder treatment at high levels of care, and Pathlight Mood and Anxiety Center ("Pathlight"), which provides mood and anxiety treatment at high levels of care.

3. I am not aware of any information relating to Plaintiff-related visits to Pathlight's website, if any, and my declaration is made in the context of the parties' competing summary judgment motions that are limited to Plaintiff's claims, so my testimony will be limited to discussing ERC's operations and use of the Meta Pixel on ERC's website, and Plaintiff's interactions with ERC and its website.

4. In my role at ERC, I oversaw and directed ERC's digital marketing during all relevant times Plaintiff is believed to have visited ERC's website, and particularly [redacted] (the "Visiting Period"), which I understand is the period of time [redacted] (the "Plaintiff Data"). *See* Exhibit 1 (produced by Meta as Pixel_ERC_00000001) and Exhibit 2 (produced by Meta as Pixel_ERC_00000002).

**HOW ERC USED THE META PIXEL**

5. Despite Plaintiff's arguments suggesting otherwise, no changes were made by ERC affecting the Meta Pixel's functionality on ERC's website during the Visiting Period related to the Plaintiff Data.

6. Instead, ERC had installed the Meta Pixel "out of the box" and did not specially configure it to transmit data other than the standard "events" the Meta Pixel transmits by default. In relation to the Plaintiff Data, those events were (1) data referencing URLs the browser visited, and (2) limited data related to button clicks - which could include clicking on website buttons, hyperlinks, or similar interactive features on ERC's website (such as horizontal scroll arrows used to browse photos and content regarding different ERC treatment locations).

7. Similarly, ERC did not specially configure any nonstandard custom events during the Visiting Period using an event setup tool, the Meta Events Manager, or otherwise. Custom events are events that the Meta Pixel can collect data about and an advertiser like ERC could specify – such as pressing a particular button on a website – so that the advertiser could later include that custom event in a custom audience that advertisements are directed to. For example, an advertiser who configured a particular button to be a custom event could send an advertisement on Facebook to a custom audience comprised of any Facebook users who (as data collected by the Meta Pixel indicates) clicked on that button within a certain period specified by the advertiser, such as the last 180 days.

8. Instead, the custom audiences that ERC used to target its ads [redacted] were based on standard events collected by the Meta Pixel. For example, ERC often used "website visitors within the last 180 days" as an inclusive custom

Audience. In other words, ERC would request that a particular ad only be shown by Meta to Facebook users that Meta determined visited a URL on ERC's website (such as its home page) in the last 180 days. Frequently, ERC also used exclusive custom audiences, such as sending an advertisement to a general audience of Facebook users Meta determined to be between the ages of 18 and 65 and from California, but instructing Meta not to send that ad to anyone in that broad category who ERC had designated to be a "Lead" or "Qualified Lead" in the last 180 days (thereby excluding them from the ad audience). The principle behind an exclusive custom audience is that ERC's prior advertising had already been effective with respect to website visitors who had since further interacted with ERC, so additional advertising to them would be unnecessary and presumably unwanted.

9. At all pertinent times related to the Visiting Period, ERC designated website visitors as "Leads" to Meta in one of two ways:

10. The first way was to configure Meta Events Manager to designate as "Leads" any website visitors who landed on a "thank you page" URL, which automatically [and only] occurred after that visitor submitted a form on ERC's website, such as the self-assessment form. Notably, a website visitor could not have submitted a form to ERC without being automatically redirected to one of these "thank you page" URLs. The following are "thank you page" URLs that were configured to designate website visitors to those pages as "Leads":

https://www.eatingrecoverycenter.com/assessment/confirmation/personal

https://www.eatingrecoverycenter.com/assessment/confirmation/personal/self-schedule

https://www.eatingrecoverycenter.com/assessment/confirmation/caregiver

https://www.eatingrecoverycenter.com/assessment/confirmation/caregiver/self-schedule

https://www.eatingrecoverycenter.com/ppf-confirmation

https://www.eatingrecoverycenter.com/ppf-confirmation-self-schedule

11. The other way "Leads" were designated to Meta was not dependent on Meta Pixel-collected data, but rather through a complex configuration of a product called CallRail (https://www.callrail.com). One of CallRail's primary functions was to generate unique phone numbers on certain webpages so if someone called ERC using that unique number after clicking on an ERC advertisement, ERC could know that call was a conversion from that advertisement. However, ERC's integration of CallRail with Meta to designate Leads only involved website visitors who were assigned ClickIDs by Meta, meaning those who had previously responded to an ERC ad. Here, the evidence produced by Meta indicates [redacted] thus Plaintiff would not have been designated a Lead to Meta in this manner. *See* Exhibit 3 (produced by Meta as Pixel_ERC_00000003) at Columns M-U.

