James F. Monagle, Esq. (SBN 236638)
MULLEN COUGHLIN LLC
500 Capital Mall, Suite 2350
Sacramento, CA 95814
T: 267-930-1529
jmonagle@mullen.law

*Attorneys for Defendant*
*Eating Recovery Center LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>EATING RECOVERY CENTER, LLC,<br><br>Defendant. | No.: 3:23-cv-00561-VC<br><br>Assigned to Hon. Vince Chhabria<br><br>**DEFENDANT EATING RECOVERY CENTER LLC'S SUPPLEMENTAL BRIEF[1] IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

---

[1] ERC inadvertently failed to properly calendar the Court's 5pm deadline and only recognized this error after noting the time that Plaintiff's filing occurred. Upon realizing this error, ERC diligently worked to file this brief as close as possible to the deadline and intentionally did not read Plaintiff's submission prior to making this filing. Given these circumstances, including the substantial amount of work performed over the past week to comply with the Court's Order, the lack of apparent prejudice, and based on the unintentional nature of the oversight, ERC sincerely apologizes and respectfully requests the Court still consider this brief.

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................... 1

II. ARGUMENT ............................................................................................................................ 1

   A.   Redirection of Communications Does Not Fall Within § 631(a) Clause Two ............. 1

      a.   The Court's Proposed Interpretation Does Not Comport with the Plain Meaning of CIPA's Statutory Language ................................................................................................ 2

      b.   The Court's Proposed Interpretation Does Not Comport with the Legal Definition of an "Attempt" ........................................................................................................................ 4

      c.   A Mechanical Redirection of a Communication is Not an Attempt to Learn the Contents of the Communication ................................................................................................ 6

      d.   Meta's Later Use of Generic URLs Does Not Establish that Meta Read or Learned the Contents of Plaintiff's Communications While in Transit ............................ 7

      e.   The Court's Proposed Interpretation Would Render Other Portions of CIPA Superfluous .................................................................................................................................... 7

      f.   To the Extent Ambiguity Could be Read into the Statute, the Rule of Lenity Requires An Interpretation Favoring the Defendant ERC ................................................ 8

   B.   If the Court Proceeds with its Tentative Interpretation of Clause Two of § 631(a), Summary Judgment Still Should Not be Granted in Plaintiff's Favor .............................. 10

   C.   If Summary Judgment Is Granted to Plaintiff Under Clause Two, Limited Scenarios Exist That May Require The Court To Address The Third Clause ................................. 11

   D.   The Court-Identified URLs Are Not Medical Information Within the Meaning of the CMIA ........................................................................................................................................ 11

   E.   The Court Correctly Concludes that Plaintiff is Not a Patient of ERC Within the Meaning of the CMIA ............................................................................................................... 14

III. CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Bittner v. United States*,
  598 U.S. 85, 103 (2023) ................................................................................................................ 9
*Cheffins v. Stewart*,
  825 F3d 588, 593 n.4 (9th Cir. 2016) .......................................................................................... 2
*Cliff Berry, Inc. v. State*,
  116 So. 3d 394, 413 (Fla. Dist. Ct. App. 2012) ........................................................................ 10
*Corley v. United States*,
  556 U.S. 303, 314 (2009) ............................................................................................................ 8
*Cousin v. Sharp Healthcare*,
  702 F. Supp. 3d 967, 975 (S.D. Cal. 2023) ............................................................................... 12
*Gutierrez v. Converse Inc.*,
  CV 23-6547-KK-MARX, 2024 WL 3511648 (C.D. Cal., July 12, 2024) ............................ 3, 5
*Harrott v. Cnty. of Kings*,
  25 Cal. 4th 1138, 1154 (2001) .................................................................................................... 9
*Howard v. Lab'y Corp. of Am.*,
  No. 1:23-CV-00758, 2024 WL 4250677 (M.D.N.C. Aug. 8, 2024) ......................................... 10
*In re Saldana*,
  122 F.4th 333, 342 (9th Cir. 2024) ............................................................................................. 8
*Joffe v. Google, Inc.*,
  746 F.3d 920, 935 (9th Cir. 2013) .............................................................................................. 9
*Mastel v. Miniclip SA*,
  No. 2:21-cv-00124 WBS KJN, 2021 WL 2983198 (E.D. Cal., July 15, 2021) ........................ 1
*Nienaber v. Overlake Hosp. Med. Ctr.*,
  733 F. Supp. 3d 1072, 1082 (W.D. Wash. 2024) ..................................................................... 12
*People v. Arias*,
  45 Cal. 4th 169, 180 (2008) .................................................................................................... 8, 9
*People v. Garton*,
  4 Cal. 5th 485, 510 (2018) .......................................................................................................... 4
*People v. Luna*,
  170 Cal. App. 4th 535, 543, 87 Cal. Rptr. 3d 781, 787 (2009) .................................................. 4
*Pettus v. Cole*,
  49 Cal. App. 4th 402, 429 (1996) ............................................................................................. 14
*R.C. v. Sussex Publishers, LLC*,
  24-CV-02609-JSC, 2025 WL 1735994 (N.D. Cal., June 23, 2025) ...................................... 2, 5
*Rodriguez v. Ford Motor Co.*,
  722 F. Supp. 3d 1104, 1121 (S.D. Cal. 2024) ............................................................................ 8
*Roller v. Brady*,
  No. D080996, 2023 WL 4554105 (Cal. Ct. App. July 17, 2023) ............................................ 14
*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) ........................................................................ 12

