UNITED STATES DISTRICT COURT
CALIFORNIA NORTHERN DISTRICT (SAN FRANCISCO)

JANE DOE, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED INDIVIDUALS,

Plaintiff,

vs.

EATING RECOVERY CENTER LLC,

Defendant.

3:23-cv-05561-VC

July 31, 2025

San Francisco, CA

BEFORE THE HONORABLE VINCE CHHABRIA
UNITED STATES DISTRICT JUDGE

TRANSCRIPT OF MOTIONS HEARING

A P P E A R A N C E S:

For the Plaintiff: TIMOTHY Z. LACOMB, ESQ.
MoginRubin LLP
4225 Executive Square, Suite 600
La Jolla, CA 92037
tlacomb@moginlawllp.com

For the Defendant: JAMES F. MONAGLE, ESQ.
Mullen Coughlin LLC
500 Capitol Mall, Suite 2350
Sacramento, CA 95814
jmonagle@mullen.law

---

ROBIN L. HERRERA, RMR, CRR, CRC
(Via Zoom Videoconferencing)
United States Court Reporter
401 West Evans Street
Florence, SC 29501
robin_herrera@scd.uscourts.gov

(Stenotype/Computer-Aided Transcription)

THE COURT: There has been a visit to an unspecified web page; right?

MR. LACOMB: Right. But the Pixel is on that web page; so it understands that there was a visit to this specific web page, and as a result of that comprehension, it is intercepting the data.

Also the interception of the data -- in order to intercept the data that it necessarily wants, it has to read what is there and intercept the components that it's going to redirect to -- back to Meta. So there's a component of read, which gets back into the language of the statute from the interception itself, because it's choosing where I am redirecting the Meta.

THE COURT: So can I give you kind of a goofy hypothetical to see if I -- it helps me understand your argument? So let's say that I communicate with my friends at city hall by handing a member of my staff a piece of paper, and I ask them to walk it over to my friends in city hall and give it to them; okay? And I'm communicating a message on the piece of paper.

And let's say you are interested in learning what I am saying to my friends at city hall, and so you set up this automatic camera like on the -- on Polk Street -- right? -- and every time my staff walks by the camera takes a photo of the staff walking with the piece of paper in

their hand; okay? And it's a really fancy camera, and so you can analyze the photograph and zoom in and read the contents of my message to my friends in city hall; okay?

And let's say the photograph is taken every time, and then only later, after my staff has delivered the message to -- the piece of paper to my friends in city hall do you sit down and start reading the -- you know, using this fancy technology to zoom in and read the contents of the messages that I sent over to my friends in city hall. Is that covered by this statute?

MR. LACOMB: I would say no because there's not a level of comprehension. I think that --

THE COURT: Okay. There's no comprehension. You would say, no, there's no comprehension involved.

MR. LACOMB: Or reading or learning anything, it's just recording.

THE COURT: Right. Okay.

MR. LACOMB: But -- or in the hypothetical, taking a picture.

THE COURT: Okay.

MR. LACOMB: But here it is -- there's an action that's taken and then the Pixel, to kind of extend your hypothetical, it would be as if your friend was walking over a handful of papers, and you wanted to know what was on some of them in order to figure out -- you wanted to know

something, and everywhere it was, you wanted that piece of paper. So you went through the pieces of paper in order to take the ones that you wanted.

And so that is the front-end component of the reading or learning and understanding is that it's not that they're taking every piece of information as -- do you mind if I grab my water, Your Honor?

THE COURT: Not at all.

MR. LACOMB: Thank you. Sorry.

So it's not mere recording as Defendant's expert brings up. It's not the same exact set of information that goes to ERC and Meta here; it's deciding what information that they're going to redirect to themselves. In order to do that, there needs to be some level of read or understand and comprehension.

And I think also --

THE COURT: But wait a minute. I thought that what was redirected was just dependent on what pages they -- the company installed the source code on.

MR. LACOMB: That's correct, but it's not all pieces of information that are necessarily available to Meta, is what I'm saying. It's when the interception takes place, there's some level of figuring out what does Meta want to redirect to itself.

It not only has the ability to do that as a result

of ERC placing it where they do, but Meta isn't -- for every action that that the Pixel event is triggered for, obtaining every single piece of information that's affiliated with that transaction. So there is some level of determination --

THE COURT: That's the stuff you're talking -- that's the parameters that you're talking about; right? Or are we talking about something else?