12. In this same way, ERC also designated those whose calls progressed beyond initial interest to being confirmed as potentially having conditions that ERC treated (with no disqualifying conditions) as well as being financially qualified as "Qualified Leads." These designations were manually made in Salesforce and that designation was automatically communicated to Meta if the Salesforce record also noted a Meta ClickID. Again, the only information sent by ERC to Meta in this context was that a particular Meta ClickID had been deemed a "Qualified Lead"; Meta was never given any information what that term meant to ERC internally. For the same reasons Plaintiff would not have been designated as a Lead to Meta, Plaintiff would not have been designated as a Qualified Lead either.

13. To the extent Plaintiff suggests ERC or its competitors can target ads to persons who may be interested in eating disorders, Plaintiff is mistaken. At all relevant times, the Detailed Targeting Audiences available to ERC through Meta were not significantly more detailed than what is available now, e.g., Fitness and Wellness, Health & Wellness (Personal Care) and Healthy Diet (Personal Care).

14. Contrary to Plaintiff's unsupported allegations, a website owner that advertises with Meta cannot target the visitors of another entity's website, meaning it is not and has not been possible (certainly not within the Visiting Period) for ERC to direct advertisements to visitors of its competitor Alsana's website, and vice versa – Alsana could not have targeted their Meta ads to ERC's website visitors.

15. A comparison of the Meta-produced data (Exhibit 3) [redacted] and the two spreadsheets of data that ERC exported from Meta Events Manager and produced [redacted] (*see* Exhibits 4 & 5) shows that [redacted]

**ADVERTISEMENTS PLAINTIFF WAS SHOWN**

16. Plaintiff apparently argues that [redacted] These assumptions are incorrect, as documents produced by both Meta and ERC prove.

17. As Exhibit 3 demonstrates [redacted]

[redacted] Meta's data indicates [redacted] Likewise, the advertising data ERC produced through the Meta Events Manager [redacted] *See* Exhibit 4, Row 173, Column E.

18. Similarly, Plaintiff also erroneously contends that Exhibit 3 (marked as Exhibit 20 in Plaintiff's motion) shows that [redacted] *See* Plaintiff's Brief, p. 16. However, Column D of Exhibit 3 references [redacted] and Meta's data demonstrates [redacted]n.

**PLAINTIFF'S INTERACTION WITH ERC'S WEBSITE**

19. All available evidence indicates that Plaintiff's first visit to ERC's website was o[redacted]. *See* Exhibit 1, column K[redacted]. Plaintiff's first visit lasted [redacted] Plaintiff resumed visiting [redacted]. *See id.*, at Rows 12, 22; Columns K, L, Q.

20. Plaintiff did not complete and submit ERC's self-assessment form at that time or any other time, as ERC would have had a record of any form submissions and does not have a record of any form submission by Plaintiff. Likewise, ERC has no record of Plaintiff entering any data into ERC's self-assessment form, as ERC does not couture any form data unless the form is submitted, and [redacted]. Likewise, [redacted] and as discussed above, had Plaintiff submitted a form she would have automatically landed on a "thank you page" [redacted]. Additionally, [redacted], but Plaintiff would have had to visit at least one additional URL reflecting a later portion of the form prior to submitting the form, [redacted].

21. What apparently occurred is that [redacted] ERC understands this is a common occurrence, *i.e.*, prospective patients often prefer that their initial interactions with ERC occur via telephone rather than through a form submission; that is what a phone number is on every step of the form. Attached as Exhibit 6 is a true and correct copy [redacted] entitled "The Basics." Plaintiff did not complete the form entries on this page, and likely called an ERC phone number such as the one shown. This portion of the form has not materially changed since Plaintiff visited it on June 14, 2022.