*Smith v. YETI Coolers, LLC*,
  754 F. Supp. 3d 933, 942 (N.D. Cal. 2024) .................................................................. 11
*Torres v. Prudential Fin., Inc.*,
  22-CV-07465 (CRB), 2025 WL 1135088 (N.D. Cal., Apr. 17, 2025) ................................ 2, 3, 6
*United States v. Snell*,
  627 F.2d 186, 187 (9th Cir. 1980) ...................................................................................... 4
*Valenzuela v. Keurig Green Mountain, Inc.*,
  674 F. Supp. 3d 751, 758 (N.D. Cal. 2023) ..................................................................... 4, 6
*Vita v. New England Baptist Hosp.*,
  494 Mass. 824, 847, 243 N.E.3d 1185, 1204 (2024) ............................................................ 9
*Williams v. DDR Media, LLC*,
  No. 22-CV-03789-SI, 2024 WL 4859078 (N.D. Cal. Nov. 20, 2024) ................................ 2, 6
*Yockey v. Salesforce, Inc.*,
  745 F. Supp. 3d 945, 953 (N.D. Cal. 2024) ........................................................................ 4

**Statutes**

Cal. Civ. Code § 56.05(j) ............................................................................................................ 15
Cal. Civ. Code § 56.05(m) .......................................................................................................... 14
Cal. Civ. Code § 56.101 .............................................................................................................. 15
Cal. Crim. Jury Instruction 460 ................................................................................................. 4, 5
Cal. Penal Code § 21a .................................................................................................................. 4
Cal. Penal Code § 631(a) ......................................................................... 1, 2, 4, 5, 7, 8, 9, 10, 11
Cal. Penal Code § 632 .............................................................................................................. 7, 8
Cal. Penal Code § 632(a)-(c) ........................................................................................................ 8

## I. INTRODUCTION

Defendant Eating Recovery Center, LLC ("ERC") submits this Supplemental Brief in further support of its Motion for Summary Judgment and in opposition to Plaintiff's Motion for Summary Judgment, pursuant to this Court's Order (ECF 145). In that Order, the Court invited the parties to address several topics, including (1) whether Meta's redirection of communications falls within § 631(a)'s second clause, (2) if so, whether summary judgment should be granted to Plaintiff under the second and fourth clauses of § 631(a), (3) if so, whether the Court would need to reach Plaintiff's argument about the third clause of CIPA § 631(a), (4) whether a person who visited certain URLs on a ERC's public website has disclosed "medical information" under the CMIA, and (5) whether Plaintiff was "patient" of ERC under CMIA with respect to such visits.

## II. ARGUMENT

### A. Redirection of Communications Does Not Fall Within § 631(a) Clause Two

The Court is "tentatively of the view that ... Meta's mere act of redirecting the communication to itself falls within" the second clause of § 631(a). See ECF Doc. No. 145, p.1. The second clause imposes liability where a person "attempts ... to learn the contents ... of any ... communication while the same is in transit ... or is being sent from, or received at any place within this state." *See Mastel v. Miniclip SA*, No. 2:21-cv-00124 WBS KJN, 2021 WL 2983198, at *4 (E.D. Cal., July 15, 2021) (the second clause requires the defendant to have "read or learned the contents of a communication while the communication was in transit, or in the process of being sent or received"). Based on both a plain understanding of the statutory language and the legal definition of the term "attempt," merely redirecting communications as discussed by the Court, without more, cannot correctly be considered an attempt to learn the contents of those communications while they are in transit or in the process of being sent or received.

Notably, in its Order, the Court hypothesized that "[i]ntercepting a communication <u>for the purpose of analyzing its contents later</u>, even without reading the communication while it's in transit, would appear to be part of an attempt to learn the contents of a communication while it's being sent." *See* ECF Doc. No 145, p. 1 (emphasis added). However, no evidence exists that Meta

DEFENDANT'S SUPPLEMENTAL BRIEF
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
-1-

redirected Plaintiff's communications while they were in transit for the purpose of reading or learning the contents of those communications later. Moreover, even if that were the case, Meta's requisite intent to "attempt to learn" the contents of communications while in transit must be to *concurrently* learn the contents of communication, not to learn the contents of those communications at some later time. The Court's proposed reading of CIPA would impermissibly render portions of the statute superfluous, and is antithetical to the rule of lenity, which applies.