MR. LACOMB: Pre-interception there's trying to figure out what data that Meta wants. So when a user clicks a link and that transmission of information goes to ERC, Meta doesn't take and the Pixel doesn't obtain that's all of the information that's going to ERC; it obtains the information that it wants to redirect to itself.

THE COURT: Can you give me a concrete example of how that works? Because -- and then I'll also ask you to show me where that is in the record. But first if you could just give me an example of what you're talking about where, you know, I click a link and the host of the web property is -- as a result of my clicking that link, the host of the web property is receiving more information than Meta is receiving.

MR. LACOMB: Well, at least different information.

THE COURT: Okay.

MR. LACOMB: So it's kind of the nature of the

HTTP network transmissions, the protocol at issue here, that when you're sending communications to different parties and for different purposes, you know, ERC is receiving the data as a result -- or in wanting to do on their website what the user is trying to get them to do; so click the link. ERC is receiving a set of data that says they clicked the link and as a result of this set of data, load the page.

Meta is receiving a different set of data that also says that in relevant part that they clicked the link, but isn't getting the same set of data that is saying --

THE COURT: What's the difference between the data?

MR. LACOMB: Off the top of my head, I could not tell you the specific differences between the data, but I do know that both experts agree that the set of data that goes to ERC and Meta are not identical. You know --

THE COURT: I just don't understand what that means. Like you got to give me a -- you got to be able to explain it to me.

MR. LACOMB: So it's just -- you're really testing my --

THE COURT: What is ERC learning that Meta is not learning, or what is Meta learning that ERC is not learning?

MR. LACOMB: As far as learning --

THE COURT: Are you saying that it just -- that

the data is in a different -- it's in a format?

MR. LACOMB: It's in a different format.

THE COURT: ERC is learning that I clicked this link --

MR. LACOMB: Right.

THE COURT: -- Meta is learning that I clicked this link, but the way they learn that is through some sort of different compilation of data?

MR. LACOMB: That's an accurate --

THE COURT: Why does that matter?

MR. LACOMB: Well, it shows that it's not simply the Pixel taking all available data as a result of this link. They're taking the data --

THE COURT: Well, it's taking the data that is -- it's about -- it's about -- this is about reading a communication; right?

MR. LACOMB: Right.

THE COURT: Reading or learning a communication, that's what this statute is about; right? So if the format of the data is somehow different, and I don't -- I'm not sure I understand what you're talking about, but if the format of the data is different in terms of what ERC receives and in terms of what Meta receives but the upshot of both sets of data is that I clicked this link, then I don't see why -- that's a distinction without a difference.

I don't see why that would matter for purposes of this statute. In other words, I don't see why it's any different from my city hall hypothetical that I gave you.

MR. LACOMB: Right. Because there's this pool of data available, the Pixel is deciding which data to redirect to itself. And so in doing that, it has to read the available data and direct what it wants to itself. And that's where I think the front-end read can be read into the -- assuming no additional --

THE COURT: So I thought you were -- I thought what you were saying is -- oh, yeah, before I ask my next question, could you tell me where in the record I can develop -- go to develop an understanding of what you're saying to me?

MR. LACOMB: Yeah. So I know on -- for us it's in the Strebe declaration. Would you like the exact cite?

THE COURT: Yes.

MR. LACOMB: The Strebe exact declaration to -- I'll stop talking and get it.

All right. So to MSJ 3, our opposition and reply brief, it's Exhibit 11, and it's paragraph 7 and 8.

THE COURT: Okay.

MR. LACOMB: And Strebe, our expert, is talking about the fact that Defendant's expert makes the point that the data elements intercepted by the Pixel -- I'm quoting

you're, like, intercepting the communication; right? You're essentially taking a photograph of the communication.

MR. LACOMB: Yeah. And I think that was the component that I was missing is analogizing the photograph to the Pixel tracking kind of the duplication or the interception at that point. In my mind I was thinking old school photograph, can't really do much with it, where, you know, the Pixel tracking technology they're having to --

THE COURT: When you take the photograph, you're essentially creating a duplicate of the communication -- right? -- because you -- the photograph gives you the ability to learn what's in the communication, it's just that you're not actually doing the learning until later.