22. To the extent Plaintiff claims [redacted] (*see* Plaintiff's Brief, p. 5) Plaintiff is mistaken. The quizzes on ERC's website do not provide any sort of diagnosis, either that the quiz taker has an eating disorder (generally) or any particular type of eating disorder. Moreover, although [redacted]. *See* Exhibit 1, Row 49. Instead, it appears that [redacted].

**ERC'S USE OF REPORTS FROM META PIXEL**

23. Plaintiff is mistaken to the extent she suggests that Plaintiff's data was included in any data analytics or advertising data summaries available to ERC through the Meta Events Manager. First, any data made available to ERC through the Meta Events Manager is aggregated and anonymized to provide statistics on advertising efficacy such as measuring conversion rates of particular ads or ad campaigns. More importantly, to the extent [redacted], she would not have even been included in any aggregated statistics that tracked ad efficacy by indicating how may Facebook users were shown an ad, clicked on it, then visited the advertiser's website or became some type of conversion as determined by the advertiser.

**PLAINTIFF'S INTERACTIONS WITH ERC DIRECTLY**

24. A review of ERC's internal records reveals that Plaintiff initiated a call to ERC on June 14, 2022 at 4:18pm MDT, which lasted less than one half hour and was handled by a member of ERC's response team (essentially, its call center staff), who are not permitted by ERC to provide any medical or diagnostic information to prospective patients, but rather are only authorized to ask basic screening questions. The screening questions Plaintiff was asked included whether Plaintiff was seeking treatment for something ERC treats [redacted] what type of treatment Plaintiff was interested in [redacted] whether Plaintiff has suicidal ideation or self-harm or substance abuse issues that would disqualify her from being treated by ERC ([redacted]), and what her insurance was – this component of an initial intake call ERC refers to as a benefits check or "bene check," which ERC's benefits team then further researches.

25. Consistent with ERC's internal policies in place throughout the Visiting Period, Plaintiff was informed on that initial call she initiated that a member of ERC's clinical assessment team would need to conduct a 60-to-90-minute assessment of Plaintiff before a clinical recommendation could be made by ERC and it could be determined whether Plaintiff could become an admitted patient of ERC's. An assessment was scheduled for June 14, 2022 on that initial call. [redacted] *See* Exhibit 7.

26. Following reminders that ERC sent to Plaintiff, when ERC called to conduct the assessment on June 14, 2022, Plaintiff asked that it be rescheduled, so it was rescheduled to June

21, 2022. Numerous reminders followed, but ERC unsuccessfully tried to contact Plaintiff on June 21, 2022, and the rescheduled assessment never occurred.

27. Lastly, Plaintiff refers to [redacted] *See* Exhibits 35 and 36 to Plaintiff's counsel's Declaration. This is a misnomer ERC used in Salesforce to distinguish prospective patients like Plaintiff and patients from other categories of contacts like professionals and family members. Thus, the term "patients" was used in this context to categorize both admitted patients and prospective patients together.

28. Unequivocally, Plaintiff was never provided any medical services, nor was she assessed, provided any initial or preliminary diagnosis of any kind, and Plaintiff never became a patient of ERC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2025.

Signed by:
Sara Villegas
1A1AFFDFD5B04E3...
Sara Villegas

# EXHIBIT 1

*see* Ex. 1 to Monagle Decl. ISO Def's MSJ

# EXHIBIT 2

*see* Ex. 2 to Monagle Decl. ISO Def's MSJ

# EXHIBIT 3

*see* Ex. 3 to Monagle Decl. ISO Def's MSJ

# EXHIBIT 4

*see* Ex. 4 to Monagle Decl. ISO Def's MSJ

# EXHIBIT 5

*see* Ex. 5 to Monagle Decl. ISO Def's MSJ

# EXHIBIT 6


https://www.eatingrecoverycenter.com/form/self-assessment-form?page=the_basics&request_type=per...

Eating Recovery Center

Treatment & Services | Conditions | Programs by State | Insurance & Admissions | Treatment at Home | Education & Support Groups

Schedule a Fre

1-877-82

## The Basics

### Your Information

Tell us about yourself:

First Name *

Last Name *

Email *

Phone *

Ok to leave a voicemail? *

# EXHIBIT 7

# *see* Ex. 7 to Monagle Decl. ISO Def's MSJ