### a. The Court's Proposed Interpretation Does Not Comport with the Plain Meaning of CIPA's Statutory Language

The term "attempt to learn" is not defined in CIPA. When a term is used in a statute but not defined, Courts first turn to the "common practice of consulting dictionary definitions to clarify the ordinary meaning" of such terms. *See Cheffins v. Stewart*, 825 F3d 588, 593 n.4 (9th Cir. 2016). The term "attempt" is defined as "the act or an instance of trying to do or accomplish something." *See* https://www.merriam-webster.com/dictionary/attempt (last accessed August 8, 2025). In accord with that definition, courts have held that "liability under prong two of section 631 'requires some effort at understanding the substantive meaning of the message, report or communication.'" *Torres v. Prudential Fin., Inc.*, 22-CV-07465 (CRB), 2025 WL 1135088, at *5 (N.D. Cal., Apr. 17, 2025) (quoting *Williams v. DDR Media, LLC*, No. 22-CV-03789-SI, 2024 WL 4859078, at *5 (N.D. Cal. Nov. 20, 2024)).

Under a plain reading of the statute, the attempt to learn the contents of a communication must occur while the same is in transit or is in the process of being sent from or received in California. *See* Cal. Penal Code § 631(a). A communication is in transit or in the process of being sent only before it reaches its intended target. *See R.C. v. Sussex Publishers, LLC*, 24-CV-02609-JSC, 2025 WL 1735994, at *2 (N.D. Cal., June 23, 2025) ("[T]he crucial question under § 631(a)'s second clause is whether [the plaintiffs] ha[ve] plausibly alleged that [a third party] read one of [their] communications while it was still in transit, *i.e.*, before it reached its intended recipient.") (citation omitted); *see also Gutierrez v. Converse Inc.*, CV 23-6547-KK-MARX, 2024 WL 3511648, at *7 (C.D. Cal., July 12, 2024], aff'd, 24-4797, 2025 WL 1895315 (9th Cir., July 9,

1  2025) ("[I]t is "virtually impossible" to learn the contents of an internet communication while it is
2  in transit.").

3      In this case, there is simply no evidence that Meta's redirection of Plaintiff's alleged
4  communications was part of a preconceived effort to understand the substantive meaning of those
5  communications at any point, much less while they were in transit.  In fact, aside from the
6  conditional use of pixel-collected data at ERC's behest, which was speculative at the time of
7  Meta's redirection, the evidence does not support that Meta read or learned the content of
8  Plaintiff's communications at all[2].  Preserving data to <u>potentially</u> use it later does not constitute an
9  attempt to learn the contents of the data at the time it is redirected. Additionally, as in *Torres v.*
10 *Prudential Fin., Inc.*, "[e]ven if [a third party's] software intercepts the contents of Plaintiffs'
11 communications in real time and stores the recording on [that third party's] server ... nothing in
12 the record plausibly indicates that [the third party] reads or attempts to read the contents of the
13 communication <u>while they are in transit</u>."  *See* 22-CV-07465 (CRB), 2025 WL 1135088, at *5

---

[2] For example, Meta's data and testimony shows that ▮▮▮▮▮▮▮▮ (not read or understand it). *See* Monagle Decl., MSJ2, Ex. 12, at 76:6-77:17; *see also* Supplemental Decl., Ex. B at 20:13-21:18 (▮▮▮▮▮▮ Monagle Decl., MSJ2, Ex. 1 depict ▮▮▮▮▮▮, respectively). Likewise, the fact that pixel event data may ▮▮▮▮▮▮ in no way suggests an intent to read or learn the contents of Plaintiff's communications. Monagle Decl., MSJ2, Ex. 12, at 95:3-5.  As for ▮▮▮▮ Monagle Decl., MSJ2, Ex. 2, Meta testified that ▮▮▮▮▮▮ *Id.*, at 95:14-96:8. Meta also testified that ▮▮▮▮▮▮, and ERC did not configure such custom events. *Id.*, at 96:17-97:7l; Villegas Dec, ¶ 7.  Meta then added ▮▮▮▮▮▮. *Id.*, at 97:8-14.  Otherwise, Meta testified that advertisers use the Meta Pixel for "creating custom audiences" and "measuring the outcomes of their ad campaigns." Supp. Dec., Ex. B, at 114:11-24; see also *Id.*, at 165:14-16. Lastly, Meta's responses to Plaintiff's written questions (Monagle Decl., MSJ2, Ex. 8) refer to ▮▮▮▮▮▮ and when asked about these potential uses at deposition, Meta's representative explained that data sent to Meta via the Pixel ▮▮▮▮▮▮ *Id.*, at 87:4-88:3. Thus, no evidence exists suggesting Meta had any intent to read or learn the contents of <u>Plaintiff's communications</u> (if any) at the time of redirection.