MR. LACOMB: Yeah. And so if we're analogizing the camera to the Pixel, then I think there's the argument that the communication has been read, maybe not by an individual, but it has been read by this piece of technology, it will be read and subsequently used. Without that kind of reading component, then you're never going to be able to use it.

And so even though it's not human reading, it is a machine reading, and that enables future use, and I think that's consistent with Footnote 5 in *Prudential* that you do have an element of reading. You may not have an element of comprehension by the machine, but you have an element of

THE COURT: Can I interrupt you? I think another way of saying what you're -- another way of putting the point that you're trying to make is that, you know, this filtering process -- right? -- is not an attempt to learn the contents of the communication. It's an effort on Meta's part to avoid learning the contents of the communication that Meta shouldn't be learning because it maybe entails private health information.

MR. MONAGLE: Or shouldn't be ingesting in the first place. So it very well could be absolutely automated, Your Honor, so they don't have any idea whether it's health information or location information or anything else. It's just search terms get automatically removed. But there was no exploration through discovery, there's nothing in the evidence other than Meta actually doesn't know what content was filtered out. They did testify to that, as to what was filtered.

But what's more important, Your Honor, is that you can't extrapolate from a very unique set of data that that happened to any other data. And here's the data that it happened to. I just gave you the lines: 30, 32, 39, 40, 43, and 44.

In each one of those cases, in Column L of Meta's data, it shows what's called the Further Resolved URL. And Meta testified that that means where they came from. And

then over in Column Q and Column T, whether you choose the Past column or the Result column, it shows where they ended up.

And if you see in every one of those cases they began on Google and they ended up on a pay-per-click ad, which literally has no communicative content other than PPC, which is abbreviated shorthand for pay per click. That was a free standalone -- as my client testified and is uncontested, that was a standalone page. It wasn't part of the website. It couldn't be natively navigated to. It was only -- it was kind of a broader-intake type of page that they set up for pay-per-click ads. And the only filtered content was from when people put something into those search bars and ended up on the pay-per-click ad. The other stuff was filtered.

And so we don't know whether that was automated, whether that was an attempt to learn the contents of what that filter content was, but it certainly didn't happen on our website. It happened before they came to our website. And frankly, you know, it's not contents of communication, nor can it be. If you look at that URL, you'll see, you know, ERC.com, PPC, and then a bunch of gobbledygook and filter parameters; so that can't be the contents of communication.

And to say that that happened with that unique

case, that people came from a search engine to a pay-per-click ad, that could be the unique circumstance that Meta decided for whatever reason we don't want anything other than where they ended up being ingested, and that could have happened instantaneously or could have happened, you know, before they stored it.

But either way, I don't think it's capable of violating CIPA. And you can't extrapolate that that happened to any of the URLs no matter how descriptive or problematic you find them.

THE COURT: Could I ask a question about that other statute? What's it called?

MR. MONAGLE: CMIA?

THE COURT: Yeah.

MR. LACOMB: Can I make one point before we go? If not --

THE COURT: I want to ask this before I forget.

MR. LACOMB: Okay.

THE COURT: But you have a chance to have the last word on any of this stuff.

All right. So let's say that I feel that I need to check myself into -- let's take it outside the context of this case; right? Let's say I feel the need to check myself into a psychiatric facility; right? And I -- you know, a particular facility has been recommended to me.

this statute as well, they presumably could have, they included it elsewhere in the CMIA; so I think there's just an absence of a patient requirement there.

THE COURT: Okay.

MR. MONAGLE: Your Honor, very briefly if I may just address for the record this medical information prong. It's hugely important to my client, and I think --

THE COURT: Go ahead.

MR. MONAGLE: Okay. I think we need to be clear as to what information is in the record as to what was given to ERC and how.

What was given to ERC in the whole intake process involved a phone call and follow-up calls or emails, whatever that may be. But all the data related to that doesn't reveal medical information.

And even if the data related to that was medical information, there's absolutely no evidence that that medical information that was received by ERC was disseminated or released to anybody. It's a whole different process; it's apples and oranges.

THE COURT: That's your argument about how, you know, if the URL indicates that I went to Eating Recovery Center Colorado or whatever, that that's -- that the disclosure of that URL is not the disclosure of medical information, that's the point you're making?