(N.D. Cal., Apr. 17, 2025) (citing *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023) (emphasis in original).

### b. The Court's Proposed Interpretation Does Not Comport with the Legal Definition of an "Attempt"

The Court's theory that the redirection of communications is an attempt to learn the contents of those communications is also at odds with California's definition of an attempted criminal act. CIPA is a criminal statute under the Penal Code. In California, "[a]n attempt to commit a crime consists of two elements: a <u>specific intent to commit the crime</u>, and a direct but ineffectual act done toward its commission." Cal. Penal Code § 21a (emphasis added); *see also* Cal. Crim. Jury Instruction 460; *United States v. Snell*, 627 F.2d 186, 187 (9th Cir. 1980) ("A conviction for attempt requires proof of culpable intent and conduct constituting a substantial step toward commission of the crime that strongly corroborates that intent."). Applying the criminal definition of attempt to this case would require a showing that Meta had a specific intent to understand the substantive meaning of Plaintiff's communications while they were in transit, and took direct action towards doing so. Because a criminal attempt requires the same *mens rea* as the offense attempted, to be liable, Meta would need to have redirected the communication with the intent to read or learn it <u>in transit</u>. No evidence exists evincing any such intent on Meta's part.

Under the Court's proposed interpretation of the statute, Meta's redirection of communications would be the requisite "direct step" supporting an attempt to learn the contents of such communications. However, "a direct step requires more than ... obtaining or arranging for something needed to commit [a violation of 631(a)]." *See* Cal. Crim. Jury Instruction 460; *see also People v. Garton*, 4 Cal. 5th 485, 510 (2018) ("The overt act element of attempt requires conduct that goes beyond mere preparation and shows that defendant is putting his or her plan into action."); *People v. Luna*, 170 Cal. App. 4th 535, 543, 87 Cal. Rptr. 3d 781, 787 (2009) ("Preparation alone is not enough [to establish an attempt], there must be some appreciable fragment of the crime committed [and] it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter."). Here, the

redirection of communications without any present intent to learn their contents is at worst obtaining the communications needed to violate § 631(a), or arranging for a violation of § 631(a).

As noted above, there is no evidence that Meta does anything with most of the data it receives, including Plaintiff's data. Thus, Meta's redirection of communications cannot establish a specific intent to learn the contents of such communications, and is not a "direct step "indicat[ing] definite and unambiguous intent to commit [a violation of § 631(a)]." *See* Cal. Crim. Jury Instruction 460; *see also R.C. v. Sussex Publishers, LLC*, No. 24-CV-02609-JSC, 2025 WL 948060, at *7 (N.D. Cal. Mar. 28, 2025) (dismissing § 631 claim where technology was used to view, read, and process data only after it was redirected and stored). Stated differently, Meta's redirection of Plaintiff's alleged communications is, at most, indicative of an intent to preserve the ability to learn the contents of such communications at some later date. Yet the Court cannot <u>assume</u> Meta's intent was to learn the contents of Plaintiff's communications at any time, much less while they were in transit. *See Gutierrez*, 2024 WL 3511648, at *8 ("the mere possibility [that a third party] 'can' ... 'connect the dots' between data [at a later date is] insufficient to establish a genuine issue of material fact as to whether [the third party] reads or attempts to read users' messages while they are in transit." The record is devoid of evidence suggesting Meta took any act to <u>attempt to</u> read or learn the contents of any of Plaintiff's communications at any time.

This Court's hypothetical posed at oral argument serves to underscore why the distinct case at hand does not implicate an attempt to learn, whether based on the dictionary definition of an "attempt" or the definition of an attempt under criminal law. In that hypothetical, the Court asked the parties to consider a scenario in which an individual took a photograph of a written communication <u>with the specific intention</u> of later learning the contents of the communication. Unlike that hypothetical, there is no evidence that Meta had the intention to learn the contents of Plaintiff's alleged communications when they were redirected. Thus, unlike that hypothetical, Meta's redirection cannot be considered an attempt to learn the contents of the communication at any time, and certainly not while the communication was in transit.

DEFENDANT'S SUPPLEMENTAL BRIEF
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
-5-

### c. A Mechanical Redirection of a Communication is Not an Attempt to Learn the Contents of the Communication

The Court's tentative view that "Meta's mere act of redirecting the communication to itself" is an "attempt[]...to learn the contents" of the communication while the same is being sent should not be adopted. Mechanical redirection of data is not an attempt to learn the contents of that data. For instance, in *Torres v. Prudential Fin., Inc.*, in ruling on a motion for summary judgment, the court held that "[e]ven if [third party] software intercepts the contents of Plaintiffs' communications in real time and stores the recording on a[ third party] server that [the third party's] employees can access, nothing in the record plausibly indicates that [the third party] reads or attempts to read the contents of the communication <u>while they are in transit</u>." 2025 WL 1135088, at *5 (citing *Valenzuela v. Keurig Green Mountain, Inc*., 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023) (emphasis in original). Though the plaintiffs in *Torres* argued that "categorizing and analyzing" information using [third party] software prior to transmission ... constitutes an attempt to understand its meaning," the court held that "[n]o reasonable jury could agree." *Id*. As Judge Breyer noted, whether the data at issue in *Torres* was categorized and analyzed "depend[ed] on a set of pre-determined criteria that [was] mechanically deployed with no intelligible understanding of those values required." *Id*. at *7 (citing *Williams*, 2024 WL 4859078, at *5); see also id. at *6 ("Even when a session replay is reassembled, it is done mechanically and without any attempt to decode its underlying meaning."). Thus, redirection of communications is not in and of itself an attempt to read or learn the contents of those communications, even if mechanical analysis is performed on the data prior to its transmission, albeit no evidence of such exists here.

As Plaintiff's counsel admitted at oral argument, the Meta Pixel redirects data from a website on an automated basis dependent on where the source code is installed. *See* Supplemental Dec., Ex. A, pp. 9:10-13:9. While Plaintiff's counsel contended that such mechanical processes amounted to reading or learning because a "different compilation of the data" is sent to Meta than is sent to ERC, there is no support for that position in the statutory language or case law.

### d. Meta's Later Use of Generic URLs Does Not Establish that Meta Read or Learned the Contents of Plaintiff's Communications While in Transit

Plaintiff may argue that Meta attempted to read or learn the contents of Plaintiff's communications to the extent that Meta later utilized previously redirected URLs to include Plaintiff in a custom advertising audience comprised of prior ERC website visitors. However, even if Meta's later utilization of data could demonstrate a specific intent to read the data while it was in transit, which it cannot, the evidence on this point shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was used to incorporate her into custom advertising audiences. *See* MSJ2 at p. 24 n. 6; *see also* Monagle Decl., MSJ2, Ex. 3 at Column B; Ex. 4 at Column E; Ex. 5 at Column E; *see also* Villegas Dec., ¶¶ 4, 7-12, 15. No evidence suggests Meta needed to read or learn any information other than a Facebook user had visited a URL containing "www.eatingrecoverycenter.com" in order to serve ads to such a custom audience. Because there was no need to, no evidence exists suggesting Meta actually read or learned the contents of any URLs beyond ERC's basic domain, and no evidence exists suggesting Meta read or learned the contents of Plaintiff's communications with ERC (such as "descriptive URLs"), let alone read or learned them while in transit.[3]

### e. The Court's Proposed Interpretation Would Render Other Portions of CIPA Superfluous

Adopting the Court's tentative reading that redirecting communications is itself an attempt to learn the contents of those communications would render multiple provisions of CIPA, including the "in transit" requirement of the second clause of § 631(a), the third clause of § 631(a),

---

[3] The Court's Order regarding supplemental briefing acknowledges the argument that "Meta's process of excising certain information from the URLs does not amount to 'reading' the contents of the communication within the meaning of the second clause of Section 631(a)." *See* ECF Doc. No. 145, p.1. A finding by the Court along these lines is justified by the fact that no evidence exists suggesting anything other than a mechanical filtering process unconcerned with the contents of communications occurred. The Court may have also concluded that "an effort on Meta's part to avoid learning the contents of the communication" occurred. *See* Supplemental Decl. Ex. A, at p. 48:4-6. Moreover, the evidence shows such filtering process ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.*, at pp. 48:9-50:10.

and § 632, superfluous. "A core canon of statutory construction is the rule against surplusage: courts must construe a statute 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *In re Saldana*, 122 F.4th 333, 342 (9th Cir. 2024) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). "Significance should be given, if possible, to every word of an act. Conversely, a construction that renders a word surplusage should be avoided." *People v. Arias*, 45 Cal. 4th 169, 180 (2008) (citations omitted).

The Court's tentative reading renders the "in transit" requirement meaningless. The crime at issue here is reading or attempting to read or learn the contents of communications while they are in transit or being sent from or received in California. If redirecting communications with the potential ability to read or learn the contents of those communications at a later time and in a different place were sufficient to violate CIPA, then the statute's "in transit" limitation would be superfluous.

The Court's tentative holding would also largely conflate the second and third clauses of § 631(a). Premising liability under the second clause on whether a defendant later reads or learns the contents of communications necessarily considers the subsequent use of the information, which is the subject matter of third clause. Thus, when considering the question of whether third-party software fits within CIPA's party exception, many courts have "agree[d] that importing a 'use' requirement into clause two would render clause three superfluous." *See, e.g., Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1121 (S.D. Cal. 2024) (citations omitted).

Finally, and perhaps most importantly, the Court's tentative reading of CIPA § 631(a) would render § 632 of CIPA superfluous. Section 632 creates liability limited to "recording" "confidential" communications by eavesdroppers. *See* Cal. Penal Code § 632(a)-(c). There would be no reason for that provision, which contains limitations that § 631(a) does not, to exist if § 631(a) applied to mere recording of all communications rather than just those that are confidential.

### f.   To the Extent Ambiguity Could be Read into the Statute, the Rule of Lenity Requires An Interpretation Favoring the Defendant ERC

The California Supreme Court has held that the rule of lenity requires courts construing ambiguous language in a criminal statute to "adopt the interpretation that is more favorable to the

1 defendant," even when only civil penalties are sought. *See People v. Arias*, 45 Cal. 4th 169, 177
2 (2008) ("If a statute defining a crime or punishment is susceptible of two reasonable
3 interpretations, we ordinarily adopt the interpretation that is more favorable to the
4 defendant."); *Harrott v. Cnty. of Kings*, 25 Cal. 4th 1138, 1154 (2001) (applying rule of lenity
5 "even though this is not a criminal prosecution because the statute we are construing imposes
6 criminal penalties"); *see also Bittner v. United States*, 598 U.S. 85, 103 (2023) ("the rule of lenity,
7 not to mention a dose of common sense, favors a strict construction" of criminal statutes, even
8 when only civil penalties are sought).

The Ninth Circuit has found that the rule "is reserved for cases where, [a]fter seizing everything from which aid can be derived, the Court is left with an ambiguous statute." *Joffe v. Google, Inc.*, 746 F.3d 920, 935 (9th Cir. 2013) (internal citations omitted). In *Vita v. New England Baptist Hosp.* the Massachusetts Supreme Judicial Court applied the rule of lenity to find the Massachusetts wiretap act could not be applied to website tracking technologies like the Meta Pixel, noting:

> "[W]e are left with serious doubts as to whether browsing and interacting with a public website are a 'wire communication' under the wiretap act. . . [w]hile the instant cases concern civil liability under the wiretap act, the act also has significant criminal penalties, including up to five years in State prison, and accordingly, the rule of lenity should be applied."

494 Mass. 824, 847, 243 N.E.3d 1185, 1204 (2024).

While ERC believes the statute at issue clearly cannot apply to the mere redirection of communications where there is no evidence that the redirecting party has a simultaneous intent to read or learn the contents of the communication, to the extent any ambiguity exists, this Court should similarly apply the rule of lenity here, and not adopt its tentative reading. It is noteworthy that the Court's tentative reading of § 631(a) clause two has not only never been suggested by any other Court, it has apparently [based on ERC's research] not even been *argued* by any other plaintiff's counsel seeking relief under CIPA. In fact, Plaintiff's counsel herein explicitly disagreed with the Court's tentative reading multiple times at oral argument. *See* Supplemental

Decl. Ex. A, at pp. 7:14-8:12 (stating that the court's photographer hypothetical is not covered by CIPA because there is no level of comprehension at the time the photograph is taken); 24:3-20 (a violation of clause two of § 631(a) occurs when the communication has been read; redirection of the photograph is not an attempt to learn its contents). Reading an arguably unambiguous statute[4] in an unprompted and unprecedented defendant-unfriendly manner is the opposite of what the rule of lenity requires, and could constitute reversible error. *See, e.g. Cliff Berry, Inc. v. State*, 116 So. 3d 394, 413 (Fla. Dist. Ct. App. 2012) (refusal to give the defendants requested special jury instruction violated rule of lenity and amounted to a reversible error).

### B. If the Court Proceeds with its Tentative Interpretation of Clause Two of § 631(a), Summary Judgment Still Should Not be Granted in Plaintiff's Favor

The Court further sought input regarding "whether, if the Court sticks with this interpretation of the [§ 631(a)] [that Meta's mere act of redirecting a communication to itself falls within clause two is an attempt to learn the contents of the communication], summary judgment should be granted in favor of [Plaintiff] under the second and fourth clauses of Section 631(a)." See ECF Doc. No. 145, p. 1. It should not.

To the extent the Court's interpretation of clause two depends on Meta's intent to later read or learn the contents of communications, the evidentiary record cannot support a finding that Meta had the requisite intent to violate clause two and learn the contents of any specific communications between Plaintiff and Meta at the time of their redirection. ERC recognizes that: "The Court is of the view that the URLs shown in Ex. 3 to the LaComb Decl. / Ex. 1 to ERC's Motion constitute the 'contents' of communication under Section 631(a)" (*see id*. at p. 1 n.1), yet it is unclear whether the Court believes all of the referenced redirected URLs fall within the Court's definition of attempt or not. As discussed above and in ERC's prior briefs, ERC does not believe a connection

---

[4] ERC maintains that clause two is unambiguous, and while other courts have found that "to invoke the rule, [a court] must conclude that there is a *grievous* ambiguity or uncertainty in the statute," ERC believes the Court-suggested ambiguity regarding the meaning of "attempt" in clause two is sufficiently grievous (*i.e.*, outcome determinative) so as to justify invoking the rule. *See Howard v. Lab'y Corp. of Am.*, No. 1:23-CV-00758, 2024 WL 4250677, at *7 (M.D.N.C. Aug. 8, 2024) (declining to apply the rule of lenity based on a finding CIPA is not sufficiently ambiguous to warrant it).

can be drawn between the redirection of any data to Meta and Meta's purported attempt to read or learn the contents of any communication between Plaintiff and ERC.

Additionally, even if Meta violated the second clause of § 631(a), to be liable under clause four of that provision ERC must still have aided, agreed with, employed, or conspired with Meta's violation. As discussed previously, at the very least "§ 631(a)'s fourth clause ... require[s] some level of knowledge and intent." *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 942 (N.D. Cal. 2024). The clause "indicates that the defendant must be acting with the third party in order to have the third party perform acts that violate the statute [and] [a]t the very least ... requires both knowledge of the conduct that will violate the statute and a purpose of aiding, agreeing with, or employing the third party to commit those acts." *Id*. No evidence exists suggesting ERC had the requisite intent to be liable under the fourth clause, including knowledge of Meta's conduct alleged to be violative of CIPA.

### C.    If Summary Judgment Is Granted to Plaintiff Under Clause Two, Limited Scenarios Exist That May Require The Court To Address The Third Clause

The Court further asked whether, "if the Court grants summary judgment to Doe under the second clause of Section 631(a), does it need to reach Doe's argument about the third clause?" *See* ECF 145, p. 2. By this, we presume the Court means summary judgment would be granted against ERC under the fourth clause of Section 631(a), based on Meta having violated clause two. If so, the Court need not address clause three. Otherwise, the only situation in which the Court would adopt its tentative reading of clause two that would also warrant consideration of clause three is if the Court agrees with ERC that no evidence [or a triable issue of fact] exists with respect to ERC's potential liability under clause four based on Meta's violation of clause two. In that case, the Court may wish to address whether Meta has violated clause three, and if it finds Meta has, determine whether ERC has violated clause four (based on Meta's violation of clause three).

### D.    The Court-Identified URLs Are Not Medical Information Within the Meaning of the CMIA

Addressing the CMIA, the Order noted that the Court was "very tentatively of the view that if a health provider allows a third party to see that a person visited URLs titled

'https://www.eatingrecoverycenter.corn/form/self-assessment-form?page=take_the_first_step&request_type=personal' [the "Self-Assessment Form URL"] and 'https://www.eatingrecoverycenter.corn/conditions/eating-disorders/quiz' [the "Eating Disorders Quiz URL"], the health provider is allowing the third party to see 'medical information' about that person within the meaning of the CMIA." *See* ECF Doc. No. 145, p. 2.

The Court reasoned that those URLs from ERC's public-facing website could allow one to reach a conclusion about a website visitor's health status. *See Id*. Significant problems with this approach include that it runs counter to Ninth Circuit case law, and it relies on numerous assumptions that may or may not be warranted, and therefore should not factor into a determination of what constitutes "medical information" under CIPA. In *Smith v. Facebook, Inc*., the Ninth Circuit held that "[i]nformation available on publicly accessible websites stands in stark contrast to ... personally identifiable patient records and medical histories ... information that unequivocally provides a window into an individual's personal medical history." 745 Fed. Appx. 8, 9 (9th Cir. 2018). The URLs at issue in *Smith* "pointed to pages containing information about treatment options for melanoma, information about a specific doctor, [and] search results related to the phrase 'intestine transplant.'" *See Smith v. Facebook, Inc*., 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017), aff'd, 745 Fed. App'x 8. Despite the collection of those URLs, the district court held that because "these pages contain *general health information that is accessible to the public at large* ... [n]othing about the URLs, or the content of the pages located at those URLs, relates to the past, present, or future physical or mental health or condition of an individual." *Id.* at 955. (emphasis added). The Ninth Circuit affirmed the district court's holding, and found that "the connection between a person's browsing history and his or her own state of health is too tenuous" for HIPAA to apply. *Smith*, 745 Fed. Appx. at 9; *see also Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 975 (S.D. Cal. 2023) ("It is clear that the California Civil Code's definition for information protected by CMIA largely tracks HIPAA's definition of PHI."); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1082 (W.D. Wash. 2024) ("[W]here nothing but browsing activity on a publicly available website is transmitted, courts within this circuit have

held that 'the URLs, or the content of the pages located at those URLs, [do not relate] to the past, present, or future physical or mental health or condition of an individual.'") (citation omitted).

There is also nothing about the URLs that plausibly demonstrates that they relate to the past or present provision of healthcare to the Plaintiff. With respect to the Self-Assessment Form URL, the only evidence properly before the Court[5] regarding this URL is uncontested, and indicates Plaintiff only ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Villegas Dec, ¶ 20. Merely ▬▬▬▬▬ a self-assessment form does not disclose information regarding the viewer's "medical history ... mental or physical condition, or treatment." Putting aside the fact this URL only references that a webpage with its title was visited (and contains no further information about the visitor), the inherent nature of a Self-Assessment Form (or an Eating Disorders Quiz) suggests the medical condition of one interacting with it is undetermined. Due to the open-ended nature of a quiz or assessment, a third party cannot divine whether a visitor encountering it had any particular medical condition or none at all, and the visitor herself presumably did not know either, or she would not need to assess or take a quiz regarding whether she did.

Likewise, the indisputable evidence regarding the Eating Disorders Quiz URL is that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Villegas Dec, ¶ 22. Thus, all Meta's data reveals is ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The uncontested evidence also indicates that the quizzes on ERC's website do not provide any sort of diagnosis, either that the quiz taker has an eating disorder (generally) or any particular type of eating disorder. *Id.* It follows that a website visitor's mere viewing of a web page referencing eating disorders and a quiz cannot implicate the visitor's "medical history ... mental or physical condition, or treatment." Taken one small step further, by the Court's logic, a visit to any URL of a website with the domain name "eatingrecoverycenter.com" (including the homepage) would "allow the conclusion" that the website visitor "likely has an eating disorder, or at least believes they may have an eating

---

[5] Solely in the body of her briefs, Plaintiff makes unsupported attorney arguments referencing this URL (MSJ1, 20:14-19; MSJ3, 9:24-26). ERC objected to these improper references at MSJ2, 9:18-19 and MSJ4, 2:18-20.

disorder." The CMIA's definition of "medical information" cannot be stretched that far, yet no meaningful distinction can be drawn between the Court's exemplar URLs and ERC's homepage.

### E. The Court Correctly Concludes that Plaintiff is Not a Patient of ERC Within the Meaning of the CMIA

The Court's view that "visiting publicly available web pages and having a phone conversation with someone from ERC's call center did not make Doe a 'patient' of ERC within the meaning of the CMIA" is correct based on the language of the statute and relevant case law. Under the CMIA, a patient is "any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains." Cal. Civ. Code § 56.05(m). While the term "health care services" is not defined in the statute, "logic dictates that in order for a health care provider to gather medical information about a person, the provider must have dealt with the person at some level and *performed professional services of some type*." *Pettus v. Cole*, 49 Cal. App. 4th 402, 429 (1996) (emphasis added); *see also Roller v. Brady*, No. D080996, 2023 WL 4554105, at *3 (Cal. Ct. App. July 17, 2023)(emphasis added)("to prevail under [CMIA], [a plaintiff' must show he was a 'patient' of [the defendant], i.e., that he *received an examination or other professional services* from her through which she acquired sensitive information about his health.").

As discussed in detail in ERC's earlier motion papers, ERC did not perform professional medical services of any type for Plaintiff. She did not meet with anyone at ERC who could provide professional medical services, and ERC performed no assessment or evaluation of Plaintiff. Villegas Dec., ¶¶ 24-28; Watson Reply Dec. To the extent that Plaintiff visited ERC's website, as set forth above, ERC received no medical information related to Plaintiff through its website; in fact, there is no evidence that ERC knew Plaintiff had visited its public website. *Id*., ¶¶ 19-22.

It should also be noted that information related to Plaintiff's phone calls with ERC was collected by ERC but not transmitted to Meta. On the other hand, information related to Plaintiff's browsing on ERC's public-facing website was transmitted to Meta, but not to ERC. Therefore, these two categories of data should not be combined in an attempt to create an amalgam of contacts sufficient to show that Plaintiff was ERC's patient (or that medical information related

to a patient was being disclosed to Meta).  See Supplemental Decl., Ex. A, at 64:4-20 (noting that no evidence relating to ██████████████████████████ constitutes "medical information," nor was any such information disclosed, and the conflation of that information with public website browsing data is "apples and oranges").

Finally, the Court is correct that Plaintiff's § 56.101 claim is foreclosed because she is not ERC's patient. While that section does not directly reference the term "plaintiff," it is only applicable to "medical information." The definition of medical information in the CMIA specifically applies only to information related to a "patient." *See* Cal. Civ. Code § 56.05(j).

## III.     CONCLUSION

For the foregoing reasons, ERC respectfully requests that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Complaint with prejudice.

Dated: August 8, 2025

Respectfully submitted,

**MULLEN COUGHLIN LLC**

By:  */s/ James F. Monagle*
James F. Monagle

*Attorneys for Defendant
Eating Recovery Center LLC*

# CERTIFICATE OF SERVICE

I hereby certify that, on August 8, 2025, I electronically filed the foregoing DEFENDANT'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT with the United States District Court for the Northern District of California by using the CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.

DATED: August 8, 2025                    Respectfully submitted,

                                By:   */s/ James F. Monagle*
                                      James F. Monagle